**THE FREEDMAN FIRM PC**
Michael G. Freedman (Cal. Bar No. 281279)
1801 Century Park East, Ste. 450
Los Angeles, California, 90067
Telephone: (310) 285-2210
E-Mail: michael@thefreedmanfirm.com

**MARCUS NEIMAN RASHBAUM
& PINEIRO LLP**
Michael A. Pineiro (*pro hac vice* forthcoming)
Brandon S. Floch (*pro hac vice* forthcoming)
Christopher R. Reilly (*pro hac vice* forthcoming)
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4260
E-Mail: mpineiro@mnrlawfirm.com
       bfloch@mnrlawfirm.com
       creilly@mnrlawfirm.com

**LEVIN LAW, P.A.**
Brian Levin (*pro hac vice* forthcoming)
2665 S. Bayshore Dr., Ph. 2B
Miami, FL 33133
Telephone: (305) 402-9050
E-Mail: brian@levinlawpa.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIUS SMITH, ROBIN SAVAGE, and MAIA WILLIAMS,<br><br>                                  Plaintiffs,<br><br>       v.<br><br>RACK ROOM SHOES, INC.,<br><br>                                  Defendant. | Case No.<br><br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

Plaintiffs Demetrius Smith, Robin Savage, and Maia Williams ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge:

## **NATURE OF THE ACTION**

1.      This is a class action suit for data privacy violations on behalf of all persons in California who have visited rackroomshoes.com.

2.      Defendant Rack Room Shoes, Inc. ("Defendant" or "Rack Room Shoes") is one of the largest online shoe retailers in the country.  Through numerous representations on its website, Defendant promises users that its "usage of cookies is in no way linked to any Personal Information while on [its] site."[1] Those representations are false.

3.      Defendant aids, employs, agrees with, and conspires with third parties— including Meta Platforms, Inc. ("Facebook" or "Meta") and Attentive Mobile, Inc. ("Attentive")—to eavesdrop on communications sent and received by Plaintiffs and Class members, including communications that contain their personally identifiable information.

4.      Put more simply, as part of its online sales and marketing efforts, Defendant surreptitiously and illegally assists third parties with gathering personally identifiable information from Defendant's online customers, all while expressly misrepresenting to those customers that it would safeguard such information from disclosure.

5.      By assisting third parties with intercepting communications that it promised to keep confidential, Defendant violates California law.

6.      Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

---

[1] Privacy Policy, Rack Room Shoes, rackroomshoes.com/privacy (last accessed Sept. 9, 2024).

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

1

**PARTIES**

7.      Plaintiff Demetrius Smith is domiciled in San Francisco, California.  On or around 2008, Plaintiff Smith created a Facebook account.  On or around July 2024, Plaintiff Smith visited rackroomshoes.com and browsed products for purchase.  When Plaintiff Smith accessed the website, a notice appeared at the bottom of the screen stating that his continued use of the website would constitute assent to Defendant's Privacy Policy.  After receiving that notice, Plaintiff Smith clicked on shoes and ultimately purchased two sets of Crocs Classics.  When checking out, Plaintiff Smith gave Defendant his first name, last name, email address, phone number, and delivery address.  Although unaware at the time, Plaintiff Smith is informed and believes that Defendant assisted third parties—including Facebook and Attentive—with intercepting his communications while visiting Defendant's website, including communications that contained his personally identifiable information.  Given that Defendant promised to safeguard his personal information from disclosure, Plaintiff Smith possessed an expectation of privacy in communications that contained such information, and he never consented to Defendant assisting other third parties with intercepting those confidential communications.

8.      Plaintiff Robin Savage is domiciled in Via Los Altos, California.  On or around 2007, Plaintiff Savage created a Facebook account.  On or around February 2024, Plaintiff Savage visited rackroomshoes.com and browsed products for purchase.  When Plaintiff Savage accessed the website, a notice appeared at the bottom of her screen stating that her continued use of the website would constitute assent to Defendant's Privacy Policy.  After receiving that notice, Plaintiff Savage clicked on shoes for sale and ultimately purchased a pair of Sketchers Street Rolling Stones. When checking out, Plaintiff Savage gave Defendant her first name, last name, email address, phone number, and delivery address.  Although unaware at the time, Plaintiff Savage is informed and believes that Defendant assisted third parties—including Facebook and Attentive—with intercepting her communications while visiting Defendant's website, including communications that contained her personally identifiable information. Given that Defendant promised to safeguard her personal information from disclosure, Plaintiff Savage possessed an

expectation of privacy in communications that contained such information, and she never consented to Defendant assisting other third parties with intercepting those confidential communications.

