**THE FREEDMAN FIRM PC**
Michael G. Freedman (Cal. Bar No. 281279)
1801 Century Park East, Ste. 450
Los Angeles, California, 90067
Telephone: (310) 285-2210
E-Mail: michael@thefreedmanfirm.com

**LEVIN LAW, P.A.**
Brian Levin (*pro hac vice*)
2665 S. Bayshore Dr., Ph. 2B
Miami, FL 33133
Telephone: (305) 402-9050
E-Mail: brian@levinlawpa.com

**MARCUS NEIMAN RASHBAUM
& PINEIRO LLP**
Michael A. Pineiro (*pro hac vice*)
Brandon S. Floch (*pro hac vice* forthcoming)
Christopher R. Reilly (*pro hac vice*)
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4260
E-Mail: mpineiro@mnrlawfirm.com
        bfloch@mnrlawfirm.com
        creilly@mnrlawfirm.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRIUS SMITH, ROBIN SAVAGE, and MAIA WILLIAMS,<br><br>                              Plaintiffs,<br><br>     v.<br><br>RACK ROOM SHOES, INC.,<br><br>                              Defendant. | Case No.  3:24-cv-06709-RFL<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Demetrius Smith, Robin Savage, and Maia Williams ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge:

## NATURE OF THE ACTION

1.  This is a class action suit for data privacy violations on behalf of all persons in the United States who have visited rackroomshoes.com.

2.  Defendant Rack Room Shoes, Inc. ("Defendant" or "Rack Room Shoes") owns and operates rackroomshoes.com, one of the largest online shoe retailers in the country. Through numerous representations on its website, Defendant promises users that its "usage of cookies is in no way linked to any Personal Information while on [its] site."[1] Those representations are false.

3.  Defendant aids, employs, agrees with, and conspires with third parties— including Meta Platforms, Inc. ("Facebook" or "Meta") and Attentive Mobile, Inc. ("Attentive")—to eavesdrop on communications sent and received by Plaintiffs and Class members, including communications that contain their personally identifiable information.

4.  By assisting third parties with intercepting communications that it promised to keep confidential, Defendant violates federal and state law.

5.  Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

## PARTIES

6.  Plaintiff Demetrius Smith is domiciled in San Francisco, California. On or around 2008, Plaintiff Smith created a Facebook account. On or around July 2024, Plaintiff Smith visited rackroomshoes.com and browsed products for purchase. When Plaintiff Smith accessed the website, a notice appeared at the bottom of the screen stating that his continued use

---

[1] Privacy Policy, Rack Room Shoes, rackroomshoes.com/privacy (last accessed Sept. 9, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

of the website would constitute assent to Defendant's Privacy Policy.  After receiving that notice, Plaintiff Smith clicked on shoes and ultimately purchased two sets of Crocs Classics.   When checking out, Plaintiff Smith gave Defendant his first name, last name, email address, phone number, and delivery address.  Although unaware at the time, Plaintiff Smith is informed and believes that Defendant assisted third parties—including Meta, Attentive, and six data brokers— with intercepting his communications while visiting Defendant's website, including communications that contained his personally identifiable information.  Given that Defendant promised to safeguard his personal information from disclosure, Plaintiff Smith possessed an expectation of privacy in communications that contained such information, and he never consented to Defendant assisting other third parties with intercepting those confidential communications.

7.     Plaintiff Robin Savage is domiciled in Via Los Altos, California.  On or around 2007, Plaintiff Savage created a Facebook account.  On or around February 2024, Plaintiff Savage visited rackroomshoes.com and browsed products for purchase.  When Plaintiff Savage accessed the website, a notice appeared at the bottom of her screen stating that her continued use of the website would constitute assent to Defendant's Privacy Policy.  After receiving that notice, Plaintiff Savage clicked on shoes for sale and ultimately purchased a pair of Sketchers Street Rolling Stones. When checking out, Plaintiff Savage gave Defendant her first name, last name, email address, phone number, and delivery address.  Although unaware at the time, Plaintiff Savage is informed and believes that Defendant assisted third parties—including Meta, Attentive, and six data brokers—with intercepting her communications while visiting Defendant's website, including communications that contained her personally identifiable information. Given that Defendant promised to safeguard her personal information from disclosure, Plaintiff Savage possessed an expectation of privacy in communications that contained such information, and she never consented to Defendant assisting other third parties with intercepting those confidential communications.

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

8.      Plaintiff Maia Williams is domiciled in Victorville, California.  On or around 2009, Plaintiff Willaims created a Facebook account.  On or around March 2024, Plaintiff Williams visited rackroomshoes.com and browsed products for purchase.  When Plaintiff Williams accessed the website, a notice appeared at the bottom of her screen stating that her continued use of the website would constitute assent to Defendant's Privacy Policy.  After receiving that notice, Plaintiff Williams clicked on shoes for sale and ultimately purchased two pairs of sneakers, the Nike Court Legacy Lifts and the Nike Air Max Systm. When checking out, Plaintiff Williams gave Defendant her first name, last name, email address, phone number, and delivery address.  Although unaware at the time, Plaintiff Williams is informed and believes that Defendant assisted third parties—including Meta, Attentive, and six data brokers—with intercepting her communications while visiting Defendant's website, including communications that contained her personally identifiable information.  Given that Defendant promised to safeguard her personal information from disclosure, Plaintiff Williams possessed an expectation of privacy in communications that contained such information, and she never consented to Defendant assisting other third parties with intercepting those confidential communications.

9.      All Plaintiffs conducted searches, visited webpages, and purchased goods from Defendant from web browsers while in California.

10.     Rack Room Shoes, Inc., is headquartered in Charlotte, North Carolina.  Rack Room Shoes, Inc., does business throughout California and the United States.

## JURISDICTION AND VENUE

**A.    Subject-Matter Jurisdiction**

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

---

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

1

**B.    Personal Jurisdiction**

2      12.      This Court has personal jurisdiction over Defendant because Defendant

3  committed an intentional act, expressly aimed at California, causing harm that Defendant knew

4  would likely be suffered in California.

5      13.      As soon as prospective customers access rackroomshoes.com, Defendant

6  prompts users to share their locations:

7  <u>Figure 1</u>

8
9
10  
11
12
13
14

15      14.      Even if customers click "Don't allow," Defendant still approximates their

16  locations:

17  <u>Figure 2</u>

18
19
20  
21
22
23

24      15.      Moreover, for those users who select "Don't allow," Defendant still sets a cookie

25  on their browsers that saves their location information:

26  <u>Figure 3</u>

27

| _dy_df_geo | United%20States.Florida.Miami | .rackroomshoes.com |
| _dy_geo | US.NA.US_FL.US_FL_Miami | .rackroomshoes.com |

28

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

16.    Defendant approximates customers' location even when they access the website through "incognito mode":

Figure 4



17.    As soon as Plaintiffs and other California-based customers accessed rackroomshoes.com, Defendant approximated their locations and knew they were located in California.

18.    Moreover, as with other California-based customers, Plaintiffs provided Defendant with their residential addresses in California when specifying where to deliver their purchased products.

19.    Defendant operates more than 20 retail stores in California through which customers can purchase shoes online. Put differently, in Defendant's regular course of business, Defendant sells physical products through its interactive website, rackroomshoes.com, and causes those products to be delivered to California. Defendant has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District.

20.    This Court's exercise of personal jurisdiction over Defendant is also appropriate because Defendant's activities in California gave rise to and furthered the privacy violations suffered by Plaintiffs. More specifically, Defendant employed and configured third-party trackers to intercept, record, and store personally identifiable information about visitors, including Plaintiffs, while those visitors were conducting searches and purchasing goods. Defendant engaged in that unlawful conduct to help third parties analyze and monetize Plaintiffs' personal information.

**C. Venue**

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## FACTUAL ALLEGATIONS

**A. Consumers Place Pecuniary Value on Privacy Promises**

22.    "Every time you go shopping, you share intimate details about your consumption patterns with retailers."[2]

23.    A now infamous anecdote, published by the New York Times in 2012 and condensed here for brevity, demonstrates the point:

> Andrew Pole had just started working as a statistician for Target in 2002, when two colleagues from the marketing department stopped by his desk to ask an odd question: "If we wanted to figure out if a customer is pregnant, even if she didn't want us to know, can you do that?"

> Target has a baby-shower registry, and Pole started there, observing how shopping habits changed as a woman approached her due date, which women on the registry had willingly disclosed. … As Pole's computers crawled through the data, he was able to identify about 26 products that, when analyzed together, allowed him to assign each shopper a 'pregnancy prediction' score.

> About a year after Pole created his pregnancy-prediction mode, a man walked into a Target outside Minneapolis and demanded to see the manager.  He was clutching coupons that had been sent to this daughter, and he was angry, according to an employee

---

[2] https://www.forbes.com/sites/kashmirhill/2012/02/16/how-target-figured-out-a-teen-girl-was-pregnant-before-her-father-did/

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

who participated in the conversation.  "My daughter got this in the mail!" he said. "She's still in high school, and you're sending her coupons for baby clothes and cribs? Are you trying to encourage her to get pregnant?"  The manager didn't have any idea what the man was talking about.  He looked at the mailer.  Sure enough, it was addressed to the man's daughter and contained advertisements for maternity clothing, nursery furniture and pictures of smiling infants.  The manager apologized and then called a few days later to apologize again.  On the phone, though, the father was somewhat abashed. "I had a talk with my daughter," he said.  … "She's due in August.  I owe you an apology."[3]

24.     Though written in 2012, the anecdote's point remains prescient: For retailers like Target and Rack Room Shoes, "the exhaustive rendering of our conscious and unconscious patterns into data sets and algorithms has revolutionized what they know about us and, therefore, how precisely they can sell."[4]

25.     Although retailers still strive for omniscient knowledge of consumer behavior, technology has rapidly changed the ways in which they try to achieve that goal.  No longer relying on in-house statisticians like Andrew Pole, retailers now depend on a vast apparatus of third parties who can identify prospective customers with discomforting precision.  Along with paying third parties for those services, retailers also funnel the fuel that enables such precision: personal information and online activity.   And with the rise of artificial intelligence, that precision continues to increase, creating a future in which the potential harm to consumers extends beyond ill-conceived purchases and touches on the very essence of free will.  As one commentator explains:

> With access to vast amounts of consumer data, AI algorithms can create highly personalized marketing messages that exploit individuals' vulnerabilities and desires. As a result, consumers may be swayed to make purchases that are not in their best interests or even harmful to their health and well-being.  Moreover, the opaque nature of AI algorithms makes it difficult for consumers to understand how their data is being used and how marketing messages are being tailored to them.  This lack of transparency creates an uneven playing field, where businesses have an unfair advantage over consumers unaware of how much their behavior is being monitored and influenced. [5]

---

[3] https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html
[4] https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html
[5] https://www.forbes.com/sites/elijahclark/2024/03/14/the-ethical-dilemma-of-ai-in-marketing-a-slippery-slope/

