BLANK ROME LLP
Ana Tagvoryan (SBN 246536)
ana.tagvoryan@blankrome.com
Harrison Brown (SBN 291503)
Harrison.brown@blankrome.com
Victor Sandoval (SBN 344461)
victor.sandoval@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone: 424.239.3400
Facsimile: 424.239.3434

*Attorneys for Defendant*
Rack Room Shoes, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

| | |
|---|---|
| DEMETRIUS SMITH, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RACK ROOM SHOES, INC.,<br><br>Defendant. | Case No. 3:24-cv-06709-RFL<br><br>[*Assigned to Judge Rita F. Lin*]<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTIONS TO DISMISS AND STRIKE AMENDED COMPLAINT**<br><br>(*Filed concurrently with Notice of Motion and Motion to Dismiss Amended Complaint, Memorandum and Points of Authorities Supporting Motion to Dismiss, [Proposed] Order Granting Motion to Dismiss, Notice of Motion and Motion to Strikes Amended Complaint, Memorandum and Points of Authorities Supporting Motion to Strike, and [Proposed] Order Granting Motion to Strike*)<br><br>Date: March 18, 2025<br>Time: 10:00 a.m.<br>Courtroom: 15<br><br>Complaint Filed: September 24, 2024<br>Complaint Served: October 9, 2024<br>Trial Date: None set |

Pursuant to Federal Rule of Evidence 201, Defendant Rack Room Shoes, Inc., ("Defendant") requests that the Court take judicial notice of the following documents, and/or find that they are incorporated by reference into plaintiffs Demetrius Smith, Robin Savage, and Maia Williams' ("Plaintiffs") Amended Complaint. True and correct copies of which are attached as exhibits to the attached Declaration of Victor Sandoval ("Sandoval Declaration"):

| **Exhibit No.** | **Description** |
|---|---|
| Exhibit 1 | Defendant's Privacy Policy as it appeared in February, March and July of 2024 |
| Exhibit 2 | Meta's "Create a New Account Page" as it appeared in 2007 |
| Exhibit 3 | Meta's "Create a New Account Page" as it appeared in 2008 |
| Exhibit 4 | Meta's "Create a New Account Page" as it appeared in 2009 |
| Exhibit 5 | Meta's "Cookies Policy" as it appeared in February, March, and July of 2024 |
| Exhibit 6 | Meta's Privacy Policy as it appeared in February and March of 2024 |
| Exhibit 7 | The pop-up window that appears when "Information from Partners, vendors and third parties" is clicked on Facebook's Privacy Policy, as it appeared in February and March of 2024 |
| Exhibit 8 | Meta's Privacy Policy as it appeared in July of 2024 |
| Exhibit 9 | The pop-up window that appears when "Information from Partners, vendors and third parties" is clicked on Facebook's Privacy Policy, as it appeared in July of 2024 |
| Exhibit 10 | Meta's Terms of Service as it appeared in February, March and July of 2024 |
| Exhibit 11 | Meta's May 26, 2022 press released concerning obtaining assent to updated policies and terms |
| Exhibit 12 | Meta's January 28, 2020 press release announcing that Off-Facebook Activity Reports are available to all Facebook users as of that date |
| Exhibit 13 | Meta's August 20, 2019 press release announcing initial roll-out of Off-Facebook Activity Reports |
| Exhibit 14 | Attentive's Master Subscription Agreement |

These exhibits are authenticated in the concurrently filed declaration of Victor J. Sandoval, though, in any event, the authenticity of these documents cannot reasonably be questioned for the reasons discussed below.

**A. Exhibits 1, 5, 6, 8, 10, and 14 are Incorporated into the Complaint by Reference.**

Exhibit 1 to the Sandoval Declaration is a true and correct copy of Defendant's Privacy Policy that was operative at the time of the Amended Complaint. The Privacy Policy is incorporated by reference in the Amended Complaint. *See* FAC ¶¶ 2 n.1 (quoting and linking to the Privacy Policy); 42 n. 39 (same); 40-50 (relying on Privacy Policy); 142, n. 138 (same).

Exhibits 5, 6, 8, and 10 to the Sandoval Declaration are true and correct copies of Meta's Privacy Policy, Cookies Policy, and Terms of Service (collectively, "Meta's Policies") that were effective at the times relevant to the Amended Complaint. Meta's Privacy Policy, Cookies Policy, and Terms of Service are incorporated by reference in the Amended Complaint. *See* FAC ¶¶ 88 ns. 60-61 (quoting and linking to Meta's Term of Service); 90 n. 65 (quoting and linking to Meta's Privacy Policy); 91 n. 66 (quoting and linking to Meta's Cookie Policy); 86-94 (relying on Meta's Term of Service, Privacy Policy, and Cookies Policy).

