**THE FREEDMAN FIRM PC**
Michael G. Freedman (Cal. Bar No. 281279)
1801 Century Park East, Ste. 450
Los Angeles, California, 90067
Telephone: (310) 285-2210
E-Mail: michael@thefreedmanfirm.com

**LEVIN LAW, P.A.**
Brian Levin (*pro hac vice*)
Jacob Polin (Cal. Bar No. 311203)
2665 S. Bayshore Dr., Ph. 2B
Miami, FL 33133
Telephone: (305) 402-9050
E-Mail: brian@levinlawpa.com
E-Mail: jpolin@levinlawpa.com

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
Michael A. Pineiro (*pro hac vice*)
Brandon S. Floch (*pro hac vice* forthcoming)
Christopher R. Reilly (*pro hac vice*)
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4260
E-Mail: mpineiro@mnrlawfirm.com
bfloch@mnrlawfirm.com
creilly@mnrlawfirm.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEMETRIUS SMITH, ROBIN SAVAGE, and MIA WILLIAMS<br><br>Plaintiffs,<br><br>v.<br><br>RACK ROOM SHOES, INC.<br><br>Defendant. | Case No. 3:24-cv-06709-RFL<br><br>[*Assigned to Judge Rita F. Lin*]<br><br>PLAINTIFFS' RESPONSE BRIEF TO DEFENDANT'S MOTION TO DISMISS AND/OR STRIKE<br><br>Date: July 8, 2025<br>Time: 10:00 AM<br>Courtroom: 15, 18th Floor<br><br>Complaint Filed: September 24, 2024<br>Complaint Served: October 9, 2024<br>Trial Date: None set |

## INTRODUCTION

This Court previously upheld the Class Plaintiffs' CIPA and invasion of privacy claims in its prior order denying the Defendant's motion to dismiss in part (ECF No. 52). The Class Plaintiffs subsequently filed a Second Amended Class Action Complaint, amending the causes of action that the Court had dismissed with leave to amend. These newly amended claims are well-supported. The Defendant's motion to dismiss and/or strike (ECF No. 59) the amended claims is meritless.

*First*, Defendant argues that Plaintiffs fail to allege economic injury to support their claims under the CDAFA, UCL, and CLRA. But consistent with binding precedent from the Ninth Circuit, Plaintiffs sufficiently establish economic injury by alleging that Defendant and third parties received unjust enrichment from Plaintiffs' and Class members' online activity and personally identifiable information. *Second*, Defendant argues that California law forbids Plaintiffs from alleging vicarious liability for their UCL claim. Not only is that incorrect, but it also ignores Plaintiffs' allegations establishing direct liability. *Third*, Defendant contends that Plaintiffs cannot establish the "unlawful" prong for their UCL claim. But because three of Plaintiffs' claims have already survived a motion to dismiss, they plainly allege the requisite predicate violation. Additionally, Plaintiffs can also satisfy the "unfair" prong of the UCL by alleging that Defendant's conduct also violated the Federal Trade Commission Act. *Fourth*, Defendant asserts that Plaintiffs try to recycle their attempt to hold Rack Room secondarily liable for violations of the Wiretap Act. That is incorrect. Plaintiffs instead allege that Defendant is directly liable for having "engaged in" such violations. *Fifth*, Defendant argues that Plaintiffs cannot establish they intentionally used intercepted communications. But as alleged in the SAC, Defendant knowingly and intentionally used those illegal interceptions to enhance their marketing and advertising efforts. *And finally*, Defendant seeks to strike both the putative nationwide class along with allegations regarding third parties other than Meta and Attentive. Both attempts prove futile and fall far short from meeting the onerous standard that litigants must meet to prevail on motions to strike.

## BACKGROUND

Plaintiffs are California residents who purchased shoes on Defendant's website. See ECF No. 53, Second Amended Complaint ("SAC") ¶¶ 6–8. Defendant "owns and operates

rackroomshoes.com, one of the largest online shoe retailers in the country." *Id.* ¶ 2. "Throughout its website, Defendant repeatedly promises consumers that it will keep their electronic communications confidential." *Id.* ¶ 40. Despite making such promises, "Defendant systematically discloses such information to numerous third parties." *Id.* ¶ 49.

Defendants disclosed Plaintiffs' private information to a variety of different companies. "Defendant's disclosures to two companies—Meta Platforms and Attentive—serve as useful starting points." *Id.* ¶ 50. Using computer code offered by both companies, Defendant assisted Meta and Attentive "with intercepting [Plaintiffs'] communications while visiting Defendant's website, including communications that contained [their] personally identifiable information." *Id.* ¶¶ 6–8. "By assisting [these] third parties with intercepting communications that it promised to keep confidential, Defendant violate[d] federal and state law." *Id.* ¶ 4.