9.     Plaintiff Maia Williams is domiciled in Victorville, California.  On or around 2009, Plaintiff Willaims created a Facebook account.  On or around March 2024, Plaintiff Williams visited rackroomshoes.com and browsed products for purchase.  When Plaintiff Savage accessed the website, a notice appeared at the bottom of her screen stating that her continued use of the website would constitute assent to Defendant's Privacy Policy.  After receiving that notice, Plaintiff Williams clicked on shoes for sale and ultimately purchased two pairs of sneakers, the Nike Court Legacy Lifts and the Nike Air Max Systm. When checking out, Plaintiff Williams gave Defendant her first name, last name, email address, phone number, and delivery address. Although unaware at the time, Plaintiff Williams is informed and believes that Defendant assisted third parties—including Facebook and Attentive—with intercepting her communications while visiting Defendant's website, including communications that contained her personally identifiable information.  Given that Defendant promised to safeguard her personal information from disclosure, Plaintiff Williams possessed an expectation of privacy in communications that contained such information, and she never consented to Defendant assisting other third parties with intercepting those confidential communications.

10.     All Plaintiffs conducted searches, visited webpages, and purchased goods from Defendant from web browsers while in California.

11.     Rack Room Shoes, Inc., is headquartered in Charlotte, North Carolina.  Rack Room Shoes, Inc., does business throughout California and the United States.

### JURISDICTION AND VENUE

A.     **Subject-Matter Jurisdiction**

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

$5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

**B.    Personal Jurisdiction**

13.    This Court has personal jurisdiction over Defendant because Defendant committed an intentional act, expressly aimed at California, causing harm that Defendant knew would likely be suffered in California.

14.    As soon as prospective customers access rackroomshoes.com, Defendant prompts users to share their locations:

Figure 1



15.    Even if customers click "Don't allow," Defendant still approximates their locations:

Figure 2

In-Store Pickup*
Midway Crossings
8.2 Miles — Store Out of Stock
CHANGE MY STORE   Store Details

* In-Store Pickup is available. Pickup hours may vary by store. Please call your local store for details. Rewards Members earn 25 points for using In-Store Pickup.

16.    Moreover, for those users who select "Don't allow," Defendant still sets a cookie on their browsers that saves their location information:

Figure 3



17.    Defendant approximates customers' location even when they access the website through "incognito mode":

Figure 4

18.    As soon as Plaintiffs and other California-based customers accessed rackroomshoes.com, Defendant approximated their locations and knew they were located in California.

19.    Moreover, as with other California-based customers, Plaintiffs provided Defendant with their residential addresses in California when specifying where to deliver their purchased products.

20.    Defendant operates more than 20 retail stores in California through which customers can purchase shoes online.  Put differently, in Defendant's regular course of business,

Defendant sells physical products through its interactive website, rackroomshoes.com, and causes those products to be delivered to California. Defendant has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District.

21.    This Court's exercise of personal jurisdiction over Defendant is also appropriate because Defendant's activities in California gave rise to and furthered the privacy violations suffered by Plaintiffs. More specifically, Defendant employed and configured third-party trackers to intercept, record, and store personally identifiable information about visitors, including Plaintiffs, while those visitors were conducting searches and purchasing goods. Defendant engaged in that unlawful conduct to help third parties analyze and monetize Plaintiffs' personal information.

**C.    Venue**

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## **FACTUAL ALLEGATIONS**

23.    Defendant owns and operates rackroomshoes.com.

24.    Despite representations to the contrary, Defendant integrates tracking technology into its website that assists Facebook, Attentive, and other third parties with intercepting communications that contain personally identifiable information.

**A.    CIPA Background**

25.    The California Invasion of Privacy Act ("CIPA") is a California state privacy law, which the California legislature enacted in 1967 to "protect the right of privacy of the people of this state" by, among other things, ensuring that communications would not be intercepted or recorded without consent from every party thereto. Cal. Penal Code § 630.