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

26.     As online surveillance continues to grow more sophisticated and pervasive, consumers' concerns over data privacy are reaching a crescendo.  Recent surveys demonstrate the point:

- "93% of adults say that being in control of who can get information about them is important; 74% feel this is 'very important,' while 19% say it is 'somewhat important.'"[6]
- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy."[7]
- "[A]n overwhelming majority of Americans (82%) believe data privacy matters more to them than ever before, with many (74%) expressing worry about how organizations handle their personal data."[8]
- "72% [of consumers] say there should be more government regulation of what companies can do with their customers' personal information."[9]

27.     Recent surveys also demonstrate that these concerns over data privacy have a substantial impact on consumer preferences and purchasing behavior:

- "93% of Americans would switch to a company that prioritizes their data privacy."[10]
- "85% of consumers … deleted a phone app, 82% opted out of sharing personal data, 78% avoided a particular website and 67% decided against making an online purchase due to private concerns."[11]
- "81% of consumers said they need to trust a brand to buy from them."[12]
- "75% of [survey] respondents indicat[ed] that trust in data practices influences their buying choices."[13]

---

[6] https://www.pewresearch.org/internet/2015/05/20/americans-views-about-data-collection-and-security/
[7] https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/
[8] https://finance.yahoo.com/news/growing-concerns-data-privacy-ethical-112500004.html2
[9] https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and-digital-privacy-laws/#americans-largely-favor-more-regulation-to-protect-personal-information
[10] https://finance.yahoo.com/news/growing-concerns-data-privacy-ethical-112500004.html2
[11] https://iapp.org/news/a/most-consumers-want-data-privacy-and-will-act-to-defend-it
[12] https://www.forbes.com/councils/forbestechcouncil/2020/12/14/the-rising-concern-around-consumer-data-and-privacy/
[13] https://www.forbes.com/sites/tonybradley/2024/10/30/privacy-and-trust-in-the-ai-age/

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

- "About half (52%) of U.S. adults said they decided recently not to use a product or service because they were worried about how much personal information would be collected about them."[14]

28.    And recent surveys show that consumers are particularly worried about the risks posed by data brokers and artificial intelligence:

- "78% of consumers believe companies must commit to ethical AI standards."[15]
- "81% of consumers think the information collected by AI companies will be used in ways people are uncomfortable with, as well as ways that were not originally intended."[16]
- "Roughly four-in-ten Americans say they are very worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%)."[17]

29.    At both the state and federal level, legislators and regulators have acknowledged consumers' concerns and sought to address them.  Among those efforts, two governmental bodies have routinely taken the initiative: the Federal Trade Commission and the California legislature.

**B.  The FTC Act, the CalOPPA, and the CCPA**

30.    The FTC's origins begin in 1914 when Congress enacted a landmark statute that mandated fairness in the marketplace.  Known as the Federal Trade Commission Act, Congress articulated the statute's purpose with simplicity and clarity: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."[18]  To ensure compliance with the Act, Congress created the FTC and vested it with regulatory authority.

31.    Relying on the operative provision within the FTC Act, the Commission "has taken action against dozens of companies that claimed to safeguard the privacy or security of users' information, but didn't live up to their promises in the day-to-day operation of their

---

[14] https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/
[15] https://www.forbes.com/sites/tonybradley/2024/10/30/privacy-and-trust-in-the-ai-age/
[16] https://iapp.org/resources/article/consumer-perspectives-of-privacy-and-ai/
[17] https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and-digital-privacy-laws/
[18] 15 U.S.C. § 45(5)(a).

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

business."[19]   In 2000, for example, the FTC brought an enforcement action against an online retailer, Toysmart.com, Inc., for "disclosing, selling, or offering for sale personal customer information, contrary to the terms of its privacy policy that personal information would never be disclosed to third parties."[20]  That conduct, according to the FTC, "was … a deceptive practice" that violated the FTC Act.[21]  A court later agreed with that conclusion, finding that the online retailer "engaged in deceptive acts or practices."[22]  That court's determination was no anomaly; other courts reviewing similar enforcement actions have reached the same conclusion.[23]

32.    Beyond enforcement actions, the FTC employs other methods to enforce compliance with privacy promises.  The FTC has, for example, repeatedly published guidance reminding companies that "[h]onoring privacy promises and obligations means implementing and adhering to safeguards that actually maintain people's privacy."[24]

33.    On top of enforcement actions and publications, the FTC also intervenes in cases to enforce privacy obligations.  In 2015, for instance, RadioShack declared bankruptcy and sought to sell or disclose data on more than 100 million customers.[25]  In response, the FTC pointed to representations within the retailer's privacy policies and urged the court to prohibit the transaction, arguing that "a sale or transfer of the personal information of RadioShack's

---

[19] https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.
[20] https://www.ftc.gov/sites/default/files/documents/cases/toysmartconsent.htm
[21] https://www.ftc.gov/sites/default/files/documents/cases/toysmartcomplaint.htm
[22] *F.T.C. v. Toysmart.com*, 2000 WL 34016434, at *1 (holding that "[t]he complaint states a claim upon which injunctive relief may be granted" because it alleged "that Toysmart engaged in deceptive acts or practices  … by disclosing, selling or offering for sale personal customer information, contrary to the terms of its privacy policy that personal information would never be disclosed to third parties");
[23] *See, e.g.*, *F.T.C. v. Wyndham Worldwide Corp.*, 799 F. 3d 236, 245 (3d Cir. 2015) (finding a violation of the Federal Trade Commission Act because "[a] company does not act equitably when it publishes a privacy policy to attract customers who are concerned about data privacy, fails to make good on that promise by investing inadequate resources in cybersecurity, exposes its unsuspecting customers to substantial financial injury, and retains the profits of their business.").
[24] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/03/ftc-cracks-down-mass-data-collectors-closer-look-avast-x-mode-inmarket
[25] https://money.cnn.com/2015/05/19/news/companies/radioshack-customer-data/index.html

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

customers would contravene RadioShack's express promise not to sell or rent such information and could constitute a deceptive or unfair practice under Section 5 of the FTC Act."[26]

34.    These efforts, taken together, reflect the same truism: "When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up to these promises."[27]

35.    At the state level, the California legislature has paved the way in protecting consumer privacy.  In 2003, for example, California became the first state to pass a law regulating privacy policies and mandating their accuracy.  Known as the California Online Privacy Protection Act, the statute requires a company operating in California to "conspicuously post its privacy policy" and "[d]iscose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[28]  Importantly, the statute defines "personally identifiable information" as including "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that permits the physical or online contacting of a specific individual."[29]

36.    Fifteen years after leading the way with CalOPPA, California enacted the California Consumer Privacy Act, becoming the first state to enact a comprehensive data privacy law.  Similar to CalOPPA, the CCPA requires companies to post privacy notices that disclose "[t]he categories of personal information to be collected and … whether that information is sold or shared."[30]  The CCPA also makes expressly clear that "[a] business shall not … use person information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice consistent with this section."[31]

---

[26] https://www.ftc.gov/system/files/documents/public_statements/643291/150518radioshackletter.pdf
[27] https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforce00ment
[28] Cal. Bus. & Prof. Code § 22575(a).
[29] *Id.*
[30] Cal. Civ. Code § 1798.100(1).
[31] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

\*\*\*

37.    Put together, both federal and state law make clear that a company acts with unlawful purpose when it collects, discloses or sells personal information after promising to keep such information confidential.

**C. The California Invasion of Privacy Act and the Wiretap Act**

38.    The California legislature enacted the California Invasion of Privacy Act to "protect the privacy of the people of this state" and to address concerns over "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications."[32]  The statute prohibits "[a]ny person" from "willfully and without the consent of all parties to the communication…read[ing], or attempt[ing] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained."[33] Put more generally, CIPA "prohibit[s] recording a communication, in whole or in part, without the consent of all parties, no matter the particular role or degree of participation that a party has in the communication."[34]   CIPA also prohibits "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with any person or persons to unlawfully do, or permit, or cause to be done" any of the conduct that CIPA makes actionable.[35]

39.    Similar to CIPA, the federal Wiretap Act establishes "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[36]  Congress designed the statute to "prohibit all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in investigation of specified types of major crimes."[37]  In

---

[32] Cal. Penal Code § 630.
[33] Cal. Penal Code § 631.
[34] *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591, 608 (2020).
[35] *Id.*
[36] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).
[37] *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1075 (N.D. Cal. 2015).

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

1  contrast with CIPA, the federal Wiretap Act lacks force "where one parties to the communication

2  has given consent" unless the interception occurred "for the purpose of committing any criminal

3  or tortious act in violation of the Constitution or laws of the United States or of any State."[38]

4  **D. Rack Room's Privacy Representations**

5      40.    Throughout its website, Defendant repeatedly promises consumers that it will

6  keep their electronic communications confidential.

7      41.    When customers first access rackroomshoes.com, Defendant presents them with

8  a prominent banner that reads: "By continuing to use our website, you consent to our use of

9  cookies and agree with our Privacy Policy."

10 Figure 5

11
12

> We use cookies to make your online experience easier. By continuing to use our website, you consent to our use of cookies and agree with our **Privacy Policy**    **Opt-Out Settings**    **Accept Cookies** 

13     42.    The Privacy Policy begins by explaining that "Rack Room values the privacy of

14 its customers," and it "endeavors to comply with relevant ethical standards in gathering, using

15 and safeguarding customer information."[39]

16     43.    The Privacy Policy then makes the following representation: "Rack Room Shoes

17 collects information through cookies and beacons … but none of the information collected

18 through cookies or beacons is personally identifiable."

19 Figure 6

20
21      Rack Room Shoes collects information through cookies and beacons (as discussed below) but none of the information collected through cookies or beacons is personally identifiable.

22     44.    The Privacy Policy later makes a similar representation: "Our usage of cookies is

23 in no way linked to any Personal Information while on our site."

24

25

26

27  [38] 18 U.S.C. § 2511(d).
28  [39] https://www.rackroomshoes.com/privacy

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

1    Figure 7

**COOKIES**

A cookie is a piece of data stored on the hard drive of your computer, containing information about you. Our usage of cookies is in no way linked to any Personal Information while on our site. Cookies can make the browsing experience easier. For instance, by accepting a cookie from our site, we can provide you a more personalized experience while shopping, thereby saving time while on our site. Most browsers can be set to reject cookies or to ask you if you want to accept/reject an incoming cookie. If you reject the cookie, you may still use our site, although you will be limited in some areas of our site. Cookies can also enable us to track and target the interests of our customers to enhance the experience on our site.

45.    The Privacy Policy defines "Personal Information" as "information that personally identifies you when you voluntarily provide it to us, such as your name, mailing address, billing address, biometric information (as set forth below), e-mail address, phone number, date of birth and, in regard to online purchases only, your credit card number."

46.    Defendant's "cookie banner" doubles down on those representations. Defendant represents that there are two types of cookies on its website: "Necessary Cookies" and "Targeting Cookies."