Exhibit 14 to the Sandoval Declaration is a true and correct copy of Attentive's Master Subscription Agreement referenced in the Amended Complaint and thus incorporated by reference. *See* FAC ¶¶ 106 ns. 86-86 (relying on and quoting and linking to Attentive's Master Subscription Agreement).

The court may rely on Exhibits 1, 5, 6, 8, 10, and 14 in deciding Defendant's Motions to Dismiss and Strike Plaintiff's Amended Complaint (the "Motions") under the "incorporation by reference" doctrine. The "incorporation by reference" doctrine permits the noticing of documents referenced or relied on in a complaint:

> Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a Motion to Dismiss under Rule 12(b)(6).

*United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (same). The purpose of this doctrine is to "prevent plaintiffs from

surviving a Rule 12(b)(6) motion by deliberately omitting documents upon which their claims are based." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (brackets and ellipses omitted).

Plaintiff's claim for damages relies on the alleged representations in Defendant's Privacy Policy, Meta's Policies, and Attentive's Master Subscription Agreement. And, each is repeatedly referenced in the Amended Complaint itself. *See Knievel*, 393 F.3d at 1076 ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."). Accordingly, the Court may reference Exhibits 1, 5, 6, 8, 10, and 14 in deciding the Motions under the "incorporation by reference" doctrine. Alternatively, the Court may take judicial notice, as set forth below.

**B. The Court May Take Judicial Notice of Exhibits 1 through 14 Which Are Screenshots from Publicly-Available Websites.**

Defendant also respectfully requests that the Court take judicial notice of Exhibits 1 through 14 attached hereto. Exhibits 1 through 14 consist of true and correct copies of screenshots from Defendant's website, www.rackroomshows.com, Meta's website www.facebook.com, and Attentive's website, www.attentive.com.

Under Federal Rule of Evidence 201, a court may take judicial notice of an adjudicative fact "not subject to reasonable dispute" in that it is either "(1) generally known within the trial court's territorial jurisdiction" or "(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). These screenshots fall into the latter category, as it is appropriate to take notice of the fact that something appears on a website because the authenticity of the website is not in question. *Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 549 (2d Cir. 2002).

"It is generally proper to take judicial notice of articles and Web sites published on the Internet." *Wang v. Pataki*, 396 F.Supp.2d 446, 458 n. 2 (S.D.N.Y. 2005); *see also Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1084 n.2 (C.D. Cal. 2001) (taking "judicial notice of www.eBay.com and the information contained therein"); *Knievel*, 393 F.3d at 1076 (recognizing judicial notice of webpages

because "[j]ust as a reader must absorb a printed statement in the context of the media in which it appears, a computer user necessarily views web pages in the context of the links through which the user accessed those pages"); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (taking judicial notice of the contents of articles to show "was in the public realm at the time"); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1145 n.8 (N.D. Cal. 2008) (taking judicial notice of the contents of a Wikipedia page); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (taking judicial notice of information posted on a publicly available website); *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1113 & n.5 (9th Cir. 2012) (same).

Courts routinely conclude that webpages are appropriate subjects of judicial notice and that their existence is not subject to reasonable dispute because they are readily accessible via the internet. *See, e.g., Kittrich Corp. v. Chilewich Sultan, LLC*, No. CV 12-10079-GHK (ARGx), 2013 WL 12131376, at *3 & n.1 (C.D. Cal. Feb. 20, 2013) (judicially noticing a company profile webpage and a webpage identifying the company's products and main export markets "to prove their existence and content"); *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 966 (C.D. Cal. 2005) (taking judicial notice of Amazon webpages and information on a medical association's website); *see also Barakezyan v. BMW of N. Am., LLC*, No. CV 16-00173 SJO (GJSx), 2016 WL 2840803, at *6 n.3 (C.D. Cal. Apr. 7, 2016) (taking judicial notice of booklets for the vehicle at issue because the booklets were "publicly available on the Internet").

A plaintiff's allegations regarding lack of consent to a website's privacy policy are no exception. *See Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (considering privacy policy on a defendant's website where the privacy policy "contradict[ed] Plaintiff's claim that he was unaware of and did not consent to the transfer of his personal information to a third party"); *Hulsey v. Peddle, LLC*, No. CV 17-3843 DSF (ASX), 2017 WL 8180583, at *1 n.1 (C.D. Cal. Oct. 23, 2017) ("The Court takes judicial notice of Junk Car Zone's Privacy Policy because its authenticity is not contested and it is central to Hulsey's claim that she did not consent to receive texts from Peddle.").