Outside of Meta and Attentive, Plaintiffs also allege that Defendant assisted six data brokers—LiveIntent, Sovrn, LiveRamp, Neustar, AtData, and Throtle—with intercepting consumers' electronic communications. Beginning with the first entity listed, Plaintiffs allege that LiveIntent offers "advertising technology" to retailers like Rack Room, along with access to "a first-of-its-kind Identity Graph." With "900 million active email addresses tied to over 25 billion identifiers," LiveIntent's Identity Graph allows retailers "to connect their data to the larger digital ecosystem," and "build a comprehensive view of their users, understand their customers' behavior across properties and platforms, monetize yield, enrich their customer database, and supercharge their marketing efforts." *Id.* ¶¶ 121(a), 126–27. "To funnel online activity and personally identifiable information into the Identity Graph, Defendant integrates LiveIntent's proprietary code, known as the 'LiveConnect Tag,' into its website." *Id.* ¶ 128.

Described as "a core component of LiveIntent's identity resolution," the LiveConnect Tag transmits "a unique numerical code that can identify customers … along with data such as the URL of the page visited and the referral URL." *Id.* "As with the Attentive Tag and the Meta Pixel, when a user accesses a website hosting the LiveConnect Tag, LiveConnect's software script surreptitiously directs the user's browser to send a separate message to LiveIntent's servers." *Id.* ¶ 129. This transmission "contains the original GET request sent to the host website along with

additional data that the LiveConnect [Tag] is configured to collect." *Id.* Through screenshots of network traffic, Plaintiffs demonstrate that LiveIntent receives "encoded values that reveal users' personally identifiable information and the content of their electronic communications." *Id.* ¶ 131.

"After matching the personally identifiable information the personally identifiable information to a user's profile and email address," LiveIntent then "directs that user's browser to send a hashed version of the email address to at least five other data brokers." *Id.* ¶ 132. Those data brokers—Svorn, LiveRamp, Neustar, AtData, and Throtle—then "contemporaneously direct the user's browser to set and send cookies that associate the user's activity with his or her email address." *Id.* ¶ 133. "Defendant also disclosed event data to LiveIntent and the other data brokers," like, for example, "cartitem," which displays the name of the shoes added to a consumer's cart. *Id.* ¶ 134; *see also* Figure 48 (showing the receipt of event data, including "Chukka Boots" being added to a user's cart"). "Once received and processed by LiveIntent and the other data brokers, Defendant knowingly uses the intercepted communications to run marketing and advertising campaigns that target consumers based on their activity on Defendant's website." *Id.* ¶ 135.

Defendant also incorporates "several other tracking technologies" into its website, including those that send information to "TikTok," "Microsoft," "Google," "Pinterest," "Outbrain," "PayPal," "LexisNexis," "Digital Media Solutions," "Mastercard," "Adobe," "Freshworks," "Sharethrough," "Taboola," and "DynaTrace." *Id.* ¶ 120. Each of these companies "tout[s] their ability to offer 'personalized' marketing and advertising strategies." *Id.* ¶ 121. And just like with Meta, Attentive, and the six data brokers, "Defendant assisted those third parties with intercepting communications from Plaintiffs and Class members that contained their personally identifiable information." *Id.* ¶ 122.

## ARGUMENT

### I. PLAINTIFFS' DISCLOSURE ALLEGATIONS ARE SPECIFIC.

Defendant moves to dismiss and strike Plaintiffs' allegations as "impermissibly group-plead." MTD at 11:23. That argument should be rejected for three reasons. *First*, Plaintiffs sufficiently delineate the actions attributable to each of the third parties alleged to have intercepted Plaintiffs' electronic communications. *See* SAC ¶¶ 51–95 (alleging conduct attributable to Meta);

*id.* ¶¶ 96–119 (alleging conduct attributable to Attentive); *id.* ¶¶ 124–42 (alleging conduct attributable to LiveIntent, Svorn, LiveRamp, Neustar, AtData, and Throtle); *id.* ¶¶ 120–22 (alleging conduct attributable Microsoft, TikTok, Google, Adobe, Mastercard, Taboola, Criteo, Sharethrough, Intercept Interactive, Pinterest, Outbrain, PayPal, Freshworks, DynaTrace, Digital Media Solutions, and LexisNexis).