26.    CIPA prohibits "[a]ny person" from "willfully and without the consent of all parties to the communication…read[ing], or attempt[ing] to read, or to learn the contents or

meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." Cal. Penal Code § 631.

27.    CIPA furthermore prohibits "aid[ing], agree[ing] with, employ[ing], or conspire[ing] with any person or persons to unlawfully do, or permit, or cause to be done" any of the conduct at issue. *Id.*

**B.    Facebook's Platform and its Business Tools**

28.    Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

29.    In 2023, Facebook generated $134 billion in revenue.[5] Roughly 95% of that came from selling advertising space.[6]

30.    Facebook sells advertising space by highlighting its ability to target users.[7]

31.    Facebook can target users so effectively because it surveils user activity both on and off its site.[8]

32.    By targeting users on and off its sites, Facebook can make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]

---

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/
[5] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS, https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx
[6] Derek Saul, *Meta Earnings: Record Profits, Sales As Ads Stay Robust During Zuckerberg's 'Year Of Efficiency'*, Forbes (Oct. 25, 2023), https://www.forbes.com/sites/dereksaul/2023/10/25/meta-earnings-record-profits-sales-as-ads-stay-robust-during-zuckerbergs-year-of-efficiency/
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

---

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

33.     Advertisers can also build "Custom Audiences."[11] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[14]

34.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[15] Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

35.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and

---

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[13] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[15] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

<u>CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

metadata, or when a user downloads a mobile application or makes a purchase.[16] Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17] Advertisers can even create their own tracking parameters by building a "custom event."[18]

36.     One such Business Tool is the Facebook Tracking Pixel. Facebook offers this piece of code to advertisers, like Rack Room Shoes, to integrate into their websites. As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[19] When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers.

37.     This second, secret transmission contains the original GET request[20] sent to the host website along with additional data that the Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Facebook's embedded code.

38.     An example illustrates the point. Take an individual who navigates to Defendant's website and clicks on a tab to browse shoes. When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Rack Room Shoes utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting

---

[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[20] "A GET request is an HTTP request used to retrieve data from a specific web page. For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code." *See* OXYLAB, WHAT IS A GET REQUEST, https://oxylabs.io/blog/curl-get-requests

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

the individual that this is happening. Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transmits the communication's content and the individual's identity.

39.    After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

## C.  Rack Room Shoes and the Facebook Tracking Pixel

40.    Defendant intentionally integrates the Facebook Tracking Pixel into its website.

<u>Figure 5</u>



41.    Defendant's Pixel captures event data called "PageView."

<u>Figure 6</u>



42.    The "PageView" event transmits the URL accessed.

43.    The URL reveals a user's search queries.  As an example, if a customer navigates to rackroomshoes.com and searches for "Men Nike Track Shoes," Defendant transmits the following URL:

Figure 7



rackroomshoes.com/search/Mens%20Nike%20Track%20Shoes

44.     Defendant's Pixel also captures event data called "Button Click."

Figure 8



45.     The "Button Click" event transmits the name of the button clicked and the name of the webpage to Facebook.

46.     Defendant's Pixel captures event data called "View Content."

Figure 9



47.     The "View Content" event transmits the inventory number for the browsed item to Facebook.

//

//

//

//

48.    Defendant's Pixel captures event data called "AddToCart."

<u>Figure 10</u>



49.    AddToCart discloses the item's name and type.

50.    Defendant's Pixel pairs event data with a user's personally identifiable information.

51.    When a user accesses Defendant's websites while logged into Facebook, the Pixel will compel the user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID:

<u>Figure 11</u>

| ar_debug | 1 | .facebook.com |
|---|---|---|
| c_user | 100035966074568 | .facebook.com |
| datr | B3zfZvZFXLRINb... | .facebook.com |
| fr | 0zIkq0elxLtqBvqi... | .facebook.com |
| presence | C%7B%22t3%22... | .facebook.com |
| ps_l | 1 | .facebook.com |
| ps_n | 1 | .facebook.com |
| sb | B3zfZjETNf-pjAS... | .facebook.com |
| wd | 1593x952 | .facebook.com |
| xs | 2%3AJhxYpAHzY... | .facebook.com |

<u>CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

52.    A Facebook ID is personally identifiable information.   To find the account associated with the Facebook ID, one need only open a web browser and enter the following: www.facebook.com/[Facebook ID].