Figure 8



47.    "Necessary Cookies" are those that "are necessary for the website to function," but Rack Room promises that they "do not store any personally identifiable information."

1    Figure 9

**Necessary Cookies**                                    **Always Active**

These cookies are necessary for the website to function and cannot be
switched off in our systems. They are usually only set in response to
actions made by you which amount to a request for services, such as
setting your privacy preferences, logging in or filling in forms. You can set
your browser to block or alert you about these cookies, but some parts of
the site will not then work. These cookies do not store any personally
identifiable information.

48.    "Targeting Cookies" are cookies that concern "adverts on other sites," but Rack
Room promises that those too "do not store directly personal information, but are based on
uniquely identifying [a user's] browser and internet device."

Figure 10

**Targeting Cookies**                                    

These cookies may be set through our site by our advertising partners.
They may be used by those companies to build a profile of your interests
and show you relevant adverts on other sites. They do not store directly
personal information, but are based on uniquely identifying your browser
and internet device. If you do not allow these cookies, you will experience
less targeted advertising.

49.    Despite repeatedly promising to keep electronic communications confidential,
Defendant systematically discloses such information to numerous third parties.

50.    Defendant's disclosures to two companies—Meta Platforms and Attentive—
serve as useful starting points.

**E.  Meta's Platform and its Business Tools**

51.     Meta describes Facebook as a "real identity platform,"[40] meaning users are allowed only one account and must share "the name they go by in everyday life."[41] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[42]

52.     In 2023, Meta generated $134 billion in revenue.[43] Roughly 95% of that came from selling advertising space.[44]

53.     Meta sells advertising space by highlighting its ability to target users.[45]

54.     Meta can target users so effectively because it surveils user activity both on and off its site.[46]

55.     By targeting users on and off its sites, Meta can make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[47] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[48]

56.     Advertisers can also build "Custom Audiences."[49] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[50] With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and

---

[40] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701?msockid=13746841a2d46d8e071f7cbaa3c86cc3
[41] https://www.facebook.com/communitystandards/integrity_authenticity.
[42] https://www.facebook.com/
[43] https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx
[44] https://www.forbes.com/sites/dereksaul/2023/10/25/meta-earnings-record-profits-sales-as-ads-stay-robust-during-zuckerbergs-year-of-efficiency/
[45] https://www.facebook.com/business/help/205029060038706.
[46] https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[47] https://www.facebook.com/business/ads/ad-targeting.
[48] https://www.facebook.com/business/news/Core-Audiences.
[49] https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[50] https://www.facebook.com/business/ads/ad-targeting.

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

behavior from your source audience to find new people who share similar qualities."[51] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[52]

57.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[53] Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

58.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[54] Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[55] Advertisers can even create their own tracking parameters by building a "custom event."[56]

59.    One such Business Tool is the Meta Pixel. Meta offers this piece of code to advertisers, like Rack Room Shoes, to integrate into their websites. As the name implies, the Meta Pixel "tracks the people and type of actions they take."[57] When a user accesses a website

---

[51] https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[52] https://www.facebook.com/business/help/170456843145568?id=2469097953376494;
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[53] https://www.facebook.com/help/331509497253087.
[54] *See* https://developers.facebook.com/docs/facebook-pixel/advanced/;
*see also* https://www.facebook.com/business/help/218844828315224?id=1205376682832142;
https://developers.facebook.com/docs/marketing-api/app-event-api/.
[55] https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[56] https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*
https://developers.facebook.com/docs/marketing-api/app-event-api/.
[57] https://www.facebook.com/business/goals/retargeting.

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to send a separate message to Meta's servers.

60.     This second, secret transmission contains the original GET request[58] sent to the host website along with additional data that the Pixel is configured to collect. This transmission is initiated by Meta's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Meta's embedded code.

61.     An example illustrates the point. Take an individual who navigates to Defendant's website and clicks on a tab to browse shoes. When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Rack Room Shoes utilizes the Meta Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Meta causes the browser to secretly duplicate the communication with Defendant, transmitting it to Meta's servers, alongside additional information that transmits the communication's content and the individual's identity.

62.     After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

**F.  Rack Room Shoes and the Meta Pixel**

63.     Defendant intentionally integrates the Meta Pixel into its website.

Figure 11



---

[58] "A GET request is an HTTP request used to retrieve data from a specific web page.  For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code."  *See* OXYLAB, WHAT IS A GET REQUEST, https://oxylabs.io/blog/curl-get-requests

1    64.    Defendant's Pixel captures event data called "PageView."

2    Figure 12



11    65.    The "PageView" event transmits the URL accessed.

12    66.    The URL reveals a user's search queries.  As an example, if a customer navigates

13    to rackroomshoes.com and searches for "Men Nike Track Shoes," Defendant transmits the

14    following URL:

15    Figure 13

16    rackroomshoes.com/search/Mens%20Nike%20Track%20Shoes

17    67.    Defendant's Pixel also captures event data called "Button Click."

18    Figure 14



22    68.    The "Button Click" event transmits the name of the button clicked and the name

26    of the webpage to Meta.

27    69.    Defendant's Pixel captures event data called "View Content."

Figure 15



70.    The "View Content" event transmits the inventory number for the browsed item to Meta.

71.    Defendant's Pixel captures event data called "AddToCart."

Figure 16

72.    AddToCart discloses the item's name and type.

73.    Defendant's Pixel pairs event data with a user's personally identifiable information.

74.    When a user accesses Defendant's websites while logged into Facebook, the Pixel will compel the user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID:

Figure 17

| | | | |
|---|---|---|---|
| ar_debug | 1 | .facebook.com | |
| c_user | 100035966074568 | .facebook.com | |
| datr | B3zfZvZFXLRINb... | .facebook.com | |
| fr | 0zIkq0eIxLtqBvqi... | .facebook.com | |
| presence | C%7B%22t3%22... | .facebook.com | |
| ps_l | 1 | .facebook.com | |
| ps_n | 1 | .facebook.com | |
| sb | B3zfZjETNf-pjAS... | .facebook.com | |
| wd | 1593x952 | .facebook.com | |
| xs | 2%3AJhxYpAHzY... | .facebook.com | |

75.     A Facebook ID is personally identifiable information.   To find the account associated with the Facebook ID, one need only open a web browser and enter the following: www.facebook.com/[Facebook ID].

76.     When a visitor's browser has recently logged out of an account, Meta compels the visitor's browser to send a small set of cookies:

Figure 18

| | | |
|---|---|---|
| wd | 1593x952 | .facebook.com |
| datr | B3zfZvZFXLRINb... | .facebook.com |
| ps_n | 1 | .facebook.com |
| ar_debug | 1 | .facebook.com |
| ps_l | 1 | .facebook.com |
| sb | B3zfZjETNf-pjAS... | .facebook.com |
| fr | 0zIkq0eIxLtqBvqi... | .facebook.com |

77.     No matter the circumstances, Meta receives at least one cookie from a user's browser:

Figure 19

| | | |
|---|---|---|
| _fbp | fb.1.1725899609586.... | .rackroomshoes.com |

78.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.

79.     The _fbp cookie contains, at least, an unencrypted value that uniquely identifies the browser.

80.     Meta, at a minimum, uses the c_user, fr and _fbp cookies to link to Facebook IDs and corresponding Facebook profiles.

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

81.     The Meta Pixel also captures the identifiers that a user submits through form fields.

82.     Even when a consumer checks out as a guest, for example, they must provide the following information:

Figure 20



83.     When a consumer completes a purchase, Defendant assists Meta with intercepting the consumer's first name, last name, phone number, email address, city, state, and zip code. The following figure shows Meta receiving hashed values for "fn," which stands for first name; "ln," which stands for last name; "em," which stands for email address; "ph," which stands for phone number; "ct," which stands for city; "st," which stands for state or province; and "zp," which stands for zip code:[59]

//

//

//

//

//

---

[59] https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/.

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

Figure 21–22

id: 577593229294108

ev: SubscribedButtonClick

dl: https://www.rackroomshoes.com/cart

rl: https://www.google.com/

if: false

ts: 1725919683828

cd[buttonFeatures]: {"classList":"text-uppercase btn btn-primary mt-4 with-loader","destination":"https://www.rackroomshoes.com/cart","id":"","imageUrl":"","innerText":"CONTINUE TO CHECKOUT","numChildButtons":0,"tag":"button","type":"submit","name":"","value":""}

cd[buttonText]: CONTINUE TO CHECKOUT

cd[formFeatures]: [{"id":"userId","name":"","tag":"input","placeholder":"email / phone","inputType":"text","valueMeaning":"empty"},{"id":"","name":"","tag":"button"}]

cd[pageFeatures]: {"title":"View Cart | Checkout Page | Rack Room Shoes"}

sw: 1920

sh: 1080

udff[fn]: d233633d9524e84c71d6fe45eb3836f8919148e4a5fc2234cc9e6494ec0f11c2

udff[ln]: 5239ea501ef63222c9321261bea495d46d2f8b2f7985d80bf4c7c4b542d6bd28

udff[em]: 6e31b641a0242ca918631883e2f73b099bb2c889da9f7ed4ec5fd4c2f91acc73

udff[ph]: 9b3716968eabd8398b861de8c40d7d39e444aeed48d3bf6222f50d1c183c2515

udff[ct]: 61e1107708f6d4cbc4ec097dbf13e32552fde750e0eb5ac1a7fff815e36d0fe3

udff[st]: 593f2d04aab251f60c9e4b8bbc1e05a34e920980ec08351a18459b2bc7dbf2f6

udff[zp]: 85755415d9818e33b477feee63d0e98bc63296d91f0d5429f4131331d15d81f8

84.    Put together, Defendant's Pixel pairs event data with personally identifiable information and sends that bundle to Meta so the social media site can match the website activity to a specific user:

Figure 23

www.facebook.com

GET

/tr/?id=577593229294108&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.rackroomshoes.com%2Fp%2Fnike-mens-initiator-sneaker%2F601924&rl=&if=false&ts=1726256994051&cd[buttonFeatures]=%7B%22classList%22%3A%22btn%20btn-primary%20btn-block%20fs-4%22%2C%22destination%22%3A%22%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22ADD%20TO%20CART%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22button%22%2C%22type%22%3A%22button%22%2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%7D&cd[buttonText]=ADD%20TO%20CART&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22Taupe%20Nike%20Mens%20Initiator%20Sneaker%20%7C%20Rack%20Room%20Shoes%22%7D&sw=1920&sh=1080&v=2.9.167&r=stable&a=adobe_launch&ec=26&o=4126&fbp=fb.1.1725899609586.99224862513057724&ler=empty&cdl=API_unavailable&it=1726256316889&coo=false&es=automatic&tm=3&rqm=GET

https

image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

gzip, deflate, br, zstd

en-US,en;q=0.9

sb=cpbkZkWOLr3oIpDxyxXinqJk; datr=cpbkZn5OaXBxmCSV6B9k64fv; ps_n=1; c_user=100035966074568;

xs=15%3AjgGCZS2qMHKxZw%3A2%3A1726256770%3A-1%3A24354; fr=0Amgj2q2srCIX0hx0.AWV2id0c-NDCVXI8JHcLLL0S-4E.Bm5JZx..AAA.0.0.Bm5JaE.AWUgM8tYSoY; ar_debug=1

85.    Upon information and belief, Defendant uses other Business Tools, like Conversions API, to assist Meta with intercepting its users' communications.