Further, the Court can take judicial notice of **Exhibits 2 - 10**, which contain screenshots captured by Archive.org's Wayback Machine of Facebook website pages from 2007, 2008, and 2009, the times Plaintiffs allegedly made their Facebook accounts; and from February, March, and July of 2024, the

times that Plaintiffs allegedly visited Defendant's website and the alleged privacy violations occurred. *See* FAC ¶¶ 6-8. "Courts have taken judicial notice of internet archives in the past, including Archive.org's 'Wayback Machine,' finding that Archive.org possesses sufficient indicia of accuracy that it can be used to readily determine the various historical versions of a website." *EVO Brands,* 657 F. Supp. 3d at 1322 (collecting cases); *UL LLC v. Space Chariot Inc*., 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017) "[c]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also In re Packaged Seafood Prods. Antitrust Litig*., 338 F. Supp. 3d 1118, 1132 n.8 (S.D. Cal. 2018); *Sabatini v. Price*, No. 17-CV-01597-AJB-JLB, 2018 WL 1638258, at *5 n.6 (S.D. Cal. Apr. 5, 2018) (taking judicial notice of webpage obtained from the Internet Archive on its own initiative), *aff'd sub nom. Sabatini v. Azar*, 749 F. App'x 588 (9th Cir. 2019); *United States ex rel. Hong v. Newport Sensors, Inc*., No. SACV 13-1164-JLS (JPRx), 2016 WL 8929246, at *3 (C.D. Cal. May 19, 2016) (same), *aff'd*, 728 F. App'x 660 (9th Cir. 2018); *O'Connor v. Lyft, Inc*., No. 16-cv-00351-JSW, 2016 WL 6126966, at *3 (N.D. Cal. Apr. 14, 2016) ("Courts have found that contents of web pages contained on and available through the Wayback Machine are judicially noticeable under Federal Rule of Evidence 201.").

**Exhibits 1 - 14** derive from Attentive, Meta and Defendant's websites. Each website is publicly available and consequently subject to judicial notice under Rule 201(b). They are also documents "whose contents are alleged in [the] complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (alteration in original) (citations omitted) (noting the court "may treat such . . . document[s] as part of the complaint, and thus may assume that [their] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)").

**Exhibit 1** displays Defendant's Privacy Policy, as it appeared in February, March, and July of 2024, when each of Plaintiffs allegedly visited Defendant's website and the alleged privacy violations occurred.

**Exhibit 2** displays Facebook's account creation page, as it appeared in 2007, when plaintiff Robin Savage allegedly created an account. As part of the account creation process, a user was required

to affirmative assent to Facebook's Terms of Use, which incorporates its Privacy Policy. **Exhibit 2** appears in archived format through the publicly accessible internet archive tool, the Wayback Machine, available at http://wayback.archive.org, which captures https://www.facebook.com/r.php.

**Exhibit 3** displays Facebook's account creation page, as it appeared in 2008, when plaintiff Demetrius Smith allegedly created an account. As part of the account creation process, a user was required to affirmative assent to Facebook's Terms of Use and Privacy Policy. **Exhibit 3** appears in archived format through the publicly accessible internet archive tool, the Wayback Machine, available at http://wayback.archive.org, which captures https://www.facebook.com/r.php.

**Exhibit 4** displays Facebook's account creation page, as it appeared in 2009, when plaintiff Maria Williams allegedly created an account. As part of the account creation process, a user was required to affirmative assent to Facebook's Terms of Use and Privacy Policy. **Exhibit 4** appears in archived format through the publicly accessible internet archive tool, the Wayback Machine, available at http://wayback.archive.org, which captures https://www.facebook.com/r.php.

**Exhibit 5** displays Facebook's Cookies Policy, as it appeared in February, March, and July of 2024, when Plaintiffs allegedly visited Defendant's website and the alleged privacy violations occurred. **Exhibit 5** appears in archived format through the publicly accessible internet archive tool, the Wayback Machine, available at http://wayback.archive.org, which captures https://www.facebook.com/privacy/policies/cookies/. In it, Meta clearly discloses that "other companies use cookies on the Meta Products to provide advertising, measurement, marketing and analytics services" and that they "use cookies on their own sites and apps in connection with the Meta Products."