*Second*, "[p]arties are expected to use discovery, not the pleadings, to learn the specifics of the claims being asserted." *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1077 (C.D. Cal. 1994); *see also Inzerillo v. Green Tree Servicing LLC*, 2014 WL 1347175, at *5 (N.D. Cal. Apr. 3, 2014) (holding that the allegations "provide sufficient notice to Defendant of Plaintiffs' claims," and that "Defendant can use discovery to learn more specifics"); *see also Wong v. American Servicing Co.*, 2009 WL 5113516, at *3 (E.D. Cal. Dec. 18, 2019) ("The Federal Rules….anticipate that the parties will familiarize themselves with the claims and ultimate facts through the discovery process.").

*Third*, though "disfavored and rarely granted" and though not supported based on Plaintiff's detailed pleading, the proper vehicle for Defendant's request is a motion for more definite statement, not motions to dismiss or strike. *See Griffin v. Cedar Fair, L.P.*,817 F. Supp. 2d 1152, 1156 (N.D. Cal. 2011); *see also Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002).

## II. PLAINTIFFS ESTABLISH STANDING VIA UNJUST ENRICHMENT.

Defendant argues that Plaintiffs "do not plausibly allege an economic injury that was caused by Rack Room's conduct." MTD at 13:19-20. That is wrong. Plaintiffs establish economic injury by properly alleging that Defendant and third parties received unjust enrichment.

As the California Supreme Court has recognized, "[t]here are innumerable ways in which economic injury … may be shown." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 324 (2011). Moreover, "the quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact." *Id.* As such, only "an identifiable trifle of economic injury" is required. *California Medical Ass'n v. Aetna Health of Cal.*, 14 Cal. 1075, 1088 (2023).

Plaintiffs adequately establish economic injury through a theory of unjust enrichment. As alleged, "Plaintiffs' and Class members' online activity—including the browsing history and

purchase history generated by navigating Defendant's website—has financial value." *Id.* ¶ 143; *see also* ¶¶ 22–29, 144–48. Despite promising otherwise, Defendant "paid the third parties here—including Meta, Attentive, and six data brokers—for services and products that relied on analyzing or otherwise exploiting Plaintiffs' and Class members' personal information and their activity on Defendant's website." SAC ¶ 147. Defendant rendered such payment "to run marketing and advertising campaigns that target consumers based on their activity on Defendant's website." *Id.* ¶ 135; *see also id.* ¶¶ 85, 116, 175. "Moreover, through services like Lookalike Audiences, third parties also received payment from companies other than Defendant to leverage Plaintiffs' and Class members' personal information and online activity for that same purpose." *Id.* ¶ 146. "Directly and indirectly," in other words, "Defendant's conduct caused numerous third parties … to profit from Plaintiffs' and Class members' personal information and their activity on Defendant's website." *Id.* What is more, "Defendant itself reaped unjust profits and revenue … from [the] enhanced marketing and advertising [it] received." *Id.* ¶ 226. "Because California law recognizes a legal interest in unjustly earned profits, Plaintiffs and Class members have an entitlement to profits earned from their personal data." *Id.* ¶ 148; *see also id.* ¶ 52–54. Accordingly, Plaintiffs adequately allege economic injury.

The Ninth Circuit's decision in *In re Facebook, Inc. Internet Tracking Litigation*, 956 F. 3d 589 (9th Cir. 2020) is directly on point. There, "the district court determined that Plaintiffs had failed to show that they had standing to pursue claims that included economic damages as an element," including "violations of the CDAFA." *Id.* at 597. Reversing that determination, the Ninth Circuit noted that "California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." *Id.* at 600. Put differently, "[u]nder California law, this stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Id.* As a corollary, "[b]ecause California law recognizes a legal interest in unjustly earned profits," the Ninth Circuit held that the plaintiffs "adequately pleaded an entitlement to Facebook's profits" by alleging that "their browsing

histories carry financial value" and that "Facebook profited from this valuable data." *Id.* Nothing more was needed: "This unauthorized use of their information for profit would entitle Plaintiffs to profits unjustly earned." *Id.*

Here, as in *In re Facebook*, Plaintiffs offer a litany of detailed allegations demonstrating that their activity on Defendant's website "has financial value," and that Defendant and the third parties "reaped unjust profits and revenue." *See, e.g.*, SAC ¶¶ 22–29, 52–55, 143–48. Plaintiffs thus establish economic injury sufficient to bring claims under the CDAFA, UCL, and CLRA. *See, e.g.*, *Rodriguez v. Google*, --- F. Supp. ----, 2025 WL 50425, at *10 (N.D. Cal. Jan. 7, 2025) (holding on summary judgment that "a reasonable jury could find that Plaintiffs suffered damage or loss because Google profited from the misappropriation of their data"); *Frasco v. Flo Health*, 2024 WL 4280933, at *2 (N.D. Cal. Sept. 23, 2024) (finding economic injury where "plaintiffs have adduced evidence from which a reasonable jury could conclude that the information obtained by Google 'carried financial value' that amounts to damage or loss suffered by plaintiffs").