53.    When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a small set of cookies:

Figure 12

| wd | 1593x952 | .facebook.com |
|---|---|---|
| datr | B3zfZvZFXLRlNb... | .facebook.com |
| ps_n | 1 | .facebook.com |
| ar_debug | 1 | .facebook.com |
| ps_l | 1 | .facebook.com |
| sb | B3zfZjETNf-pjAS... | .facebook.com |
| fr | 0zlkq0elxLtqBvqi... | .facebook.com |

54.    No matter the circumstances, Facebook receives at least one cookie from a user's browser:

Figure 13

| _fbp | fb.1.1725899609586.... | .rackroomshoes.com |
|---|---|---|

55.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.

56.    The _fbp cookie contains, at least, an unencrypted value that uniquely identifies the browser.

57.    Facebook, at a minimum, uses the c_user, fr and _fbp cookies to link to Facebook IDs and corresponding Facebook profiles.

58.    Defendant also uses its Pixel to capture identifiers that a user submits through form fields.

//

//

//

//

//

//

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

59.    Even when a consumer checks out as a guest, for example, they must provide the following information:

Figure 14



When a consumer completes a purchase, Defendant assists Facebook with intercepting the consumer's first name, last name, phone number, and email address.  The following figure shows Facebook receiving encrypted values for "fn," which stands for first name; "ln," which stands for last name; "em," which stands for email address; and "ph," which stands for phone number:[21]

//
//
//
//
//
//
//
//
//
//

---

[21] https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/.

Figure 15

id: 577593229294108

ev: SubscribedButtonClick

dl: https://www.rackroomshoes.com/cart

rl: https://www.google.com/

if: false

ts: 1725919683828

cd[buttonFeatures]: {"classList":"text-uppercase btn btn-primary mt-4 with-loader","destination":"https://www.rackroom
shoes.com/cart","id":"","imageUrl":"","innerText":"CONTINUE TO CHECKOUT","numChildButtons":0,"tag":"button","typ
e":"submit","name":"","value":""}

cd[buttonText]: CONTINUE TO CHECKOUT

cd[formFeatures]: [{"id":"userId","name":"","tag":"input","placeholder":"email / phone","inputType":"text","valueMeani
ng":"empty"},{"id":"","name":"","tag":"button"}]

cd[pageFeatures]: {"title":"View Cart | Checkout Page | Rack Room Shoes"}

sw: 1920

sh: 1080

udff[fn]: 5d7f15f2fce8ddb2dbef5c38be896c238ba7e0a432e396759030a853fa6b1151

udff[ln]: 5239ea501ef63222c9321261bea495d46d2f8b2f7985d80bf4c7c4b542d6bd28

udff[em]: 98195cc0814d5311034dd5fbcf9de239d9c76dfd58a5e57991e76f347be8fc4c

udff[ph]: 9b3716968eabd8398b861de8c40d7d39e444aeed48d3bf6222f50d1c183c2515

60.     Put together, Defendant's Pixel pairs event data with personally identifiable information and sends that bundle to Facebook so the social media site can match the website activity to a specific user:

Figure 16

www.facebook.com
GET
/tr/?id=577593229294108&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.rackroomshoes.com%2Fp%2Fnike-mens-initiator-
sneaker%2F6019248&rl=&if=false&ts=1726256994051&cd[buttonFeatures]=%7B%22classList%22%3A%22btn%20btn-primary%20btn-block%20fs-
4%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22ADD%20TO%2
0CART%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22button%22%2C%22type%22%3A%22button%22%2C%22name%22%3A%22%22
%2C%22value%22%3A%22%22%7D&cd[buttonText]=ADD%20TO%20CART&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22T
aupe%20Nike%20Mens%20Initiator%20Sneaker%20%7C%20Rack%20Room%20Shoes%22%7D&sw=1920&sh=1080&v=2.9.167&r=stable&a=adobe_la
unch&ec=26&o=4126&fbp=fb.1.1725899609586.99224862513057724&ler=empty&cdl=API_unavailable&it=1726256316889&coo=false&es=automat
ic&tm=3&rqm=GET
https
image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
gzip, deflate, br, zstd
en-US,en;q=0.9
sb=cpbkZkWOLr3olpDxyxXinqJk; datr=cpbkZn5OaXBxmCSV6B9k64fv; ps_n=1; c_user=100035966074568;
xs=15%3AjgGCZS2qMHKxZw%3A2%3A1726256770%3A-1%3A2354; fr=0Amgj2q2srCIX0hx0.AWV2id0c-NDCVXi8JHcLLL0S-
4E.Bm5JZx..AAA.0.0.Bm5JaE.AWUgM8tYSoY; ar_debug=1