**G. Meta Never Receives Consent from Consumer to Intercept Confidential Communications**

86.    Meta never receives consent from users to collect electronic communications on websites that have a statutory obligation to shield those communications from disclosure.  In fact, Meta expressly warrants the opposite.

87.    When creating a Facebook account, a user assents to four agreements: the Terms of Service, the Data Policy, the Privacy Policy, and the Cookies Policy.  For California Residents, Meta also publishes a California Privacy Policy.

88.    Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[60]  The Terms of Service then prohibit anyone from using Facebook's platform in a manner that is "unlawful, misleading, discriminatory or fraudulent."[61]

89.    Facebook's Data Policy describes how Meta collects information from its "Meta Business Tools," including "the Meta pixel."[62]  Specifically, Meta acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[63] Meta then offers an express representation: **"We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."[64]**

90.    Facebook's Privacy Policy says Meta "require[s] partners to have the right to collect, use and share [consumers'] information before giving it to us."[65]

91.    Facebook's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[66]

---

[60] https://www.facebook.com/legal/terms/update..
[61] *Id.*
[62] https://www.facebook.com/help/155833707900388/
[63] *Id.*
[64] *Id.*
[65] https://www.facebook.com/privacy/policy/version/5601719079934335
[66] www.facebook.com/policies/cookies/.

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

92.     For California residents, Meta reiterates that promise: "We require each of these partners to have rights to collect, use, and share your data before providing any data to us."[67]

93.     Facebook's other representations reinforce these warranties.  In an article titled, "How does Meta work with data providers?," Meta states that "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[68]  Under the Custom Audience Terms, businesses must "represent and warrant … that [they] have all necessary rights and permissions and a lawful basis to disclose and use the Hashed Data in compliance with all applicable laws, regulations, and industry guidelines."[69]

94.     Because state and federal law required Defendant to comply with its privacy promises, Defendant lacked a lawful basis to disclose personally identifiable information. Accordingly, Meta never received consent from Plaintiffs and Class members to intercept their communications on Defendant's website.

## H.  Attentive and its Tracking Tools

95.     Attentive operates one of the largest marketing platforms in the country, with "over 27% of the top 1,000 retailers in North America" utilizing its product, "including 40% of the top apparel brands, 40% of the top jewelry brands, [and] 33% of the top health and beauty brands."[70]  Given Attentive's ubiquity, the company has collected more than "1.8 billion email and phone numbers" and "1.4 trillion customer data points."[71]

96.     To unlock the "full advantage" of its platform, Attentive requires retailers to integrate the "Attentive Tag" into their websites.[72]  The Attentive Tag captures "behavioral data, page view, product view, add to cart, and purchase events."[73]

---

[67] https://www.facebook.com/legal/policy/ccpa.
[68] https://www.facebook.com/help/494750870625830?ref=dp.
[69] https://www.facebook.com/legal/terms/customaudience
[70] https://www.attentive.com/retail-ecommerce-marketing
[71] https://www.attentive.com/audience-segmentation-manager
[72] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag
[73] *Id.*

97.     Through the Attentive Tag, Attentive "analyze[s] behaviors across the entire customer life cycle."[74]  In exchange for that information, Attentive provides retailers with "a treasure trove of insights about [their] customers' shopping habits, like their browsing and purchasing history."[75]

98.     Attentive collects and assimilates personal information into its "Identity Graph," which is "a web of data built with multiple unique identifiers (e.g. cookies, phone numbers, email, on-site shopping behavior, device information, first name, last name, etc.) with the customer at the center."[76]  Through the Identity Graph, Attentive offers retailers "a comprehensive customer profile."

Figure 24



99.     These profiles show various data points, like a consumer's "activities," "preferences," [f]avorite products," and "[d]evices."

[74] https://www.attentive.com/sms-analytics-and-reporting
[75] https://www.attentive.com/blog/web-traffic-optimization
[76] https://www.attentive.com/blog/attentive-signal-faq#:~:text=The%20short%20answer%20is%20our%20Attentive%20Identity%20Graph.,name%2C%20etc.%29%20with%20the%20customer%20at%20the%20center.

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

Figure 25



100.    Each profile also contains tabs for "Subscriptions," "Activities," "Attributes," and "Offers."[77]

Figure 26



101.    Upon information and belief, the "Activities" tab reveals the content of the consumer's electronic communications.

---

[77] https://help.attentivemobile.com/hc/en-us/articles/4412398776724-View-subscriber-profiles#h_01HMHNE64DY37DDMX49SGNHDPX

### I.   Attentive Intentionally Circumvents Privacy Controls

102.    To maintain its market share, Attentive constantly innovates to address "signal loss."  Signal loss "refers to the diminishing strength of pixel fires on important signals or data points (such as purchase events), which were once reliably tied to campaigns and individual users."[78]  To mitigate that loss, Attentive developed "Attentive Signals."  Attentive's Chief Strategy Officer, Eric Miao, best explains the innovation:

> Attentive Signal is our identity product. It's at the core of our platform. It powers everything you can do with it—from optimizing your customer segmentation strategy to triggering top-performing journeys.  It collects and attributes a vast amount of shopper data directly to Attentive subscribers.  This includes everything from zero-party data, like shopping preferences, to enrichment data, like device information.[79]

103.    Put differently, "Attentive Signal is an identity solution that enables marketers to understand who's shopping on their site, identify specific habits, and build personalized experiences."[80]  According to Attentive, it's so effective "that no matter where or how someone chooses to shop, all of their data can be linked back to their unique profile."[81]  It's so effective, in other words, that Attentive can eliminate the "three key factors that contribute to signal loss": "evolving privacy requirements," "advanced ad-blockers," and "savvy customers."[82]

### J.   Rack Room's Knowledge of Attentive's Platform and Practices

104.    Defendant knows that Attentive uses identifiers and online activity for its own commercial purposes.  Among other things, Attentive makes prominent representations on its website about how it leverages personal information to enhance its platform.  Attentive claims, for example, that it can send more triggered emails than its competitors because it "recognizes over 1 [billion] email addresses and phone numbers across devices":

---

[78] https://www.forbes.com/councils/forbesagencycouncil/2023/07/19/how-to-overcome-signal-loss-in-digital-marketing-campaigns/
[79] https://www.attentive.com/signal-identity-solution
[80] https://www.attentive.com/signal-identity-solution
[81] https://www.attentive.com/blog/attentive-signal-faq#:~:text=Attentive%20Signal%20is%20our%20identity,data%20directly%20to%20Attentive%20subscribers..
[82] https://www.attentive.com/blog/attentive-signal-faq#:~:text=This%20includes%20everything%20from%20zero,personalized%20experiences%20that%20customers%20want.

Figure 27

Triggered Email

**Identify and engage more of your on-site browsers**

Increase the email identification rate of your website traffic. Attentive recognizes over 1b email addresses and phone numbers across devices, resulting in a 100% increase in triggered email sends.

105.    Moreover, over the last two years, Attentive has incorporated artificial intelligence into several new products—"AI Journeys," "Audiences AI," and "Identity AI"—that were trained using the "1.4 trillion datapoints" in Attentive's possession.[83]  Since rolling those products out, Attentive has aggressively pitched them to existing customers, stating that their products will soon "help marketers deliver the sorts of truly 1:1 personalized experiences they have always dreamt of (and can deliver without any additional manual work)."[84]  Those pitches have paid off; as of December 2023, "80% of Attentive customers [were] using AI."[85] Whether Rack Room counts among the 80% or not, Defendant knows that Attentive created these products by, in part, leveraging personal information from customers who accessed Defendant's website.

106.    Finally, for all retailers that use Attentive's platform, they must provide Attentive with a license to "copy, process and transmit the data, information and other materials transmitted to or through the Platform," including "Customer Data" like "telephone numbers" and "email addresses." [86]  That license also allows Attentive to use Customer Data "to provide

---

[83] https://www.attentive.com/blog/attentive-ai#:~:text=Trained%20on%20over%201.4%20trillion,planning%2C%20testing%2C%20and%20sending%20high
[84] https://www.attentive.com/blog/attentive-signal-faq
[85] https://www.businesswire.com/news/home/20231213790998/en/Attentive-Drives-Strong-Momentum-with-80-of-Customers-Now-Using-Its-AI-Solutions
[86] https://www.attentive.com/legal/msa

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

and improve the Services."[87]  From that contract alone, Defendant knew that Attentive would use Customer Data to enhance its platform.

### K. Rack Room's Website and Attentive's Tracking

107.    Defendant integrated into its website code from Attentive—including but not limited to the Attentive Tag—for the purpose of "capturing behavioral data" and linking it to personally identifiable information.

108.    As with the Meta Pixel, when consumers access and navigate rackroomshoes.com, Attentive's software script surreptitiously directs the user's browser to send a separate message to Attentive's servers.  This second, secret transmission contains the original GET request[88] sent to the host website along with additional data that Attentive's code is configured to collect. This transmission is initiated by Attentive's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Attentive's embedded code.

109.    When consumers purchase products on Defendant's website, they must input their phone numbers and email addresses:

Figure 28



---

[87] https://www.attentive.com/legal/msa

[88] "A GET request is an HTTP request used to retrieve data from a specific web page.  For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code."  *See* OXYLAB, WHAT IS A GET REQUEST, https://oxylabs.io/blog/curl-get-requests

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

110.    When consumers click "continue," Defendant assists Attentive with contemporaneously receiving unencrypted versions of both identifiers:

<u>Figure 29</u>

| attntv_mstore_phone | 4075804543:0 | www.rackroomshoes.com |
|---|---|---|
| attntv_mstore_email | chrisreillyfl@gmail.com:0 | www.rackroomshoes.com |

111.    Under these circumstances, identifiers constitute "content," not record information.

112.    Attentive also pairs those direct identifiers with event data, like "page views and purchases."[89]  By way of example, if a user clicks on "Mens Air Max Alpha Trainer Cross Training Shoe," Attentive contemporaneously receives the following information:

<u>Figure 30</u>

```
v: 4.37.24_ab98783f9a
pd: https://www.rackroomshoes.com/p/nike-mens-air-max-alpha-trainer-5-cross-training-shoe/601642
u: 8baf553ae4994cc2941a6a0d6a031b53
c: rackroomshoes
ceid: QF4
lt: 1725914609732
tag: modern
cs: 2595617328
t: c
r: https://www.rackroomshoes.com/
m: {"source":"gtag","email":"chrisreillyfl@gmail.com","image":"https://deichmann.scene7.com/asset/deichmann/US_01_601642_01?$rr_main$&defaultIm
age=default_obs","name":"MENS AIR MAX ALPHA TRAINER 5 CROSS TRAINING SHOE","phone":"4075804543","productId":"%[Tinuiti] Product - by page path
SKU - Lookup Table%","sku":"%[Tinuiti] Product - by page path SKU - Lookup Table%"}
cb: 1725917879274
```

113.    As shown in the above figure, Attentive obtains: the full URL string; the name of the product; the customer's email address; and the customer's phone number.  This information enables Attentive to identify consumers and understand the content of their electronic communications.