**Exhibit 6** displays Facebook's Privacy Policy, as it appeared in February and March of 2024, when plaintiffs Robin Savage and Maia Williams allegedly visited Defendant's website and the alleged privacy violations occurred. **Exhibit 6** appears in archived format through the publicly accessible internet archive tool, the Wayback Machine, available at http://wayback.archive.org, which captures https://www.facebook.com/about/privacy/update.

**Exhibit 7** displays the pop-up window that appears when "Information from Partners, vendors and third parties" is clicked on Facebook's Privacy Policy, as it appeared in February and March of 2024. In it, Meta clearly discloses that it receives various information from information and activities on

and off Facebook, including, websites visited and cookie data, transactions made, demographic data, email addresses, and websites' "communications with you".

**Exhibit 8** displays Facebook's Privacy Policy, as it appeared in July of 2024, when plaintiff Demetrius Smith allegedly visited Defendant's website and the alleged privacy violations occurred. **Exhibit 8** appears in archived format through the publicly accessible internet archive tool, the Wayback Machine, available at http://wayback.archive.org, which captures https://www.facebook.com/about/privacy/update.

**Exhibit 9** displays the pop-up window that appears when "Information from Partners, vendors and third parties" is clicked on Facebook's Privacy Policy, as it appeared in February and July of 2024. In it, Meta clearly discloses that it receives various information from information and activities on and off Facebook, including, websites visited and cookie data, transactions made, demographic data, email addresses, and websites' "communications with you".

**Exhibit 10** displays Facebook's Terms of Service, as they appeared in February, March and July of 2024, when Plaintiffs allegedly visited Defendant's website and the alleged privacy violations occurred. **Exhibit 10** appears in archived format through the publicly accessible internet archive tool, the Wayback Machine, available at http://wayback.archive.org, which captures https://www.facebook.com/legal/terms/update. Facebook's Terms of Service as they appeared in February, March and July of 2024 incorporate by reference Facebook's Cookies and Privacy Policies.

**Exhibit 11** displays Meta's May 26, 2022 press release concerning obtaining assent to updated policies and terms. In it, Meta discusses how it provides notifications letting Facebook user know when they have updated their Terms of Use and Privacy Policy and thereby obtain assent thereto. Accordingly, although Plaintiffs assented to earlier versions of Meta's Terms of Use and Privacy Policy, they would have assented to the versions in effect in February, March, and July of 2024, when each of Plaintiffs allegedly visited Defendant's website and the alleged privacy violations occurred.

**Exhibit 12** displays Meta's January 28, 2020 press release announcing that Off-Facebook Activity Reports are available to all Facebook users as of that date. In it, Meta discloses that "[o]ther businesses send us information about your activity on their sites and we use that information to show you ads that are relevant to you. Now you can see a summary of that information and clear it from your

account if you want to." It links to Meta's August 20, 2019 press release announcing initial roll-out of Off-Facebook Activity Reports.

**Exhibit 13** displays Meta's August 20, 2019 press release announcing initial roll-out of Off-Facebook Activity Reports. In it, Meta describes the tool as allowing users to "[s]ee a summary of the information other apps and websites have sent Facebook through our online business tools, like Facebook Pixel[.]"

**Exhibit 14** displays Attentive's Master Subscription Agreement. In it, Attentive confirms that it is a service provider that cannot use customer data outside of its business relationship with Defendant.

For the reasons stated herein, Defendant respectfully requests that the Court take judicial notice of Exhibits 1 to 14 in connection with Defendant's Motions.

DATED: January 16, 2025

BLANK ROME LLP

By: */s/ Victor Sandoval*
Ana Tagvoryan
Victor J. Sandoval
Attorneys for Defendant
RACK ROOM SHOES

# DECLARATION OF VICTOR SANDOVAL

I, Victor Sandoval, declare as follows:

1. I am an attorney at the firm Blank Rome LLP, counsel for Defendant Rack Room Shoes, Inc. ("Defendant") in the above-entitled action. I am one of the attorneys responsible for handling this case on behalf of Defendant. I make this declaration in support of Defendant's Motion to Dismiss and/or Strike plaintiffs Demetrius Smith, Robin Savage, and Maia Williams' ("Plaintiffs") Complaint. I make this declaration of my personal knowledge and my review of the litigation files kept in the ordinary course of business and could and would testify competently hereto.