Defendant's arguments to the contrary lack merit. *First*, Defendant argues that "Plaintiffs fail to articulate how they themselves lost a monetary interest when browsing Rack Room's website." MTD at 11:11–12. But per the Ninth Circuit, "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss." *In re Facebook, Inc.*, 956 F. 3d at 599 (citation omitted).

*Second*, Defendant seems to suggest that Plaintiffs must "quantify[] the market value of browsing or purchase history from a single website." MTD at 14:16–18. The Supreme Court of California begs to differ, having noted that "a specific measure" of economic injury "is not required." *California Medical Assn.*, 14 Cal. 5th at 1088.

*Third*, Defendant argues that "[c]ourts have repeatedly held that the mere collection or use of such personal information, without more, does not establish economic injury or loss for

purposes of standing or statutory claims." MTD at 15:24–16:3. None of the cases cited to support this premise involved a litigant seeking to establish economic injury through unjust enrichment.[1,2]

## III. PLAINTIFFS ESTABLISH VICARIOUS LIABILITY.

Defendant asserts that "liability under the UCL cannot be predicated on vicarious liability." MTD at 16:17. That is wrong. Under California law, "aiding and abetting is a theory of vicarious liability," *see People v. Torres*, 224 Cal. App. 3d 762, 770 (1990), and "[l]iability may be imposed on those who aid and abet another's violation of the UCL" with knowledge and substantial assistance or encouragement. *City and County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 691 (N.D. Cal. 2020) (internal quotations omitted). Indeed, the only published case that Defendant relies upon, *People v. Toomey*, 157 Cal. App. 3d 1 (1984), confirms that "participation in the unlawful practice," including "aiding and abetting the principal," can properly serve as a basis for liability. *Id.* at 15. Because Plaintiffs' claims rest on the foundational allegation that "Defendant aids, employs, agrees with, and conspires with third parties … to eavesdrop on communications," Plaintiffs easily satisfy that standard. *See* SAC ¶ 3; *see also id.* ¶¶ 63, 85–86, 108, 120, 122, 135, 139, 147.

Defendant also contends that "vicarious liability is a distinct claim." MTD at 16:15. That is also incorrect. "[T]heories of liability," like "aiding and abetting," are "not distinct causes of action under California law." *See, e.g.*, *Kelley v. Mortgage Electronic Registration Systems, Inc.*, 642 F. Supp. 2d 1048, 1057 (N.D. Cal. 2009); *cf. Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F. 3d 1211, 1228 (9th Cir. 1998) ("Under California law, there is no separate and distinct tort cause of action for civil conspiracy.").

---

[1] In a footnote, Defendant argues that "Plaintiffs also have not alleged that they otherwise have browser privacy settings turned on with respect to their online activities, including most importantly, as to their own activity on Facebook and any facts regarding their Facebook Privacy settings." MTD at 15, n. 4. But "[a]rguments raised only in footnotes, or only on reply, are generally deemed waived." *Estate of Saunders v. C.I.R.*, 745 F. 3d 953, 962 n. 8 (9th Cir. 2014). If the Court wishes to consider that argument, Plaintiffs respectfully request supplemental briefing.

[2] In a footnote, Defendant argues that "Plaintiffs also allege that Rack Room itself profited from the acquisition of their browsing activity and purchasing data—but do not allege how this is illegal or unjust." MTD at 13, n. 3. As discussed *supra* at fn. 1, if the Court believes it appropriate to consider that argument, Plaintiffs respectfully request supplemental briefing.