61.    Upon information and belief, Defendant uses other Business Tools, like Conversions API, to assist Facebook with intercepting its users' communications.[22]

**D.  Rack Room Shoes and Attentive**

62.    Attentive is a technology company that "uses AI to enhance SMS and email marketing for personalized and effective customer engagement."[23]

63.    Defendant utilizes Attentive to "captur[e] behavioral data" and link it to personally identifiable information.

64.    When consumers make a purchase, they must input their phone numbers and email addresses:

Figure 17



65.    When consumers click "continue," Attentive's software creates two cookies that transmit unencrypted versions of both identifiers:

Figure 18

| attntv_mstore_phone | 4075804543:0 | www.rackroomshoes.com |
| attntv_mstore_email | chrisreillyfl@gmail.com:0 | www.rackroomshoes.com |

66.    Attentive then pairs those direct identifiers with event data, like "page views and purchases."[24]

---

[22] "The Conversions API is designed to create a connection between an advertiser's marketing data (such as website events, app events, business messaging events and offline conversions) from an advertiser's server, website platform, mobile app, or CRM to Meta systems that optimize ad targeting, decrease cost per result and measure outcomes." Meta, Conversions API, https://developers.facebook.com/docs/marketing-api/conversions-api/

[23] https://www.attentive.com/

[24] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag#h_01J5R88CY3M5K3XP1XDSYWEQV7

67.    By way of example, if a user purchases "Mens Air Max Alpha Trainer Cross Training Shoe," Attentive intercepts the following information:

Figure 19

v: 4.37.24_ab98783f9a
pd: https://www.rackroomshoes.com/p/nike-mens-air-max-alpha-trainer-5-cross-training-shoe/601642
u: 8baf553ae4994cc2941a6a0d6a031b53
c: rackroomshoes
ceid: QF4
lt: 1725914609732
tag: modern
cs: 2595617328
t: c
r: https://www.rackroomshoes.com/
m: {"source":"gtag","email":"chrisreillyf1@gmail.com","image":"https://deichmann.scene7.com/asset/deichmann/US_01_601642_01?$rr_main$&defaultImage=default_obs","name":"MENS AIR MAX ALPHA TRAINER 5 CROSS TRAINING SHOE","phone":"4075804543","productId":"%[Tinuiti] Product - by page path SKU - Lookup Table%","sku":"%[Tinuiti] Product - by page path SKU - Lookup Table%"}
cb: 1725917879274

68.    As shown in the above figure, Defendant transmits to Attentive the name of the product—"MENS AIR ALPHA TRAINER 5 CROSS TRAINING SHOE"—along with the customer's email address and phone number.

69.    Attentive receives this event data and personally identifiable information at "events.attentivemobile.com."

**E.  Rack Room Shoes Makes Demonstrably False Representations to its Customers**

70.    When customers first access rackroomshoes.com, Defendant presents them with a prominent banner that reads: "By continuing to use our website, you consent to our use of cookies and agree with our Privacy Policy."

Figure 20

We use cookies to make your online experience easier. By continuing to use our website, you consent to our use of cookies and agree with our **Privacy Policy**.        Opt-Out Settings    Accept Cookies

71.    The Privacy Policy, in turn, makes the following representation: "Our usage of cookies is in no way linked to any Personal Information while on our site."

Figure 21

## COOKIES

A cookie is a piece of data stored on the hard drive of your computer, containing information about you. Our usage of cookies is in no way linked to any Personal Information while on our site. Cookies can make the browsing experience easier. For instance, by accepting a cookie from our site, we can provide you a more personalized experience while shopping, thereby saving time while on our site. Most browsers can be set to reject cookies or to ask you if you want to accept/reject an incoming cookie. If you reject the cookie, you may still use our site, although you will be limited in some areas of our site. Cookies can also enable us to track and target the interests of our customers to enhance the experience on our site.