114.    Attentive receives this event data and personally identifiable information at "events.attentivemobile.com."

---

[89] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag#h_01J5R88CY3M5K3XP1XDSYWEQV7

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>
31

115.     Even if a user turns "targeting cookies" off, Defendant still assists Attentive with intercepting event data, email addresses, and phone numbers.

116.     Defendant never received consent from Plaintiffs and Class members to assist Attentive in intercepting their electronic communications that contain their personally identifiable information.

117.     Upon information and belief, Defendant can export a spreadsheet from Attentive showing all customers who inputted their phone numbers and email addresses into the sign-up unit on Defendant's website.

Figure 31



**Rack Room Shoes and Miscellaneous Third Parties**

118.     Along with Meta and Attentive, Defendant's website incorporates several other tracking technologies that disclose information to the following companies: LiveIntent, Inc., Sovrn, Inc., LiveRamp, Inc., Neustar, Inc., AtData, Inc., Throtle, Inc., Microsoft, Inc., TikTok,

Inc., Google, LLC, Adobe, Inc., Mastercard, Inc., Taboola, Inc., Criteo, S.A., Sharethrough Inc.,

Intercept Interactive, Inc., Pinterest, Inc., Outbrain, Inc., PayPal Holdings, Inc., Freshworks Inc.,

DynaTrace LLC, Digital Media Solutions, Inc.,  and LexisNexis Risk Solutions, Inc.

119.    Of these companies, nine are registered in California as data brokers,[90] and all of

them tout their ability to offer "personalized" marketing and advertising strategies:[91]

a.   LiveIntent, Inc., allows companies to "connect [their] data to the larger digital ecosystem" and "[t]ap into a scalable, organic data set anchored around encrypted email addresses that are authenticated by daily engagement."[92]

b.   Sovrn, Inc., and its parent company, Sovrn Holdings, Inc., offer programmatic advertising and "help small and mid-sized publishers understand their audience, enrich their proprietary first-party data, and package up audience segments for advertisers."[93]

c.   LiveRamp Holdings, Inc., is a company that "helps businesses centralize their fragmented customer data to create more accurate audience segments, and achieve better behavioral targeting."[94]

d.   Neustar, Inc., and its parent company, TransUnion LLC, offer services that "build and activate advanced audience profiles and look-a-like models across channels."[95]

e.   AtData, Inc., is a company that allows businesses to "[e]nhance [their] customer profiles … with AtData's proprietary technology and data assets, including more than 1 billion unique records."[96]

f.   Throtle, Inc., offers "personalized marketing to healthcare professionals (HCPs) and consumers."[97]

g.   Microsoft, Inc., offers companies "ad personalization and measurement" that leverages "first-party data" and "us[es] Customer match to easily on-board [their] audiences and re-engage [their] customers in a streamlined way."[98]

---

[90] LiveIntent https://oag.ca.gov/data-broker/registration/187040;
Sovrn, https://oag.ca.gov/data-broker/registration/187736;
LiveRamp https://oag.ca.gov/data-broker/registration/560496;
Neustar, https://oag.ca.gov/data-broker/registration/562353;
AtData, https://oag.ca.gov/data-broker/registration/568244;
Throtle, https://oag.ca.gov/data-broker/registration/185964;
Digital Media Solutions, https://oag.ca.gov/data-broker/registration/545420;
ShareThrough, https://oag.ca.gov/data-broker/registration/578001;
LexisNexis, https://oag.ca.gov/data-broker/registration/186572.
[91] *See, e.g.*, https://www.undertone.com/;
[92] https://www.liveintent.com/identity-solutions/
[93] https://www.sovrn.com/blog/making-sense-of-programmatic-advertising/
[94] https://www.publift.com/blog/what-is-liveramp
[95] https://www.cdn.neustar/resources/product-literature/marketing/neustar-identity-resolution-marketing-solutions.pdf
[96] https://atdata.com/data-enrichment/
[97] https://www.throtle.io/about-us
[98] https://about.ads.microsoft.com/en/blog/post/june-2024/shaping-your-identity-strategy

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

h.  TikTok offers companies the ability to "[b]oost [their] business with the most engaged audiences all in one place."[99]

i.  Google, LLC offers businesses "[p]ersonalized advertising."[100]

j.  Adobe, Inc., offers companies "real-time personalization insights and engagement."[101]

k.  Taboola, Inc., offers "Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[102]

l.  Criteo, S.A., offers a service called "Criteo Audience Match," which allows businesses to "re-engage [their] customers across social networks, web, mobile web, and apps."[103]

m.  Sharethrough, Inc., is a company that offers advertising product that enable companies to engage in "user-based targeting."[104]

n.  Intercept Interactive, Inc., offers a product called "Undertone," which Defendant utilizes, and which provides "personalized, High Impact ad campaigns with unmatched precision & seamless cross-channel scalability."[105]

o.  Pinterest, Inc., is a social media platform that lets businesses "[u]se our targeting suite to find new customers or upload customer lists for retargeting campaigns."[106]

p.  Outbrain, Inc., is a marketing company that "us[es] data from user profiles and behavior to target potential customers who meet certain criteria."[107]

q.  PayPal Holdings, Inc., offers products that rely on artificial intelligence to "process data – including behavioral, demographic, and psychographic information – across various platforms to help businesses understand customer behaviors and preferences."[108]

r.  MasterCard's "Dyanmic Yield" product, which Defendant utilizes, promises to "[t]ransform simple customer interactions into long-lasting hyper-personalized relationships."[109]  It captures "person-level data, no matter the source, and use[s] it for personalization."[110]

s.  FreshWorks, Inc., provides "FreshChat," a service that Defendant utilizes, which offers "insights into customer behavior" and "personalized experiences."[111]

t.  Dynatrace LLC lets customers "[k]now each customers journey and interactions with your application."[112]

---

[99] https://support.tiktok.com/en/account-and-privacy/personalized-ads-and-data/how-your-ads-are-personalized

[100] https://support.google.com/adspolicy/answer/143465?hl=en

[101] https://business.adobe.com/products/experience-platform/personalized-insights-engagement.html

[102] https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works

[103] https://www.criteo.com/blog/criteos-technology-helps-re-engage-lapsed-shoppers/

[104] https://support.sharethrough.com/hc/en-us/articles/211834783-Bidding-Targeting-and-Optimizations

[105] https://www.undertone.com/

[106] https://business.pinterest.com/advertise/

[107] https://www.outbrain.com/glossary/ad-targeting/

[108] https://www.paypal.com/us/brc/article/enhance-customer-experience-with-ai-personalization

[109] https://www.mastercardservices.com/en/capabilities/dynamic-yield

[110] *Id.*

[111] https://www.freshworks.com/live-chat-software/

[112] https://www.dynatrace.com/solutions/customer-experience/

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

u. Digital Media Solutions, Inc., and its subsidiary, Traverse Data, Inc., "leverage[] data and the power of the email channel to generate new customers for marketers and incremental revenue for publishers."[113]

v. LexisNexis Risk Solutions, Inc., says it provides "person-level insights to inform personalization and segmentation strategies."[114]

120.    Upon information and belief, Defendant assisted those third parties with intercepting communications from Plaintiffs and Class members that contained their personally identifiable information.

121.    Traverse Data, Inc., is an example.  When users sign up for Defendant's email list, Defendant assists Traverse Data with intercepting a confidential communication that contains an encrypted version of the user's email address.

Figure 32



▼Query String Parameters        view source        view URL-encoded
emailSha1Lower: 17a5afd3f2a34ddb56e0ea4738e0b6dcd8e3755c
emailSha256Lower: 8d33bfce5ff44dbd833bcab0bd4f7f7f24a57c61a37e98674a503d4d9027f45c
emailMd5Lower: a2639a9c8a3a9036b413cc56c0ba317e5

122.    Defendant's disclosures to six other data brokers—LiveIntent, Sovrn, LiveRamp, Neustar, AtData, and Throtle—also illustrate the point.  These disclosures stem from Defendant's relationship with one data broker in particular: LiveIntent.

123.    LiveIntent "equip[s] brands with advertising technology designed to help advertisers & publishers harness email by resolving identity, driving sales, & increasing revenue."[115]  Among other services, LiveIntent "runs a first-of-its-kind Identity Graph." [116]

124.    "An identity graph is an online database"; it "stores all identifiers tied to individual customers and prospects,"[117] and it "captur[es] customer behavior and preferences across devices and marketing channels."[118]  By "unifying disparate audience data points and attributing them to a single profile," an identity graph creates "a comprehensive view of each

---

[113] https://www.traversedata.com/author/craig.html
[114] https://risk.lexisnexis.com/corporations-and-non-profits/customer-acquisition
[115] https://www.liveintent.com/
[116] https://www.liveintent.com/blog/personalization/
[117] https://www.liveintent.com/blog/li-weekly-whats-an-identity-graph/
[118] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

customer or prospect," allowing companies to "understand exactly who their customers are, how they behave on each platform, and activate that data and insights to drive engagement."[119]

125.    LiveIntent's Identity Graph "has over 900 million active email addresses tied to over 25 billion identifiers."[120]    Through its Identity Graph, companies "can build a comprehensive view of their users, understand their customers' behavior across properties and platforms, monetize yield, enrich their customer database, and supercharge their marketing efforts."[121]    To funnel online activity and personally identifiable information into the Identity Graph, Defendant integrates LiveIntent's proprietary code, known as the "LiveConnect Tag," into its website.

126.    "LiveConnect is a core component of LiveIntent's identity resolution, crucial for transforming anonymous website traffic into identifiable, addressable interactions."[122]  Through the LiveConnect Tag, LiveIntent receives a unique numerical code that "can identify customers and prospects that visit your website and apps without logging in,"[123] along with "data such as the URL of the page visited and the referral URL."[124]

127.    As with the Attentive Tag and the Meta Pixel, when a user accesses a website hosting the LiveConnect Tag, LiveConnect's software script surreptitiously directs the user's browser to send a separate message to LiveIntent's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that the LiveConnect is configured to collect. This transmission is initiated by LiveIntent's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and LiveIntent's embedded code.