2. Attached hereto as **Exhibit 1** is a true and correct copy of Defendant's Privacy Policy, as it appeared in February, March, and July of 2024, when each of Plaintiffs allegedly visited Defendant's website and the alleged privacy violations occurred.

3. Attached hereto as **Exhibit 2** is a true and correct copy of Facebook's account creation page, as it appeared in 2007, when plaintiff Robin Savage allegedly created an account. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024.

4. Attached hereto as **Exhibit 3** is a true and correct copy of Facebook's account creation page, as it appeared in 2008, when plaintiff Demetrius Smith allegedly created an account. As part of the account creation process, a user was required to affirmative assent to Facebook's Terms of Use and Privacy Policy. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024.

5. Attached hereto as **Exhibit 4** is a true and correct copy of Facebook's account creation page, as it appeared in 2009, when plaintiff Maria Williams allegedly created an account. As part of the account creation process, a user was required to affirmative assent to Facebook's Terms of Use and Privacy Policy. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024.

6. Attached hereto as **Exhibit 5** is a true and correct copy of Facebook's Cookies Policy, as it appeared in February, March, and July of 2024, when Plaintiffs allegedly visited Defendant's website and the alleged privacy violations occurred. My office obtained this copy through the publicly accessible

internet archive tool, the Wayback Machine, on November 26, 2024. In it, Meta clearly discloses that "other companies use cookies on the Meta Products to provide advertising, measurement, marketing and analytics services" and that they "use cookies on their own sites and apps in connection with the Meta Products."

7. Attached hereto as **Exhibit 6** is a true and correct copy of Facebook's Privacy Policy, as it appeared in February and March of 2024, when plaintiffs Robin Savage and Maia Williams allegedly visited Defendant's website and the alleged privacy violations occurred. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024.

8. Attached hereto as **Exhibit 7** is a true and correct copy of the pop-up window that appears when "Information from Partners, vendors and third parties" is clicked on Facebook's Privacy Policy, as it appeared in February and March of 2024. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024. In it, Meta clearly discloses that it receives various information from information and activities on and off Facebook, including, websites visited and cookie data, transactions made, demographic data, email addresses, and websites' "communications with you".

9. Attached hereto as **Exhibit 8** is a true and correct copy of Facebook's Privacy Policy, as it appeared in July of 2024, when plaintiff Demetrius Smith allegedly visited Defendant's website and the alleged privacy violations occurred. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024.

10. Attached hereto as **Exhibit 9** is a true and correct copy of the pop-up window that appears when "Information from Partners, vendors and third parties" is clicked on Facebook's Privacy Policy, as it appeared in July of 2024. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024. In it, Meta clearly discloses that it receives various information from information and activities on and off Facebook, including, websites visited and cookie data, transactions made, demographic data, email addresses, and websites' "communications with you".

11. Attached hereto as **Exhibit 10** is a true and correct copy of Facebook's Terms of Service, as they appeared in February, March and July of 2024, when Plaintiffs allegedly visited Defendant's

website and the alleged privacy violations occurred. My office obtained this copy through the publicly accessible internet archive tool, the Wayback Machine, on November 26, 2024.

12. Attached hereto as **Exhibit 11** is a true and correct copy of Meta's March 26, 2022 press release concerning obtaining assent to updated policies and terms. My office obtained this copy on November 26, 2024.

13. Attached hereto as **Exhibit 12** is a true and correct copy of Meta's January 28, 2020 press release announcing that Off-Facebook Activity Reports are available to all Facebook users nationwide as of that date. My office obtained this copy on November 26, 2024. In it, Meta discloses that "[o]ther businesses send us information about your activity on their sites and we use that information to show you ads that are relevant to you. Now you can see a summary of that information and clear it from your account if you want to" and links to Meta's August 20, 2019 press release announcing initial roll-out of Off-Facebook Activity Reports.

14. Attached hereto as **Exhibit 13** is a true and correct copy of Meta's August 20, 2019 press release announcing initial roll-out of Off-Facebook Activity Reports. In it, Meta describes the tool as allowing users to "[s]ee a summary of the information other apps and websites have sent Facebook through our online business tools, like Facebook Pixel[.]" My office obtained this copy on November 26, 2024.

15. Attached hereto as **Exhibit 14** is a true and correct copy of Attentive's Master Subscription Agreement referenced in the Amended Complaint. In it, Attentive confirms that it is a service provider that cannot use customer data outside of its business relationship with Defendant. My office obtained this copy on January 13, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of January, 2025, in Los Angeles, California.

By: *<u>/s/ Victor Sandoval</u>*
Victor Sandoval