## IV. PLAINTIFFS PLEAD PROPER UCL PREDICATE VIOLATIONS.

Defendant argues that "Plaintiffs cannot plead a predicate violation and their UCL claim fails for this independent reason." MTD at 17:16–17. That is wrong. "Virtually any law—federal, state or local—can serve as a predicate" for a UCL violation. *Ticconi v. Blue Shield of California Life & Health Ins.*, 160 Cal. App. 4th 528, 539 (2008). Plaintiffs identify seven statutory bases and one constitutional basis—the Wiretap Act, CIPA § 631, CIPA § 632, CDAFA, constitutional invasion of privacy, CalOPPA, CCPA, and the FTCA—that properly serve as a predicate violation under the UCL, three of which have already survived a motion to dismiss. *See, e.g.*, *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 632 (N.D. Cal. 2021) (upholding UCL claim where the plaintiffs "adequately pled their CIPA and statutory larceny claims, on which the UCL is predicated").

Additionally, as to the "unfairness prong" of the UCL, California courts have observed that "the test for determining whether a business practice is unfair in consumer cases arising under the UCL is the same as that used under section 5 of the Federal Trade Commission Act." *Rubenstein v. The Gap, Inc.*, 14 Cal. App. 5th 870, 880 (2017). So Plaintiffs have satisfied the "unfair" prong here by adequately demonstrating that Defendant's misconduct would be actionable under the FTCA. *See, e.g.*, SAC ¶¶ 30–34 (referencing multiple enforcement actions brought pursuant to "the operative provision within the FTCA Act" when companies "claimed to safeguard the privacy or security of users' information, but didn't live up to their promises").

## V. DEFENDANT ENGAGED IN VIOLATIONS OF THE WIRETAP ACT.

Turning to the Wiretap Act, Defendant asserts that Plaintiffs "are seeking to hold Defendant secondarily liable for their interceptions by omitting the word 'procure,' but repeating the same facts previously alleged." MTD at 18:8–11. That is wrong. Plaintiffs establish direct liability against Defendant for having "engaged in" violations of the Wiretap Act. *See* SAC ¶ 169.

In the FAC, Plaintiffs sought to hold Defendant liable under the Wiretap Act for having "intentionally procured Meta, Attentive, and other third parties to intercept electronic communications." *See* ECF No. 27 ¶ 167. In the Order dismissing that claim, this Court held "that defendants cannot be liable under section 2520 for 'procuring' an interception, because in 1986 Congress amended the section to remove the phrase 'or procures any other person to intercept,

disclose, or use such communications' as a basis for civil liability." *See* ECF No. 52 ("MTD Order") at 13. That same logic, as to secondary liability, upholds the theory of direct liability here. In the 1986 amendment, Congress did not simply excise the "procuring" language; Congress also removed language that would have limited liability to only those that "intercept, disclose, or use" a communication, and it added language permitting recovery against those that "engaged in" violations of the Wiretap Act. *Compare* Pub. L. 90-351, Tit. III § 802 *with* 18 U.S.C. § 2520. As the Sixth Circuit explains, the takeaway is straightforward:

> If Congress had meant to restrict liability to only those persons or entities who make the specific decision to 'intercept, disclose, or intentionally use' a communication, then Congress would have used those terms in defining the class of defendants subject to suit under § 2520. But as [the appellant] notes, Congress eschewed that route. Congress instead chose to impose liability on any person or entity that 'engaged in' the interception, disclosure, or intentional use of the communication in question.

*See Luis v. Zang*, 833 F. 3d 619, 636 (6th Cir. 2016); *see also In re Saldana*, 122 F. 4th 333, 341 (9th Cir. 2024) ("[A] significant change in language is presumed to entail a change in meaning even when legislative history is silent as to Congress's intent.") (internal quotations omitted).

**A. Defendant Provided Close Assistance to Third-Party Interceptors**

As canons of construction make clear, Plaintiffs properly allege that Defendant "engaged in" violations of the Wiretap Act by "assisting third parties with intercepting communications that it promised to keep confidential." SAC ¶ 4; *see also id.* ¶¶ 6–8, 83, 111, 118, 122, 149, 169.

"Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *BP America Production Co. v. Burton*, 549 U.S. 84, 91 (2006). "To determine the ordinary meaning of a word, consulting common dictionary definitions is the usual course." *Animal Legal Defense Fund v. United States Department of Agriculture*, 933 F. 3d 1088, 1093 (9th Cir. 2019) (internal quotations omitted). As relevant here, "*Merriam-Webster's Dictionary* contemporaneously defines engage as 'to begin and carry on an enterprise or activity' and 'to do or take part in something.'" *Consumer Financial Protection Bureau v. National Collegiate Master Student Loan Trust*, 96 F. 4th 599, 611 (3d Cir. 2024). Moreover, "*Black's Law Dictionary* defines engage as: 'To employ or involve one's self; to take part in; to embark on.'" *Id.* Notably, "[t]his definition has remained remarkably consistent over time." *Id.*; *see also*

*Gollehon v. Mahoney*, 626 F. 3d 1019, 1023 (9th Cir. 2010) (noting primary reliance on "dictionaries in use at the time of the statute's enactment").