72.     The Privacy Policy defines "Personal Information" as "information that personally identifies you when you voluntarily provide it to us, such as your name, mailing address, billing address, biometric information (as set forth below), e-mail address, phone number, date of birth and, in regard to online purchases only, your credit card number."

73.     When customers click on the "Opt-Out Settings," Defendant's banner doubles down on these false representations, informing customers that "targeting cookies" on the website "do not store directly personal information, but are based on uniquely identifying your browser and internet device."

Figure 22

### Targeting Cookies 

These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

74.     Making matters worse, even if a user turns "targeting cookies" off, Defendant still assists Attentive with intercepting event data, email addresses, and phone numbers:

Figure 23

| attntv_mstore_phone | 4075804543:0 | www.rackroomshoes.com |
| attntv_mstore_email | chrisreillyfl@gmail.com:0 | www.rackroomshoes.com |

75.    Defendant never received consent from Plaintiffs and class members to assist third parties in intercepting their communications.  Indeed, Defendant's representations warrant the exact opposite, promising Plaintiffs and class members that it refuses to use tracking technology that will link their web activity to personally identifiable information.

76.    Moreover, by making these representations, Defendant created an expectation of privacy on its website, promising users that it would refrain from using tracking technologies that link web activity to personally identifiable information.  As a corollary, by making these representations, Plaintiffs and class members possessed the reasonable expectation that their communications with Defendant would remain confidential.  Rather than uphold that expectation, Defendant surreptitiously assisted third parties with intercepting their confidential communications.

77.    Along with Meta Platforms, Inc. and Attentive Mobile, Inc., Defendant's website incorporates several other tracking technologies provided by the following companies: Microsoft, Inc., TikTok, Inc., Google, LLC, Adobe, Inc., Taboola, Inc., Criteo, S.A., Sharethrough Inc., Intercept Interactive, Inc., Pinterest, Inc., Outbrain, Inc., PayPal Holdings, Inc., Freshworks Inc., Traverse Data, Inc., and LexisNexis Risk Solutions, Inc.

78.    These companies tout their ability to offer "personalized" advertisements and marketing strategies:[25]

    a.  Microsoft, Inc., offers companies "ad personalization and measurement" that leverages "first-party data" and "us[es] Customer match to easily on-board [their] audiences and re-engage [their] customers in a streamlined way."[26]

    b.  TikTok offers companies the ability to "[b]oost [their] business with the most engaged audiences all in one place."[27]

    c.  Google, LLC offers businesses "[p]ersonalized advertising."[28]

    d.  Adobe, Inc., offers companies "real-time personalization insights and engagement."[29]

---

[25] *See, e.g.*, https://www.undertone.com/;

[26] https://about.ads.microsoft.com/en/blog/post/june-2024/shaping-your-identity-strategy

[27] https://support.tiktok.com/en/account-and-privacy/personalized-ads-and-data/how-your-ads-are-personalized

[28] https://support.google.com/adspolicy/answer/143465?hl=en

[29] https://business.adobe.com/products/experience-platform/personalized-insights-engagement.html

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

e.  Taboola, Inc., offers "Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[30]

f.  Criteo, S.A., offers a service called "Criteo Audience Match," which allows businesses to "re-engage [their] customers across social networks, web, mobile web, and apps."[31]

g.  Sharethrough, Inc., is a company that offers "Dynamic Retargeting," creating "personalized offers" for "visitors who leave your website without making a purchase."[32]

h.  Intercept Interactive, Inc., offers a product called "Undertone," which Defendant utilizes, and which provides "personalized, High Impact ad campaigns with unmatched precision & seamless cross-channel scalability."[33]

i.  Pinterest, Inc., is a social media platform that lets businesses "[u]se our targeting suite to find new customers or upload customer lists for retargeting campaigns."[34]

j.  Outbrain, Inc., is a marketing company that "us[es] data from user profiles and behavior to target potential customers who meet certain criteria."[35]

k.  PayPal Holdings, Inc., offers products that rely on artificial intelligence to "process data – including behavioral, demographic, and psychographic information – across various platforms to help businesses understand customer behaviors and preferences."[36]

l.  MasterCard's "Dyanmic Yield" product, which Defendant utilizes, promises to "[t]ransform simple customer interactions into long-lasting hyper-personalized relationships."[37]  It captures "person-level data, no matter the source, and use[s] it for personalization."[38]

m.  FreshWorks, Inc., provides "FreshChat," a service that Defendant utilizes, which offers "insights into customer behavior" and "personalized experiences."[39]

n.  Traverse Data, Inc., "leverages data and the power of the email channel to generate new customers for marketers and incremental revenue for publishers."[40]

o.  LexisNexis Risk Solutions, Inc., says it provides "person-level insights to inform personalization and segmentation strategies."[41]

79.  Upon information and belief, Defendant assisted these third parties with intercepting communications from Plaintiffs and Class members that contain their personally identifiable information.