---

[119] https://www.liveintent.com/blog/personalization/
[120] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/
[121] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/
[122] https://support.liveintent.com/liveconnect-configuration-guide-for-hiro-clients/
[123] https://www.liveintent.com/blog/li-weekly-whats-an-identity-graph/
[124] https://support.liveintent.com/liveconnect-for-publishers-frequently-asked-questions-faq/

1    128.    Defendant also funnels information to the Identity Graph through server-side

2    code.  Known as the Programmatic Bidding API, it "allows Demand Side Platforms (DSP) to

3    bid and buy on LiveIntent e-mail inventory."[125]    At a minimum, the API transmits a "unique

4    identifier for the user,"[126] along with information about the webpage visited.

5    129.    Through its code on Defendant's website, LiveIntent receives the "bidder_id" and

6    the "bidder_uuid," along with encoded values that reveal users' personally identifiable

7    information and the content of their electronic communications.

8    Figures 33 & 34



12    130.    After matching the personally identifiable information to a user's profile and

13    email address, LiveIntent directs that user's browser to send a hashed version of the email

14    address to at least five other data brokers.

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26

27    [125] https://support.liveintent.com/programmatic-bidding-api/
28    [126] https://support.liveintent.com/hc/en-us/articles/360015338292-Programmatic-Bidding-API

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

Figures 35–37 (Initiator Chains)

*LiveIntent (liadm.com) to Svorn (lijit.com) to LiveRamp (pippio.com) to Neustar (agkn.com)*

▼ **Request initiator chain**
  ▼https://i.liadm.com/s/28292?bidder_id=71340&bidder_uuid=k-RDL0fTGqx4HaM9PvGa84WWTI76XPqtZjvECxVQ
    ▼https://he.lijit.com/merge?pid=8100&event_type=email&lc_md5=f308620aef5f30afb927c9cb746d144e&lc_sha1=1edaf8a22
      ▼https://pippio.com/api/sync?pid=710524&_=1&it=4&iv=f308620aef5f30afb927c9cb746d144e&it=4&iv=1edaf8a22d7cdc
        **https://aa.agkn.com/adscores/s.pixel?sid=9102279158&lsid=15998&em=f308620aef5f30afb927c9cb746d144e**

*LiveIntent (liadm.com) to LiveRamp (pippio.com) to AtData (rlcdn.com)*

▼ **Request initiator chain**
  ▼https://i.liadm.com/s/28292?bidder_id=71340&bidder_uuid=k-Ij0Fnw8XjjyvUpimy1jOi7xJBaYZsHF6V3ikHg
    ▼https://pippio.com/api/sync?pid=710914&_=1&it=4&iv=f308620aef5f30afb927c9cb746d144e&it=4&iv=1edaf8a22d7cdcac6
      ▼**https://ei.rlcdn.com/448046.gif?n=1&partner_site_id=16342&cparams=placement%3D710914&m=f308620aef5f30**

*LiveIntent (liadm.com) to Throttle (thrtle.com)*

▼ **Request initiator chain**
  ▼https://i.liadm.com/s/28292?bidder_id=71340&bidder_uuid=k-RDL0fTGqx4HaM9PvGa84WWTI76XPqtZjvECxVQ
    ▼**https://thrtle.com/3012?sha256=190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f&md5=f308**
      ▼https://thrtle.com/12?_t=1733972626&mc=36bd1f57-9579-4cf5-96df-68e4414245e0&md5=f308620aef5f30afb927c9v
        ▼**https://thrtle.com/sync?vxii_pid=12&dt=1733972626&vxii_rmax=3**

Figure 38: Initial Request URL and Response Headers

| ▼ General | |
|---|---|
| Request URL: | https://i.liadm.com/s/28292?bidder_id=71340&bidder_uuid=k-RDL0fTGqx4HaM9PvGa84WWTI76XPqtZjvECxVQ |
| Request Method: | GET |
| Status Code: | 🟠 303 See Other |
| Remote Address: | 34.194.4.126:443 |
| Referrer Policy: | strict-origin-when-cross-origin |
| ▼ Response Headers | ☐ Raw |
| Connection: | keep-alive |
| Content-Length: | 0 |
| Date: | Thu, 12 Dec 2024 03:05:10 GMT |
| Location: | https://he.lijit.com/merge?pid=8100&event_type=email&lc_md5=f308620aef5f30afb927c9cb746d144e&lc_sha1=1edaf8a22d7cdcac6e809c311416b731fc5a98e5&lc_sha256=190299ba3ea a266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f& |
| Request-Time: | 2 |
| Set-Cookie: | _li_ss=CgsKCQj____BxDTGRlvDQYg2LcSKAoGCJMBEMcZCgYlxQEQyRkKBgj0ARDHGQoGCJQBEMcZCgYI_gEQyRk; Max-Age=2592000; Expires=Sat, 11 Jan 2025 03:05:10 GMT; SameSite=None; Path=/s; Secure |
| Set-Cookie: | lidid=4f1ce36d-552a-4c9e-8c60-7971eabffd65; Max-Age=63072000; Expires=Sat, 12 Dec 2026 03:05:10 GMT; SameSite=None; Path=/; Domain=liadm.com; Secure |
| Strict-Transport-Security: | max-age=31536000; includeSubDomains |
| Trace-Id: | 6ec56fafcc909410 |

1    Figures 39–43: Hashed Versions of Email Address

2    *Svorn*

3    ▼Query String Parameters    view source    view URL-encoded
      pid: 8100
4     event_type: email
      lc_md5: f308620aef5f30afb927c9cb746d144e
      lc_sha1: 1edaf8a22d7cdcac6e809c311416b731fc5a98e5
5     lc_sha256: 190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f

6

7    *LiveRamp*

      ▼Query String Parameters    view source    view URL-encoded
      pid: 710914
8     _: 1
      it: 4
9     iv: f308620aef5f30afb927c9cb746d144e
      it: 4
10    iv: 1edaf8a22d7cdcac6e809c311416b731fc5a98e5
      it: 4
11    iv: 190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f

12

13   *Neustar*

      ▼Query String Parameters    view source    view URL-encoded
14    sid: 9102279158
      lsid: 15998
15    em: f308620aef5f30afb927c9cb746d144e
      lsid: 15998
16
      em: 1edaf8a22d7cdcac6e809c311416b731fc5a98e5
17

18   *AtData*

19    ▼Query String Parameters    view source    view URL-encoded
      n: 1
20    partner_site_id: 16342
      cparams: placement=710914
21    m: f308620aef5f30afb927c9cb746d144e
      s: 1edaf8a22d7cdcac6e809c311416b731fc5a98e5
22    s256: 190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f

23

24   *Throtle*

25    ▼Query String Parameters    view source    view URL-encoded
      sha256: 190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f
26    md5: f308620aef5f30afb927c9cb746d144e
      sha1: 1edaf8a22d7cdcac6e809c311416b731fc5a98e5
27    us_privacy: 1YN-
      _t: 1733972626

28

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

131. Once the data brokers receive the GET request with the hashed email address, they contemporaneously direct the user's browser to set and send cookies that associate the user's activity with his or her email address.

Figures 44–47: Cookie Values

*Svorn*

Set-Cookie:    ljt_reader=2445fe67c08047ba44e7369a; Path=/; Domain=lijit.com; Expires=Fri, 12 Dec 2025 03:05:10 GMT; Secure; SameSite=None

Set-Cookie:    3pids="8105:f308620aef5f30afb927c9cb746d144e,,1edaf8a22d7cdcac6e809c311416b731f c5a98e5,,190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f,|810 0:f308620aef5f30afb927c9cb746d144e,,1edaf8a22d7cdcac6e809c311416b731fc5a98e5,,19 0299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f,,"; Path=/; Domain=lijit.com; Expires=Fri, 12 Dec 2025 03:05:10 GMT; Secure; SameSite=None

*LiveRamp*

**Request Cookies**          ☐ show filtered out request cookies

| Name | ▲ | Value | Domain | Path |
|------|---|-------|--------|------|
| did | | BWWzgg1my9... | .pippio.com | / |
| didts | | 1734142061 | .pippio.com | / |
| nnls | | | .pippio.com | / |
| pxrc | | CO3Q87oGEgc... | .pippio.com | / |

**Response Cookies**

| Name | ▲ | Value | Domain | Path |
|------|---|-------|--------|------|
| pxrc | | CPrV87oGEgclqB... | pippio.com | / |

*Neustar*

**Request Cookies**          ☐ show filtered out request cookies

| Na... | ▲ | Value | Domain |
|-------|---|-------|--------|
| ab | | 0001%3ALDUBTh... | .agkn.com |

**Response Cookies**

| Na... | ▲ | Value | Domain |
|-------|---|-------|--------|
| ab | | 0001%3ALDUBTh... | .agkn.com |

//

//

//

//

//

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

1

*Throtle*

2

| | |
|---|---|
| :authority: | thrtle.com |
| :method: | GET |
| :path: | /sync?vxii_pid=5038&vxii_pdid=y-GvEFdPxE2oRxW3vHjV0o7EyNVpzYmU5w9d0V3g---~A |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | mc=eyJpZCI6Ijk2Zjk5NDRiLTIwNTktNDE1NC05MTMyLTBjMWIxNDk1NzNjYyIsImwiOjE3MzQwNDg1Mzk1MDksInQiOiJ9; sc=eyJpIjoiZmRiM2MwYzItMTA1Mi00MzA4LTk2YWYtN2E3OTFiYWRhN2Ziliwic2lkIjoic2lkLTczYjY1NmE4LWl4ZTYtMTFlZi1hYjhkLTAyNDIyYWZmMGMwZSIsIm1zIjoyLCJ0IjoyfSwibmMiMiOjI1NwIjo1MDM4LCJwcCI6MSwidHNIIljoxLCJpciI6dHJ1ZSwibHRzSI6MTczNDA0ODUzOTUwOSwiXyI6dHJ1ZSwibHRzSI6MTczNDA0ODUzOTUwOSwiXyI6dHJ1ZSwixyl6dHJ1ZX0 |

13

14      132.    Defendant also discloses event data to LiveIntent and the other data brokers

15   through first-party cookies, like the "se.email.rackroomshoes.com" cookie.