Here, Plaintiffs allege that "Defendant aids, employs, agrees with, and conspires with third parties … to eavesdrop on communications sent and received by Plaintiffs and Class members, including communications that contain their personally identifiable information." *See* SAC ¶ 3. As part of that enterprise, Defendant "customized," "configured," "deployed," and "intentionally integrate[d]" the computer code that "intercepted electronic communications electronic communications from Plaintiffs and Class members while they accessed and navigated Defendant's website." *See* SAC ¶¶ 20, 63, 97, 108, 120, 127, 169. Defendant took these actions "to run marketing and advertising campaigns that target consumers based on their activity on Defendant's website." *Id.* ¶ 135; *see also* ¶¶ 85, 116, 135. Indeed, Defendant "paid the third parties here—including Meta, Attentive, and six data brokers—for services and products that relied on analyzing or otherwise exploiting Plaintiffs' and Class members' personal information and their activity on Defendant's website." *Id.*¶ 147. By working hand in glove with the third-party interceptors, Defendant "engaged in" violations of the Wiretap Act under any ordinary understanding of that term. *See, e.g.*, *Consumer Financial Protection Bureau*, 96 F. 4th at 608 (upholding the district court's determination that "a person 'engage[s]' in an activity if he contracts with a third party to do that activity on his behalf").

That conclusion is further confirmed by the statutory text. The Wiretap Act attaches liability to those that "engaged in" violations of the statute "[e]xcept as provided in section 2511(2)(a)(ii)." *See* 18 U.S.C. § 2520(a). That section shields from liability "providers of wire or electronic communication service" and "other persons" who "provide information, facilities, or technical assistance to persons authorized by law to intercept wire, oral, or electronic communications." *See* 18 U.S.C. § 2511(2)(a)(ii). If it were already non-actionable to provide interceptors with "information," "facilities," or "technical assistance," then creating such a carveout would be an exercise in superfluity. And as an interpretative principle, "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same

statutory scheme." *Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013). Accordingly, Plaintiffs properly allege that such assistance is actionable under the Wiretap Act.

**B. Defendant Played an Active Role with Devices it Possessed and Assembled.**

Defendant also "engaged in" violations of the Wiretap Act by possessing and assembling the wiretapping devices while simultaneously playing "an active role in the use of the computer code to intercept Plaintiffs' and Class members' electronic communications." *See* SAC ¶¶ 20, 63, 97, 108, 120, 127, 169 (alleging Defendant not only "customized," "configured," "intentionally integrate[d]," and "deployed" the computer code but also "played an active role" in its use); *see also Luis*, 833 F. 3d at 637 (noting that "§2520 does not support a cause of action against those who simply possess a wiretapping device," but that liability does attach "when that defendant also plays an active role in the use of the relevant device to intercept, disclose, or intentionally use a plaintiff's electronic communications"); *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1011 (N.D. Cal. 2024) ("Section 2520 at the very least provides a private right of action to enforce Section 2512(1)(b) against a defendant who also played an active role in the unlawful interception, disclosure, or use of the plaintiff's communication"); *see generally* 18 U.S.C. § 2512(1)(b) (prohibiting any person from "assembl[ing]" or "possess[ing]" any electronic device "knowing or having reason to know that the design of such device renders it primarily useful for the purposeful of the surreptitious interception of … electronic communications").

**VI. DEFENDANT UNLAWFULLY USED INTERCEPTED COMMUNICATIONS.**

Defendant argues that Plaintiffs fails to allege "that Rack Room is liable for 'using' information intercepted by third parties." MTD at 17:21–22. That is incorrect. Plaintiffs properly allege that Defendant intentionally uses intercepted communications to augment its marketing and advertising efforts.

The Wiretap Act "makes illegal not only unauthorized interceptions but also the disclosure and use of information obtained through such interceptions." *Gelbard v. United States*, 408 U.S. 41, 52 (1972) (citing 18 U.S.C. § 2520). "Liability for disclosure or use is contingent on the original interception being unlawful." *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 797 (N.D. Cal. 2020). With respect to the original interception, "[i]f either party to a

communication consents to its interception, then there is no violation of the Wiretap Act, 'unless such communication is intercepted for the purpose of committing any criminal or tortious act.'" *Campbell v. Facebook*, 77 F. Supp. 3d 836, 846 (N.D. Cal. 2014) (quoting 18 U.S.C. § 2511(2)(d)). In other words, whether consent is established or not, interceptions remain actionable under the Wiretap Act "when done for the purpose of facilitating some further impropriety." *Planned Parenthood Federation of America, Inc. v. Newman*, 51 F. 4th 1125, 1135 (9th Cir. 2022) (quotations omitted).