---

[30] https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works
[31] https://www.criteo.com/blog/criteos-technology-helps-re-engage-lapsed-shoppers/
[32] https://www.criteo.com/solutions/criteo-dynamic-retargeting/
[33] https://www.undertone.com/
[34] https://business.pinterest.com/advertise/
[35] https://www.outbrain.com/glossary/ad-targeting/
[36] https://www.paypal.com/us/brc/article/enhance-customer-experience-with-ai-personalization
[37] https://www.mastercardservices.com/en/capabilities/dynamic-yield
[38] *Id.*
[39] https://www.freshworks.com/live-chat-software/
[40] https://www.traversedata.com/author/craig.html
[41] https://risk.lexisnexis.com/corporations-and-non-profits/customer-acquisition

80.    Traverse Data, Inc., is an example.  When users sign up for Defendant's email list, Defendant assists Traverse Data with intercepting a confidential communication that contains an encrypted version of the user's email address.

Figure 24



81.    In sum, whether its location data or personally identifiable information, Defendant knowingly and repeatedly has made—and continues to make—false representations that give customers a misplaced sense of privacy.  In contrast to those representations, Defendant sends customers' personally identifiable information to a host of unrelated third parties—without their consent.

## TOLLING, CONCEALMENT, AND ESTOPPEL

82.    The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

83.    Defendant has repeatedly represented to its customers that its "usage of cookies is in no way linked to any Personal Information while on [its] site."[42]

84.    Defendant has never disclosed that it would or could disregard those representations and instead helps third parties intercept communications containing customers' personally identifiable information.  Defendant affirmatively hid its true actions and knowingly made statements that were misleading and concealed the true nature of their conduct and operation.  The circumstances of third-party trackers employed on and with respect to Defendant's website would lead reasonable users to believe third parties were not collecting their personally identifiable information or that Defendant was facilitating disclosure of the same.

85.    Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

---

[42] Privacy Policy, Rack Room Shoes, rackroomshoes.com/privacy (last accessed Sept. 9, 2024).

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

86.     Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendant therefore is estopped from relying on any statute of limitations.

87.     All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

88.     Accordingly, Plaintiffs and the Class could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## CLASS ALLEGATIONS

89.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated and seek to certify the following class (the "Class"): All persons in California who accessed and navigated www.rackroomshoes.com.

90.     Plaintiffs reserve the right to modify the class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

91.     <u>Numerosity of the Class:</u> The Class is composed of thousands of individuals, the joinder of which in one action would be impracticable.  The disposition of their claims through this class action will benefit both parties and the Court.

92.     <u>Existence and Predominance of Common Questions of Fact and Law:</u>  There is a well-defined community of interest in the questions of law and fact affecting proposed Class members.  The questions of law and fact common to the proposed class predominate over questions affecting only individual members.  Such questions include, but are not limited to, the following:

a)  whether Defendant facilitated or procured the unlawful actions of third parties, including Meta and Attentive;

b)  whether Defendant obtain express consent to their conduct;

c)  whether Defendant's conduct violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

d) whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgement interest and costs of this suit; and

e) whether Defendant should be enjoined from similar conduct in the future.

93.    <u>Typicality</u>:  Plaintiffs are asserting claims that are typical of the proposed Class members' claims because they have accessed and browsed Defendant's website, www.rackroomshoes.com.  Plaintiffs and the proposed Class members have similarly suffered harm arising from Defendant's violations of the law, as alleged herein.

94.    <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases. Plaintiffs do not have any interests antagonistic to those of the Classes.