16   <u>Figure 48: First-Party Cookie</u>

17

▼ **Request Payload**     view source

```
▼ [[{type: "cart",…}, {type: "cartitem",…}, {type: "event",…}]
  ▼ 0: {type: "cart",…}
      actionId: "rackroomshoes_00674e5c-08c3-4b69-b424-d361d0ebb0f8"
    ▼ meta: {accountKey: "rackroomshoes", bid: "df0753b3-d8cd-41a6-aa76-1268eaf95c20", debug: false}
        accountKey: "rackroomshoes"
        bid: "df0753b3-d8cd-41a6-aa76-1268eaf95c20"
        debug: false
      method: "clean"
      type: "cart"
  ▼ 1: {type: "cartitem",…}
      actionId: "rackroomshoes_ed2c9639-fce9-4e5f-8879-02c71f3d924f"
    ▼ data: [{productID: "503783", sku: "105725037833", category: "Chukka Boots",…}]
      ▶ 0: {productID: "503783", sku: "105725037833", category: "Chukka Boots",…}
    ▼ meta: {accountKey: "rackroomshoes", bid: "df0753b3-d8cd-41a6-aa76-1268eaf95c20", debug: false}
        accountKey: "rackroomshoes"
        bid: "df0753b3-d8cd-41a6-aa76-1268eaf95c20"
        debug: false
      method: "add"
      type: "cartitem"
  ▼ 2: {type: "event",…}
      actionId: "rackroomshoes_551baa74-1837-4b00-8d39-457ea5c1ce72"
    ▼ eventData: {properties: {}}
        properties: {}
      eventName: "cart"
    ▼ meta: {accountKey: "rackroomshoes", bid: "df0753b3-d8cd-41a6-aa76-1268eaf95c20", debug: false}
        accountKey: "rackroomshoes"
        bid: "df0753b3-d8cd-41a6-aa76-1268eaf95c20"
        debug: false
      type: "event"
```

27

28

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

133.    Although the data brokers receive email addresses that are hashed, those identifiers still constitute personally identifiable information.    As the FTC has explained, "hashes aren't 'anonymous' and can still be used to identify users," so "[c]ompanies should not act or claim as if hashing personal information renders it anonymized."[127]   Indeed, two of the data brokers here, LiveRamp and Neustar, acknowledge that there is nothing anonymous about hashed email addresses.  As LiveRamp explains, "[w]hile an email in hashed form may not be human readable, they are standardized algorithms, and many firms are now offering services that can reverse email hashing to correctly guess consumers' email addresses."[128]  The transmission to Neustar, a subsidiary of TransUnion, proves the point.   TransUnion and Neustar use "combined data assets," and, in 2024, "TransUnion received top ranks for accuracy in linking hashed email addresses to physical addresses."[129]   If a hashed email can link to a physical address, then it certainly qualifies as personally identifiable information.

134.    More generally, the email addresses are hashed through a cryptographic protocol, "MD5," that experts have long considered "severely compromised."[130]  Indeed, "[t]he MD5 hash algorithm was declared 'not safe' by its own creator in 2012 after research showed how susceptible it was to brute-force attacks."[131] In 2016, for example, "a crew of hobbyist crackers" reviewed a leaked database of "15.26 million passwords obscured using MD5," and, within ten days, they "deciphered more than 11 million of the passwords."[132]   Given the exponential increase in computing power, it would take "a crew of hobbyists crackers" much less time to do the same thing today.

---

[127] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous
[128] https://liveramp.com/blog/the-trouble-with-hashed-emails-hems/#:~:text=Hashed%20emails%20(HEMs)%20aren't%20secure&text=While%20an%20email%20in%20hashed,on%20a%20personally%20identifiable%20level.
[129] https://newsroom.transunion.com/transunion-announces-enhanced-identity-graph-for-marketing-solutions/
[130] https://www.okta.com/identity-101/md5/
[131] https://www.bleepingcomputer.com/news/security/cracked-logins-of-570-000-mortal-online-players-sold-on-forums/
[132] https://arstechnica.com/information-technology/2015/09/once-seen-as-bulletproof-11-million-ashley-madison-passwords-already-cracked/

135.    As the owner and operator of the website, Defendant intended for these third parties—LiveIntent, Svorn, LiveRamp, Neustar, AtData, and Throtle—to receive consumers' electronic communications and their personally identifiable information.  And because those third parties are well-known and registered data brokers, Defendant knew that they would use those communications for their own commercial purposes.

136.    Put together, Defendant assisted at least six data brokers—LiveIntent, Svorn, LiveRamp, Neustar, AtData, and Throtle—with intercepting electronic communications that not only revealed the consumers' personally identifiable information but also the content of their communications.

137.    Although each of these disclosures constitute a blatant violation of consumers' privacy, Defendant's disclosures to Throtle, Inc., are particularly egregious.

138.    "Throtle offers valuable and effective identity solutions for the healthcare industry."[133]  Similar to LiveIntent, Throtle maintains an identity graph that collects "exposure and engagement data (impressions, clicks, etc.)" and matches that activity against "a wide array of personal and persistent data points, including email addresses, postal addresses, mobile numbers, device IDs, MAIDs, and so on."[134]  Through "precise data accuracy across hundreds of millions of profiles,"[135] Throtle's identity graph offers insights into, among other things, "disease and patient identification."[136]

139.    As Throtle itself recognizes, "[h]ealthcare data is among the most sensitive information out there."[137] Although Defendant is a shoe retailer, even unremarkable purchases can provide alarmingly precise inferences about a person's health.  By failing to receive consumers' consent before disclosing their personally identifiable information and online

---

[133] https://www.throtle.io/
[134] https://www.newswire.com/news/throtle-s-data-pixel-technology-to-enhance-healthverity-media-22295349
[135] https://www.throtle.io/
[136] https://www.newswire.com/news/throtle-s-data-pixel-technology-to-enhance-healthverity-media-22295349
[137] https://www.throtle.io/blog/consumer-identity-graphs-are-not-the-same-as-marketing-databases

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

activity to a data broker that specializes in deducing inferences about medical conditions, Defendant brazenly violated their trust and privacy.

***

140.    In sum, Defendant knowingly and repeatedly has made—and continues to make—false representations that give customers a misplaced sense of privacy.  By making these representations, Defendant created an expectation of privacy on its website, promising users that it would refrain from using tracking technologies that link web activity to personally identifiable information.  As a corollary, by making these representations, Plaintiffs and Class members possessed the reasonable expectation that their communications with Defendant would remain confidential.  Rather than uphold that expectation, Defendant surreptitiously assisted third parties with intercepting their confidential communications.

## TOLLING, CONCEALMENT, AND ESTOPPEL

141.    The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

142.    Defendant has repeatedly represented to its customers that its "usage of cookies is in no way linked to any Personal Information while on [its] site."[138]

143.    Defendant has never disclosed that it would or could disregard those representations and instead helps third parties intercept communications containing customers' personally identifiable information.  Defendant affirmatively hid its true actions and knowingly made statements that were misleading and concealed the true nature of their conduct and operation. The circumstances of third-party trackers employed on and with respect to Defendant's website would lead reasonable users to believe third parties were not collecting their personally identifiable information or that Defendant was facilitating disclosure of the same.

144.    Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

---

[138] Privacy Policy, Rack Room Shoes, rackroomshoes.com/privacy (last accessed Sept. 9, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

145.    Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendant therefore is estopped from relying on any statute of limitations.

146.    All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

147.    Accordingly, Plaintiffs and the Class could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## **CLASS ALLEGATIONS**

148.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated and seek to certify the following class (the "Nationwide Class"): All persons in the United States who accessed and navigated www.rackroomshoes.com.

149.    Plaintiffs also seek to certify the following sub-class (the "California Class"): All persons in the state of California who accessed and navigated www.rackroomshoes.com.

150.    Plaintiffs reserve the right to modify the class definitions, including by using additional subclasses, as appropriate based on further investigation and discovery obtained in the case.

151.    Numerosity of the Class: The Nationwide Class and California Class are composed of thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both parties and the Court.

152.    Existence and Predominance of Common Questions of Fact and Law:  There is a well-defined community of interest in the questions of law and fact affecting proposed Class members.  The questions of law and fact common to the proposed class predominate over questions affecting only individual members.  Such questions include, but are not limited to, the following:

a)    whether Defendant facilitated or procured the unlawful actions of third parties, including Meta and Attentive;

b)  whether Defendant obtain express consent to their conduct;
c)  whether Defendant's conduct violated the Wiretap Act or California Invasion of Privacy Act, Cal. Penal Code § 631;
d)  whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgement interest and costs of this suit; and
e)  whether Defendant should be enjoined from similar conduct in the future.

153.    Typicality:  Plaintiffs are asserting claims that are typical of the proposed Class members' claims because they have accessed and browsed Defendant's website, www.rackroomshoes.com.  Plaintiffs and the proposed Class members have similarly suffered harm arising from Defendant's violations of the law, as alleged herein.

154.    Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases. Plaintiffs do not have any interests antagonistic to those of the Classes.

155.    Superiority: A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' and the proposed Class members' claims.  Plaintiffs and Class members have suffered irreparable harm as a result of Defendant's unfair, unlawful, and unconscionable conduct.  Because of the size of the individual Class members' claims, few, if any, proposed Class members could afford to seek legal redress for the wrongs complained of herein.  Absent the class action, the proposed Class members will continue to suffer losses and the violations of law described herein will continue without remedy, and Defendant will be permitted to retain the proceeds of its misdeeds.  Defendant continues to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

156.    Injunctive Relief: Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendants acted on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

157.    Particular Issues: Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>
46

1
2

<u>**COUNT I**</u>
**Violation of the Wiretap Act**
**18 U.S.C. § 2510, *et. seq.***

3      158.    Plaintiffs repeat the allegations contained in paragraphs 1 through 156 as if fully

4    set forth herein.

5      159.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

6      160.    The Wiretap Act, as amended by the Electronic Communications Privacy Act of

7    1986, prohibits intentionally intercepting or endeavoring to intercept electronic communications.

8    18 U.S.C. § 2511(1)(a).

9      161.    The Wiretap Act also prohibits procuring another person to either intercept or

10   endeavor to intercept an electronic communication.  *Id.*

11     162.    Defendant intentionally procured Meta, Attentive, and other third parties to

12   intercept electronic communications.  The interceptions were done contemporaneously with

13   Plaintiffs' and Class members' sending and receiving communications.  The intercepted

14   communications included the "contents" of electronic communications, including detailed URL

15   requests.

16     163.    The transmission of data between Plaintiffs and Defendant constitute "transfer[s]

17   of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in

18   part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects

19   interstate commerce[,]" and were therefore "electronic communications" within the meaning of

20   18 U.S.C. § 2510(12).

21     164.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

22                a.    The computer codes and programs used by Meta, Attentive, and
                        other third parties to track Plaintiffs' and Class members'
23                      communications while they were navigating Defendant's website;
                  b.    Plaintiffs' and Class members' browsers or mobile applications;
24                c.    Plaintiffs' and Class members' computing and mobile devices;
                  d.    Meta's web and ad servers;
25                e.    Attentive's web and ad servers;
                  f.    Third parties' web and ad servers;
26                g.    The web and ad-servers from which Meta, Attentive, and other third
                        parties tracked and intercepted Plaintiffs' and Class members'
27                      communications while they were using a web browser or mobile
                        application to navigate Defendant's website;
28

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

h.  The computer codes and programs used by Meta, Attentive, and other third parties to effectuate their tracking and intercepting of Plaintiffs' and Class members' communications while they were navigating Defendant's website; and

i.  The plan that Meta, Attentive, and other third parties carried out to effectuate their tracking and intercepting of Plaintiffs' and Class members' electronic communications.

165.  Plaintiffs and Class members were unaware that Meta, Attentive, and other third parties were redirecting the referrer URL, form field entries, or the text of buttons clicked.

166.  Plaintiffs and Class members never provided Meta, Attentive, or other third parties with consent to intercept or collect their electronic communications.

167.  Defendant procured Meta, Attentive, and other third parties to intercept Plaintiffs' and Class members' electronic communications for an unlawful or tortious purpose. That purpose includes, for example, associating the content of their electronic communications with preexisting consumer profiles. It also includes continuing to use and exploit the contents of the electronic communications in a manner that exceeds what Defendant promised Plaintiffs and Class members in its Privacy Policy.

168.  As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiffs and Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably incurred.

**COUNT II**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(California Class)**

169.  Plaintiffs repeat the allegations contained in paragraphs 1 through 156 as if fully set forth herein.

170.  Plaintiffs bring this claim individually and on behalf of the California Class.

171.  The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose:

The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping on

private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

172.    California Penal Code § 631(a) provides in pertinent part:

Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

173.    A defendant must show it had the consent of all parties to the communication.

174.    At all relevant times, Defendant aided, agreed with, and conspired with third parties to track and intercept Plaintiffs' and the California Class members' internet communications exchanged with Defendant while accessing Defendant's website.  Defendant assisted these interceptions without first receiving authorization or consent from Plaintiffs and the California Class members.

175.    Meta, Attentive, and other third parties intercepted these communications without consent from all parties to the communications.

176.    Meta, Attentive, and other third parties intended to learn, and did learn, some meaning of the content in the communications including without limitation in the URLs, search queries, and other content described herein exchanged between the California Class members and Defendant on Defendant's website.

177.    Defendant, when aiding and assisting third parties' eavesdropping, intended those third parties to learn the content of the visitor's communications.

178.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and, even if they do not, the tracking technology by Meta, Attentive, and other third parties falls within the broad catch-all category of "any other manner":

    a.   The computer codes and programs that Meta, Attentive, and other third parties used to track Plaintiffs' and the Class members' communications while they navigated Defendant's website;

    b.   Plaintiffs' and Class members' browsers;

    c.   Plaintiffs' and Class members' computing and mobile devices;

    d.   The web and ad servers of Meta, Attentive, and other third parties;

    e.   The web and ad-servers from which Meta, Attentive, and other third parties tracked and intercepted Plaintiffs' and Class members' communications while they were using their web browser to access or navigate Defendant's website;

    f.   The computer codes and programs that Meta, Attentive, and other third parties used to track and intercept the Plaintiffs' and Class members' communications while they were using a browser to visit Defendant's website.

179.    The plan that Meta, Attentive, and other third parties carried out to effectuate its tracking and interception of Plaintiffs' and Class members' communications while they were using a web browser or mobile application to visit Defendant's website originated in and was executed in California.

180.    Pursuant to California Penal Code § 637.2, Plaintiffs and the California Class members have been injured by the violation of California Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages, as well as injunctive relief.

### COUNT III
**Violation of California Invasion of Privacy Act**
**Cal. Penal Code § 632**
**(California Class)**

181.    Plaintiffs repeat the allegations contained in paragraphs 1 through 156 above as if fully set forth herein.

182.    Plaintiffs bring this claim individually and on behalf of the California Class.

183.    The data collected on Defendant's websites constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

184.    Defendant is liable for aiding and abetting violations of 632 by Meta, Attentive, and other third parties.

185.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the California Class members have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>COUNT IV</u>
**Violation of the Comprehensive Computer Data and Access and Fraud Act ("CDAFA")**
**Cal. Penal Code § 502,** *et. seq.*
**(California Class)**

186.    Plaintiffs repeat the allegations contained in paragraphs 1 through 156 above as if fully set forth herein.

187.    Plaintiffs bring this claim individually and on behalf of the California Class.

188.    Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

189.    Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and the California Class members' data.

190.    Defendant effectively charged Plaintiffs and the California Class members by taking, copying, analyzing, and using their valuable personal information without permission and exploiting that information for Defendant's own financial benefit.  Plaintiffs and the California Class members retain a stake in the profits Defendant earned from their personal information and other data because, under the circumstances, it is unjust for Defendant to retain those profits.

191.    As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused loss to Plaintiffs and the California Class members and has been unjustly enriched in an amount to be proven at trial.

192.    Plaintiffs, on behalf of themselves and the California Class members, seek compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

193.    Plaintiffs and the California Class members are entitled to punitive damages because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice.

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

194.    Plaintiffs and the California Class members are also entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

**COUNT V**
**Invasion of Privacy**
**(California Class)**

195.    Plaintiffs hereby incorporate Paragraphs 1 through 156 as if fully stated herein.

196.    Plaintiffs bring this claim individually and on behalf of the California Class.

197.    The right to privacy in California's constitution creates a right of action against private entities such as Defendant.

198.    Plaintiffs' and Class members' expectation of privacy is deeply enshrined in California's Constitution.  Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights.  Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property and obtaining safety, happiness, and private."  The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11.  Critically, the argument in favor of Proposition 11 reveals the legislative intent was to curb business' control over unauthorized collection and use of consumers' personal information:

> The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us.  Fundamental to our privacy is the ability to control circulation of personal information.  This is essential to social relationships and personal freedom.

199.    The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

200.    To plead a California constitutional privacy claim, a plaintiff must show an invasion of (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

201.    As described herein, Defendant has intruded upon the following legally protected privacy interests:

g.    The Wiretap Act as alleged herein;
h.    The California Invasion of Privacy Act as alleged herein;
i.    Defendant's Privacy Policies and other public promises that it would not procure third parties to track or intercept the Plaintiffs' and Class members' communications or access their computing device and web-browsers while browsing Defendant's website.

202.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiffs and Class members could not reasonably expect Defendant would commit acts in violation of federal and state civil and criminal law.

203.    Plaintiffs and Class members also had a reasonable expectation of privacy under the circumstances in that Defendant affirmatively promised users (including Plaintiffs and Class members) that it would not procure third parties to track their online activity and personally identifiable information while they were using Defendant's website.

204.    Defendant's actions constitute a serious invasion of privacy in that it:

j.    Violated several criminal laws, including the Wiretap Act;
k.    Invaded the privacy rights of millions of Americans (including Plaintiffs and Class members) without their consent; and
l.    Constituted the unauthorized taking of valuable information from millions of Americans through deceit.

205.    Committing criminal acts against millions of Americans constitutes an egregious breach of social norms that is highly offensive.

206.    The surreptitious and unauthorized tracking of the internet communications of millions of Americans, particularly where, as here, Defendant promised to protect their privacy, constitutes an egregious breach of social norms that is highly offensive.

207.    The disclosure of personally identifiable information of millions of Americans through deceit is highly offensive behavior.

208.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation and injunctive relief.

//

//

FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT VI**
**California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et . seq.***
**(California Class)**

209.    Plaintiffs hereby incorporate Paragraphs 1 through 156 as if fully stated herein.

210.    Plaintiffs bring this claim individually and on behalf of the California Class.

211.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the practices aforementioned, Defendant has violated the UCL.

212.    Defendant's "unlawful" acts and practices include its violation of the Wiretap Act, 18 U.S.C. § 2510, et. seq.; the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632; the California Computer Data Access and Fraud Act, Cal. Penal Code § 502, et. seq.; Invasion of Privacy; California Online Privacy Protection Act, Cal. Bus. & Prof. Code § 22576, et. seq.; the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, et. seq.; and the Federal Trade Commission Act, 15 U.S.C. § 45, et. seq.

213.    Defendant's conduct violated the spirit and letter of those laws, which protect property, economic and privacy interest and prohibits unauthorized disclosure of private communications and personal information.

214.    Defendant's "unfair" acts and practices include its violation of property, economic and privacy interests protected by the statutes identified in paragraph 211. To establish liability under the unfair prong, Plaintiffs and Class members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

215.    Plaintiffs and Class members have suffered injury-in-fact, including the loss of money and/or property as a result of Defendant's unfair and/or unlawful practices, to wit, the unauthorized disclosure of their personal information which has value as demonstrated by its use by Defendant. Plaintiffs and Class members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

216.    Defendant's actions caused damage to and loss of Plaintiffs' and the California Class members' property right to control the dissemination and use of their personal information and communications.

217.    Defendant reaped unjust profits and revenue in violation of the UCL.   This includes Defendant's profits and revenues from enhanced marketing and advertising they received from Plaintiffs' and Class members' personal information and communications. Plaintiffs and Class members seek restitution and disgorgement of these unjust profits and revenues.

### COUNT VII
### California's Consumers Legal Remedies Act ("CLRA")
### Cal. Civ. Code § 1782, *et. seq.*

218.    Plaintiffs hereby incorporate Paragraphs 1 through 156 as if fully stated herein.

219.    Plaintiffs bring this claim individually and on behalf of the California Class.

220.    The CLRA prohibits an enumerated list of "unfair methods of competition and unfair or deceptive acts or practices … undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services." Cal. Civ. Code § 1770(a).

221.    The CLRA prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." Cal. Civ. Code § 1770(5).

222.    Defendant's conduct violated the CLRA by representing that consumers could purchase products on Defendant's website without needing to disclose their electronic communications to other third parties.

223.    Plaintiffs and Class members have suffered injury-in-fact, including the loss of money and/or property as a result of Defendant's unfair and/or unlawful practices, to wit, the unauthorized disclosure of their personal information which has value as demonstrated by its use by Defendant.   Plaintiffs and Class members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

224.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

225.    Defendant reaped unjust profits and revenue in violation of the CLRA.  This includes Defendant's profits and revenues from enhanced marketing and advertising they received from Plaintiffs' and Class members' personal information and communications.

226.    At this time, Plaintiffs and Class members only seek injunctive relief pursuant to Cal. Civ. Code § 1782.

<u>**PRAYER FOR RELIEF**</u>

227.    WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

  a. For an order certifying the putative Nationwide Class and California Class and naming Plaintiffs as the representatives of the putative Classes and Plaintiffs' attorneys as Class Counsel to represent the putative Class members;

  b. For an order declaring that the Defendant's conduct violates the statutes referenced herein;

  c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

  d. For an order finding in favor of Plaintiffs and the putative Nationwide Class and California Class on all counts asserted herein;

  e. For the statutory damages in amounts to be determined by the Court and/or jury;

  f. For prejudgment interest on all amounts awarded;

  g. For injunctive relief as pleaded or as the Court may deem proper; and

<u>FIRST AMENDED CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED</u>

h. For an order awarding Plaintiffs and the putative Nationwide Class and California Class their reasonable attorneys' fees and expenses and cost of suit.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: December 18, 2024

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**

By:    */s/ Michael A. Pineiro*
Michael A. Pineiro

Michael A. Pineiro (*pro hac vice*)
Brandon S. Floch (*pro hac vice* forthcoming)
Christopher R. Reilly (*pro hac vice*)

**LEVIN LAW, P.A.**
Brian Levin (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice* forthcoming)

**THE FREEDMAN FIRM PC**
Michael G. Freedman (Cal. Bar No. 281279)

*Attorneys for Plaintiffs*