Plaintiffs sufficiently establish that the original interceptions were unlawful. As alleged, "third parties intercept[ed] communications," and they executed those interceptions "for unlawful and tortious purposes," including, for example, "associating the content of Plaintiffs' and Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiffs and Class members in its Privacy Policy." *Id.* ¶¶ 152, 169. Multiple courts—including this one—have recognized that "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the CDAFA, intrusion upon seclusion, and invasion of privacy." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *Marden v. LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024) (Lin, J.) (quoting *Brown* and finding that the plaintiff "plausibly alleges tortious intent"); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024) (quoting *Brown* and finding that the crime-tort exception applies "if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims.").

Resisting that conclusion, Defendant argues that "the [crime-tort] exception cannot apply" because "the alleged purpose [of the interception] was financial gain." *See* MTD 19:18–20:1. The majority of courts disagree. *See, e.g.*, *Walgreens*, 733 F. Supp. 3d at 901 ("[E]ven where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims.") (collecting cases).

Defendant also argues that this Court's Order on the prior motion to dismiss "found that Plaintiffs could not allege that the crime-tort exception applies unless they can allege that Defendant itself intercepted their communications." *See* MTD at 18:4–5; *see also id.* at 19:9–10. Along with misinterpreting that decision, Defendant misses the analytical distinction here. Plaintiffs need only show that the "original interception" was "unlawful." *see In re Google*, 457 F. Supp. at 819. By alleging that the crime-tort exception would prohibit third-party interceptors from invoking consent as a defense, Plaintiffs do exactly that. *See* SAC ¶ 169.

Having established unlawful interceptions by third parties, Plaintiffs adequately allege that Defendant violated the Wiretap Act by "knowingly us[ing] the intercepted communications to run marketing and advertising campaigns that target[ed] consumers based on their activity on Defendant's website." *See id.* ¶¶ 85, 116, 135; *see also Alhadeff v. Experian Information Solutions, Inc.*, 541 F. Supp. 3d 1041, 1045 (C.D. Cal. 2021) (reviewing similar allegations and holding that they "sufficiently allege 'use'" under Florida's analog to the Wiretap Act).[3]

## VII. DEFENDANT CANNOT STRIKE THE NATIONWIDE CLASS.

Pointing to the Supreme Court's decision in *Bristol-Myers Squib Co. v. Superior Court of Cal.*, 137 S. Ct. 1773 (2017), Defendant argues that the nationwide class should be struck "because this Court does not have personal jurisdiction over Defendant as to out-of-state putative class members." MTD at 20:6–9. As an initial matter, the Court should not—and cannot—entertain the motion to strike the nationwide class allegations because it fails to raise any of the limited grounds for a motion to strike. *See, e.g.*, *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 2014 WL 1048710, at *3 (N.D. Cal. Mar. 14, 2014) (noting that, based on Ninth Circuit's decision in *Whittlestone*, "recent district courts have stated that Rule 12(f) motions to strike are not the proper vehicle for seeking dismissal of class allegations"); *see also Roy v. Wells Fargo Bank*, N.A., 2015 WL 1408919, at *2 (N.D. Cal. Mar. 27, 2015) (collecting cases).

[3] In a footnote, Defendant argues that "Plaintiffs do not even allege that Rack Room 'intentionally used' their intercepted communications, as required by law." MTD at 19, n. 5. As discussed *supra* at fn. 1, if the Court believes it appropriate to consider that argument, Plaintiffs respectfully request supplemental briefing.

In addition to this fundamental procedural defect, other courts have found that a motion to strike class allegations at the threshold stage is premature. *See, e.g., Miller v. Nature's Path Foods, Inc.*, 2024 WL 4177940, at *4 (N.D. Cal. Sept. 11, 2014) ("Nature Path's motion to strike the nationwide class for lack of personal jurisdiction is denied as premature."); *Santos v. CarMax Business Services*, LLC, 2018 WL 7916823, at *6 (N.D. Cal. May 8, 2018) ("[A] determination that none of Santos' claims can succeed as a nationwide class is premature."); *Sousa v. 7-Eleven, Inc.*, 2020 WL 6399595, at *5 (S.D. Cal. Nov. 2, 2020) ("Given the early stage of the proceedings, the Court finds that Defendant's motion to strike Plaintiff's class allegations is premature."); *Herrera v. Wells Fargo Bank, N.A.*, 2020 WL 5802421, at *12 (Sept. 1, 2020) ("The Court concludes that it is premature to strike the nationwide class and so DENIES Wells' Fargo's motion to strike the nationwide classes.").

In the very limited circumstances where courts do evaluate motions to strike class allegations, those judges "have applied a very strict standard to motions to strike class allegations on the pleadings, whereby "[o]nly if the court is convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim succeed may the allegations be stricken." *Roy*, 2015 WL 1408919, at *2 (cleaned up). That is clearly not the case here.

Defendant's authority does not apply to the federal claims here. Although some courts have held that "*Bristol-Myers* applies to federal courts sitting in diversity," *Pilgrim v. General Motor Co.*, 408 F. Supp. 3d 1160, 1167 (C.D. Cal. 2019), those cases are inapplicable where, as here, "a federal court presides over litigation involving a federal question." *Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 859 (N.D. Cal. 2018). Because the Fifth Amendment—not the Fourteenth Amendment—governs personal jurisdiction for cases implicating a federal question, "the due process analysis does not incorporate the interstate sovereignty concerns that animated *Bristol-Myers* and which may be 'decisive' in a state court's analysis." *Id.* Accordingly, "a court would not apply *Bristol-Myers* when sitting in federal question jurisdiction," as here. *See, e.g.*, *In re Packaged Seafood Products Antitrust Litig.*, 338 F. Supp. 3d 1118, 1173 (S.D. Cal. 2018).

Ignoring the difference between the Fifth Amendment and the Fourteenth Amendment, Defendant asserts "that each plaintiff's claim must arise from Defendant's forum-related activities

regardless of whether specific jurisdiction was established for another claimant." MTD at 20:24-25. As the Ninth Circuit has held, however, "'minimum contacts' with a particular district or state for purposes of personal jurisdiction is *not* imposed on the federal courts in a federal question case by due process concerns." *Securities Investor Protection Corp. v. Vigman*, 764 F. 2d 1309, 1315 (9th Cir. 1985) (emphasis in the original). Instead, the Fifth Amendment only asks "whether the party has sufficient contacts with the United States, not any particular state." *Id.* Accordingly, even assuming *Bristol-Myers* has applicability here, putative class members can rely on Defendant's contacts with the United States as a whole—not just California—to support personal jurisdiction. *See, e.g.*, *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F. 2d 1406, 1416 (9th Cir. 1989) ("[W]hen a [federal] statute authorizes nationwide service of process, national contacts analysis is appropriate."); *Securities and Exchange Commission v. Gastauer*, 93 F. 4th 1, 8 (1st Cir. 2024) ("In a federal question case such as this one, the Fifth Amendment Due Process Clause requires the plaintiff to show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state.") (internal quotations omitted).

## VIII. DEFENDANT CANNOT STRIKE THIRD-PARTY ALLEGATIONS.

Defendant argues that the Court should strike "allegations relating to the third parties other than Meta and Attentive" because they are purportedly "immaterial and impertinent." *See* MTD at 22:7–8. That is wrong. As relevant here, "motions to strike are generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Griffin v. Gomez*, 2010 WL 4704448, at *4 (N.D. Cal. Nov. 12, 2010). Moreover, "[a]ny doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike." *In re Wal-Mart Stores, Inc. Wage and Hour Litigation*, 505 F. Supp. 2d 609, 614 (N.D. Cal. 2007). Allegations concerning other third parties can establish knowledge by creating "an inference of systemic conduct." *See, e.g.*, *Mathes v. Clipper Feet*, 774 F. 2d 980, 989 (9th Cir. 1985). Accordingly, Defendant's motion to strike must be denied.

Dated: June 17, 2025

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**

By: */s/ Michael A. Pineiro*
Michael A. Pineiro

Michael A. Pineiro (*pro hac vice*)
Brandon S. Floch (*pro hac vice* forthcoming)
Christopher R. Reilly (*pro hac vice*)

**LEVIN LAW, P.A.**
Brian Levin (*pro hac vice*)
Jacob Polin (Cal. Bar No. 311203)

**THE FREEDMAN FIRM PC**
Michael G. Freedman (Cal. Bar No. 281279)

*Attorneys for Plaintiffs*