95.    <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' and the proposed Class members' claims.  Plaintiffs and Class members have suffered irreparable harm as a result of Defendant's unfair, unlawful, and unconscionable conduct.  Because of the size of the individual Class members' claims, few, if any, proposed Class members could afford to seek legal redress for the wrongs complained of herein.  Absent the class action, the proposed Class members will continue to suffer losses and the violations of law described herein will continue without remedy, and Defendant will be permitted to retain the proceeds of its misdeeds.  Defendant continues to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

96.    <u>Injunctive Relief</u>: Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendants acted on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

97.    <u>Particular Issues:</u> Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

<u>CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

## COUNT I
### Violation of the California Invasion of Privacy Act
### Cal. Penal Code § 631

98. Plaintiffs repeat the allegations contained in paragraphs 1 through 97 as if fully set forth herein.

99. Plaintiffs bring this claim individually and on behalf of the members of the putative class against Defendant.

100. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping on private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

101. California Penal Code § 631(a) provides in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

102. A defendant must show it had the consent of all parties to the communication.

103. At all relevant times, Defendant aided, agreed with, and conspired with third parties to track and intercept Plaintiffs' and Class members' internet communications exchanged with Defendant while accessing Defendant's website. Defendant assisted these interceptions without first receiving authorization or consent from Plaintiffs and Class members.

104. Meta, Attentive, and other third parties intercepted these communications without consent from all parties to the communications.

---

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

105.    Meta, Attentive, and other third parties intended to learn, and did learn, some meaning of the content in the communications including without limitation in the URLs, search queries, and other content described herein exchanged between Class members and Defendant on Defendant's website

106.    Defendant, when aiding and assisting third parties' eavesdropping, intended those third parties to learn the content of the visitor's communications.

107.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and, even if they do not, the tracking technology by Facebook, Attentive, and other third parties falls within the broad catch-all category of "any other manner":

    a.   The computer codes and programs that Facebook, Attentive, and other third parties used to track Plaintiffs' and the Class members' communications while they navigated Defendant's website;

    b.   Plaintiffs' and Class members' browsers;

    c.   Plaintiffs' and Class members' computing and mobile devices;

    d.   The web and ad servers of Facebook, Attentive, and other third parties;

    e.   The web and ad-servers from which Facebook, Attentive, and other third parties tracked and intercepted Plaintiffs' and Class members' communications while they were using their web browser to access or navigate Defendant's website;

    f.   The computer codes and programs that Facebook, Attentive, and other third parties used to track and intercept the Plaintiffs' and Class members' communications while they were using a browser to visit Defendant's website.

108.    The plan that Facebook, Attentive, and other third parties carried out to effectuate its tracking and interception of Plaintiffs' and Class members' communications while they were using a web browser or mobile application to visit Defendant's website originated in and was executed in California.

109.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violation of California Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages, as well as injunctive relief.

### COUNT II
**Violation of California Invasion of Privacy Act**
**Cal. Penal Code § 632**

110.    Plaintiffs repeat the allegations contained in paragraphs 1 through 97 above as if fully set forth herein.

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

111.    Plaintiffs bring this Count individually and on behalf of the members of the putative Class.

112.    The data collected on Defendant's websites constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

113.    Defendant is liable for aiding and abetting violations of 632 by Facebook, Attentive, and other third parties.

114.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and class members have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## PRAYER FOR RELIEF

115.    WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

  a. For an order certifying the putative class and naming Plaintiffs as the representatives of the putative Class and Plaintiffs' attorneys as Class Counsel to represent the putative Class members;

  b. For an order declaring that the Defendant's conduct violates the statutes referenced herein;

  c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

  d. For an order finding in favor of Plaintiffs and the putative Class on all counts asserted herein;

  e. For the statutory damages in amounts to be determined by the Court and/or jury;

  f. For prejudgment interest on all amounts awarded;

  g. For injunctive relief as pleaded or as the Court may deem proper; and

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

h. For an order awarding Plaintiffs and the putative Class their reasonable attorneys' fees and expenses and cost of suit.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: September 24, 2024

**THE FREEDMAN FIRM PC**

By:    */s/ Michael G. Freedman*
       Michael G. Freedman

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
Michael A. Pineiro (*pro hac vice* forthcoming)
Brandon S. Floch (*pro hac vice* forthcoming)
Christopher R. Reilly (*pro hac vice* forthcoming)

**LEVIN LAW, P.A.**
Brian Levin (*pro hac vice* forthcoming)
Brandon T. Grzandziel (*pro hac vice* forthcoming)

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED