BLANK ROME LLP
Ana Tagvoryan (SBN 246536)
ana.tagvoryan@blankrome.com
Harrison Brown (SBN 291503)
harrison.brown@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone: 424.239.3400

D. Morgan Barry (admitted *pro hac vice*)
morgan.barry@blankrome.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.885.5499

Glen L. Abramson (admitted *pro hac vice*)
glen.abramson@blankrome.com
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone: 215.569.5500

Attorneys for Defendant
Rack Room Shoes, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

| | |
|---|---|
| DEMETRIUS SMITH, ROBIN SAVAGE, and MAIA WILLIAMS,<br><br>Plaintiffs,<br><br>v.<br><br>RACK ROOM SHOES, INC.,<br><br>Defendant. | Case No. 3:24-cv-06709-RFL(SK)<br><br>**ANSWER AND AFFIRMATIVE DEFENSES TO THIRD AMENDED COMPLAINT**<br><br>Complaint Filed: September 24, 2024<br><br>Trial Date: None set |

Rack Room Shoes, Inc. ("Defendant") hereby answers the Third Amended Complaint (the "TAC") of Demetrius Smith ("Smith"), Robin Savage ("Savage"), and Maia Williams ("Williams") (together, Smith, Savage, and Williams are "Plaintiffs"). Defendant denies all allegations in the TAC unless specifically admitted.

## ANSWER TO THIRD AMENDED COMPLAINT

## NATURE OF THE ACTION

1. This is a class action suit for data privacy violations on behalf of all persons in the United States who have visited rackroomshoes.com.

**Answer:** Admitted that this purports to be a class action suit for data privacy violations on behalf of all persons in the United States who have visited rackroomshoes.com. Denied that any data privacy violations occurred.

2. Defendant Rack Room Shoes, Inc. ("Defendant" or "Rack Room Shoes") owns and operates rackroomshoes.com, one of the largest online shoe retailers in the country. Through numerous representations on its website, Defendant promises users that its "usage of cookies is in no way linked to any Personal Information while on [its] site."[1] Those representations are false.

**Answer:** Admitted that Defendant owns and operates rackroomshoes.com. To the extent not expressly admitted, this paragraph states legal conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

3. Defendant aids, employs, agrees with, and conspires with third parties— including Meta Platforms, Inc. ("Facebook" or "Meta"), Attentive Mobile, Inc. ("Attentive"), and Zeta Global Holdings Corp. ("Zeta")—to eavesdrop on communications sent and received by Plaintiffs and Class members, including communications that contain their personally identifiable information.

**Answer:** This paragraph states legal conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

4. Defendant uses these intercepted communications through platforms—including Salesforce, Cordial, and Zeta—to run marketing and advertising campaigns.

[1] Privacy Policy, Rack Room Shoes, rackroomshoes.com/privacy (last accessed Sept. 9, 2024).

**Answer:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

5. By assisting third parties with intercepting communications and intentionally using those intercepted communications, Defendant violates federal and state law.

**Answer:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

6. Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

**Answer:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

## PARTIES

7. Plaintiff Demetrius Smith is domiciled in San Francisco, California. On or around 2008, Plaintiff Smith created a Facebook account. On or around July 2024, Plaintiff Smith visited rackroomshoes.com and browsed products for purchase. When Plaintiff Smith accessed the website, a notice appeared at the bottom of the screen stating that his continued use of the website would constitute assent to Defendant's Privacy Policy. After receiving that notice, Plaintiff Smith clicked on shoes and ultimately purchased two sets of Crocs Classics. When checking out, Plaintiff Smith gave Defendant his first name, last name, email address, phone number, and delivery address. Although unaware at the time, Plaintiff Smith is informed and believes that Defendant assisted third parties—including Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—with intercepting his communications while visiting Defendant's website, including communications that contained his personally identifiable information. Given that Defendant promised to safeguard his personal information from disclosure, Plaintiff Smith possessed an expectation of privacy in communications that contained such information, and he never consented to Defendant assisting other third parties with intercepting those confidential communications.

**Answer:** Admitted that Defendant has a purchase record for a Demetrius Smith on July 14, 2024, with an address in San Francisco showing purchases of Crocs. Defendant lacks knowledge regarding Smith's domicile, when he created his Facebook account, or whether a notice appeared at

the bottom of his screen stating that continued use of the website would constitute assent to the Privacy Policy, and therefore is unable to admit or deny. To the extent a response is required, denied. Defendant specifically denies it assisted third parties with intercepting Smith's communications or that it promised to safeguard his personal information from disclosure. The remaining allegations in this paragraph state legal conclusions to which no response is required. To the extent a response is required, denied.

8. Plaintiff Robin Savage is domiciled in Via Los Altos, California. On or around 2007, Plaintiff Savage created a Facebook account. On or around February 2024, Plaintiff Savage visited rackroomshoes.com and browsed products for purchase. When Plaintiff Savage accessed the website, a notice appeared at the bottom of her screen stating that her continued use of the website would constitute assent to Defendant's Privacy Policy. After receiving that notice, Plaintiff Savage clicked on shoes for sale and ultimately purchased a pair of Sketchers Street Rolling Stones. When checking out, Plaintiff Savage gave Defendant her first name, last name, email address, phone number, and delivery address. Although unaware at the time, Plaintiff Savage is informed and believes that Defendant assisted third parties—including Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—with intercepting her communications while visiting Defendant's website, including communications that contained her personally identifiable information. Given that Defendant promised to safeguard her personal information from disclosure, Plaintiff Savage possessed an expectation of privacy in communications that contained such information, and she never consented to Defendant assisting other third parties with intercepting those confidential communications.

**<u>Answer</u>:** Savage dismissed her claims. Therefore, no response is required.

9. Plaintiff Maia Williams is domiciled in Victorville, California. On or around 2009, Plaintiff Willaims created a Facebook account. On or around March 2024, Plaintiff Williams visited rackroomshoes.com and browsed products for purchase. When Plaintiff Williams accessed the website, a notice appeared at the bottom of her screen stating that her continued use of the website would constitute assent to Defendant's Privacy Policy. After receiving that notice, Plaintiff Williams clicked on shoes for sale and ultimately purchased two pairs of sneakers, the Nike Court Legacy Lifts and the Nike Air Max Systm. When checking out, Plaintiff Williams gave Defendant her first name, last name,

email address, phone number, and delivery address. Although unaware at the time, Plaintiff Williams is informed and believes that Defendant assisted third parties—including Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—with intercepting her communications while visiting Defendant's website, including communications that contained her personally identifiable information. Given that Defendant promised to safeguard her personal information from disclosure, Plaintiff Williams possessed an expectation of privacy in communications that contained such information, and she never consented to Defendant assisting other third parties with intercepting those confidential communications.

**Answer:** Defendant admits that it has a purchase record for a Maia Williams in March 2024 showing purchases of sneakers. Defendant lacks knowledge regarding Williams's domicile, when she created her Facebook account, or whether a notice appeared at the bottom of her screen stating that continued use of the website would constitute assent to the Privacy Policy, and therefore is unable to admit or deny. To the extent a response is required, denied. Defendant specifically denies it assisted third parties with intercepting Williams's communications or that it promised to safeguard her personal information from disclosure. The remaining allegations in this paragraph state legal conclusions to which no response is required. To the extent a response is required, denied.

10. All Plaintiffs conducted searches, visited webpages, and purchased goods from Defendant from web browsers while in California.

**Answer:** As to Smith and Williams, Defendant admits it has records showing website visits and purchases of goods from browsing the website; however, Defendant lacks knowledge regarding the remaining allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied. As to Savage, Savage dismissed her claims. Therefore, no response is required.

11. Rack Room Shoes, Inc., is headquartered in Charlotte, North Carolina. Rack Room Shoes, Inc., does business throughout California and the United States.

**Answer:** Admitted.

## JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

**Answer:** Admitted that this Court has subject-matter jurisdiction under CAFA. To the extent not expressly admitted, this paragraph states legal conclusions to which no response is required. To the extent the allegations are contrary to law, denied. Moreover, all factual allegations related to the putative class are denied.

**B. Personal Jurisdiction**

13. This Court has personal jurisdiction over Defendant because Defendant committed an intentional act, expressly aimed at California, causing harm that Defendant knew would likely be suffered in California.

**Answer:** This paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

14. As soon as prospective customers access rackroomshoes.com, Defendant prompts users to share their locations:

Figure 1




**Answer:** Denied.

15. Even if customers click "Don't allow," Defendant still approximates their locations:

Figure 2




**Answer:** Admitted that Defendant approximates some users' locations depending on their browser, settings, and/or use of a VPN. Denied that Defendant approximates all customers' locations.

16. Moreover, for those users who select "Don't allow," Defendant still sets a cookie on their browsers that saves their location information:

Figure 3

| | | |
|---|---|---|
| _dy_df_geo | United%20States.Florida.Miami | .rackroomshoes.com |
| _dy_geo | US.NA.US_FL.US_FL_Miami | .rackroomshoes.com |

**Answer:** Admitted that Defendant sets a cookie on some users' browsers that saves their approximate location information depending on the user's browser, settings, and/or use of a VPN. Denied that Defendant sets a cookie on all users' browsers that saves their location information.

17. Defendant approximates customers' location even when they access the website through "incognito mode":

Figure 4




**Answer:** Admitted that Defendant approximates some users' location even when they access the website through "incognito mode" depending on the user's browser, settings, and/or use of a VPN. Denied that Defendant approximates all customers' location even when they access the website through "incognito mode."

18. As soon as Plaintiffs and other California-based customers accessed rackroomshoes.com, Defendant approximated their locations and knew they were located in California.

**Answer:** Admitted that Defendant approximated the location of some California-based customers depending on the customer's browser, settings, and/or use of a VPN. Denied that Defendant approximates all customers' locations or that Defendant knew customers were located in California. IP-address-based locations only indicate where the connection originates from, not necessarily where the user is located.

19. Moreover, as with other California-based customers, Plaintiffs provided Defendant with their residential addresses in California when specifying where to deliver their purchased products.

**Answer:** Admitted that Plaintiffs provided Defendant with addresses in California when specifying where to deliver their purchased products. Admitted that some other California-based customers provided Defendant with addresses in California when specifying where to deliver their purchased products. Denied that all other California-based customers provided Defendant with

addresses in California when specifying where to deliver their purchased products.

20. Defendant operates more than 20 retail stores in California through which customers can purchase shoes online. Put differently, in Defendant's regular course of business, Defendant sells physical products through its interactive website, rackroomshoes.com, and causes those products to be delivered to California. Defendant has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District.

**Answer:** Admitted that Defendant operates retail stores in California and that customers can purchase products online for delivery to addresses in California. The remaining portion of this paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

21. This Court's exercise of personal jurisdiction over Defendant is also appropriate because Defendant's activities in California gave rise to and furthered the privacy violations suffered by Plaintiffs. More specifically, Defendant employed and configured third party trackers to intercept, record, and store personally identifiable information about visitors, including Plaintiffs, while those visitors were conducting searches and purchasing goods. Defendant engaged in that unlawful conduct to help third parties analyze and monetize Plaintiffs' personal information.

**Answer:** This paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

**C. Venue**

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph concerning where Plaintiffs' claims took place, and therefore is unable to admit or deny. The remaining portion of this paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

## FACTUAL ALLEGATIONS

**A. Consumers Place Pecuniary Value on Privacy Promises**

23. "Every time you go shopping, you share intimate details about your consumption patterns with retailers."[2]

**Answer:** Admitted that the website located at the URL in footnote 2 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted.

24. A now infamous anecdote, published by the New York Times in 2012 and condensed here for brevity, demonstrates the point:

> Andrew Pole had just started working as a statistician for Target in 2002, when two colleagues from the marketing department stopped by his desk to ask an odd question: "If we wanted to figure out if a customer is pregnant, even if she didn't want us to know, can you do that?"
>
> Target has a baby-shower registry, and Pole started there, observing how shopping habits changed as a woman approached her due date, which women on the registry had willingly disclosed. … As Pole's computers crawled through the data, he was able to identify about 26 products that, when analyzed together, allowed him to assign each shopper a 'pregnancy prediction' score.
>
> About a year after Pole created his pregnancy-prediction mode, a man walked into a Target outside Minneapolis and demanded to see the manager. He was clutching coupons that had been sent to this daughter, and he was angry, according to an employee who participated in the conversation. "My daughter got this in the mail!" he said. "She's still in high school, and you're sending her coupons for baby clothes and cribs? Are you trying to encourage her to get pregnant?" The manager didn't have any idea what the man was talking about. He looked at the mailer. Sure enough, it was addressed to the man's daughter and contained advertisements for maternity clothing, nursery furniture and pictures of smiling infants. The manager apologized and then called a few days later to apologize again. On the phone, though, the father was somewhat abashed. "I had a talk with my daughter," he said. … "She's due in August. I owe you an apology."[3]

**Answer:** Admitted that the website located at the URL in footnote 3 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth

---

[2] https://www.forbes.com/sites/kashmirhill/2012/02/16/how-target-figured-out-a-teen-girl-was- pregnant-before-her-father-did/

[3] https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html

of the matter asserted. The remaining allegations are denied.

25. Though written in 2012, the anecdote's point remains prescient: For retailers like Target and Rack Room Shoes, "the exhaustive rendering of our conscious and unconscious patterns into data sets and algorithms has revolutionized what they know about us and, therefore, how precisely they can sell."[4]

**Answer:** Admitted that the website located at the URL in footnote 4 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations are denied.

26. Although retailers still strive for omniscient knowledge of consumer behavior, technology has rapidly changed the ways in which they try to achieve that goal. No longer relying on in-house statisticians like Andrew Pole, retailers now depend on a vast apparatus of third parties who can identify prospective customers with discomforting precision. Along with paying third parties for those services, retailers also funnel the fuel that enables such precision: personal information and online activity. And with the rise of artificial intelligence, that precision continues to increase, creating a future in which the potential harm to consumers extends beyond ill-conceived purchases and touches on the very essence of free will. As one commentator explains:

> With access to vast amounts of consumer data, AI algorithms can create highly personalized marketing messages that exploit individuals' vulnerabilities and desires. As a result, consumers may be swayed to make purchases that are not in their best interests or even harmful to their health and well-being. Moreover, the opaque nature of AI algorithms makes it difficult for consumers to understand how their data is being used and how marketing messages are being tailored to them. This lack of transparency creates an uneven playing field, where businesses have an unfair advantage over consumers unaware of how much their behavior is being monitored and influenced.[5]

**Answer:** Admitted that the website located at the URL in footnote 5 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth

[4] https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html

[5] https://www.forbes.com/sites/elijahclark/2024/03/14/the-ethical-dilemma-of-ai-in-marketing-a- slippery-slope/

of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

27. As online surveillance continues to grow more sophisticated and pervasive, consumers' concerns over data privacy are reaching a crescendo. Recent surveys demonstrate the point:

- "93% of adults say that being in control of who can get information about them is important; 74% feel this is 'very important,' while 19% say it is 'somewhat important.'"[6]
- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy."[7]
- "[A]n overwhelming majority of Americans (82%) believe data privacy matters more to them than ever before, with many (74%) expressing worry about how organizations handle their personal data."[8]
- "72% [of consumers] say there should be more government regulation of what companies can do with their customers' personal information."[9]

**Answer:** Admitted that the websites located at the URLs in footnotes 6-9 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

28. Recent surveys also demonstrate that these concerns over data privacy have a substantial impact on consumer preferences and purchasing behavior:

- "93% of Americans would switch to a company that prioritizes their data privacy."[10]
- "85% of consumers … deleted a phone app, 82% opted out of sharing personal data, 78% avoided a particular website and 67% decided against making an online purchase due to private concerns."[11]
- "81% of consumers said they need to trust a brand to buy from them."[12]
- "75% of [survey] respondents indicat[ed] that trust in data practices influences their buying choices."[13]
- "About half (52%) of U.S. adults said they decided recently not to use a product or service because they were worried about how much personal information would be

6

[6] https://www.pewresearch.org/internet/2015/05/20/americans-views-about-data-collection-and- security/
[7] https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans-- who-is-responsible-for-better-data-protections/
[8] https://finance.yahoo.com/news/growing-concerns-data-privacy-ethical-112500004.html2
[9] https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and- digital-privacy-laws/#americans-largely-favor-more-regulation-to-protect-personal-information
[10] https://finance.yahoo.com/news/growing-concerns-data-privacy-ethical-112500004.html2
[11] https://iapp.org/news/a/most-consumers-want-data-privacy-and-will-act-to-defend-it
[12] https://www.forbes.com/councils/forbestechcouncil/2020/12/14/the-rising-concern-around- consumer-data-and-privacy/
[13] https://www.forbes.com/sites/tonybradley/2024/10/30/privacy-and-trust-in-the-ai-age/

collected about them."[14]

**Answer:** Admitted that the websites located at the URLs in footnotes 10-14 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on that website are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

29. And recent surveys show that consumers are particularly worried about the risks posed by data brokers and artificial intelligence:

- "78% of consumers believe companies must commit to ethical AI standards."[15]
- "81% of consumers think the information collected by AI companies will be used in ways people are uncomfortable with, as well as ways that were not originally intended."[16]
- "Roughly four-in-ten Americans say they are very worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%)."[17]

**Answer:** Admitted that the websites located at the URLs in footnotes 15-17 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

30. Defendant knows that marketing and advertising efforts can conflict with data privacy. In a 2019 presentation detailing efforts to increase "personalization" and "engagement," Defendant recognized that "data privacy risk is real."

<u>Figures 5–6</u>

---

[14] https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a- product-or-service-because-of-privacy-concerns/

[15] https://www.forbes.com/sites/tonybradley/2024/10/30/privacy-and-trust-in-the-ai-age/

[16] https://iapp.org/resources/article/consumer-perspectives-of-privacy-and-ai/

[17] https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and- digital-privacy-laws/







**<u>Answer</u>:** Admitted that the first screenshot contains the words "data privacy risk is real" and that the second screenshot contains the words "personalization" and "engagement." The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

31. At both the state and federal level, legislators and regulators have acknowledged consumers' concerns and sought to address them. Among those efforts, two governmental bodies have routinely taken the initiative: the Federal Trade Commission and the California legislature.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

**B. The FTC Act, the CalOPPA, and the CCPA**

32. The FTC's origins begin in 1914 when Congress enacted a landmark statute that mandated fairness in the marketplace. Known as the Federal Trade Commission Act, Congress articulated the statute's purpose with simplicity and clarity: "Unfair methods of competition in or

affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."[18] To ensure compliance with the Act, Congress created the FTC and vested it with regulatory authority.

**Answer:** Admitted that Congress passed the Federal Trade Commission Act and created the FTC and vested it with regulatory authority. The remainder of this paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied. To the extent a response is required, denied.

33. Relying on the operative provision within the FTC Act, the Commission "has taken action against dozens of companies that claimed to safeguard the privacy or security of users' information, but didn't live up to their promises in the day-to-day operation of their business."[19] In 2000, for example, the FTC brought an enforcement action against an online retailer, Toysmart.com, Inc., for "disclosing, selling, or offering for sale personal customer information, contrary to the terms of its privacy policy that personal information would never be disclosed to third parties."[20] That conduct, according to the FTC, "was … a deceptive practice" that violated the FTC Act.[21] A court later agreed with that conclusion, finding that the online retailer "engaged in deceptive acts or practices."[22] That court's determination was no anomaly; other courts reviewing similar enforcement actions have reached the same conclusion.[23]

**Answer:** Admitted that the websites located at the URLs identified in footnotes 19-23 contain the quoted language as of the date of this Answer. Further, the websites speaks for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate,

---

[18] 15 U.S.C. § 45(5)(a).

[19] https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.

[20] https://www.ftc.gov/sites/default/files/documents/cases/toysmartconsent.htm

[21] https://www.ftc.gov/sites/default/files/documents/cases/toysmartcomplaint.htm

[22] *F.T.C. v. Toysmart.com*, 2000 WL 34016434, at *1 (holding that "t]he complaint states a claim upon which injunctive relief may be granted" because it alleged "that Toysmart engaged in deceptive acts or practices … by disclosing, selling or offering for sale personal customer information, contrary to the terms of its privacy policy that personal information would never be disclosed to third parties");

[23] *See, e.g., F.T.C. v. Wyndham Worldwide Corp.*, 799 F. 3d 236, 245 (3d Cir. 2015) (finding a violation of the Federal Trade Commission Act because "[a] company does not act equitably when it publishes a privacy policy to attract customers who are concerned about data privacy, fails to make good on that promise by investing inadequate resources in cybersecurity, exposes its unsuspecting customers to substantial financial injury, and retains the profits of their business.").

or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied. To the extent the allegations are contrary to law, denied.

34. Beyond enforcement actions, the FTC employs other methods to enforce compliance with privacy promises. The FTC has, for example, repeatedly published guidance reminding companies that "[h]onoring privacy promises and obligations means implementing and adhering to safeguards that actually maintain people's privacy."[24]

**Answer:** Admitted that the website located at the URL identified in footnote 24 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied. To the extent the allegations are contrary to law, denied.

35. On top of enforcement actions and publications, the FTC also intervenes in cases to enforce privacy obligations. In 2015, for instance, RadioShack declared bankruptcy and sought to sell or disclose data on more than 100 million customers.[25] In response, the FTC pointed to representations within the retailer's privacy policies and urged the court to prohibit the transaction, arguing that "a sale or transfer of the personal information of RadioShack's customers would contravene RadioShack's express promise not to sell or rent such information and could constitute a deceptive or unfair practice under Section 5 of the FTC Act."[26]

**Answer:** Admitted that the websites located at the URLs identified in footnote 25-26 contain the quoted language as of the date of this Answer. Further, the websites speaks for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied. To the extent

---

[24] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/03/ftc-cracks-down-mass-data-collectors-closer-look-avast-x-mode-inmarket

[25] https://money.cnn.com/2015/05/19/news/companies/radioshack-customer-data/index.html

[26] https://www.ftc.gov/system/files/documents/public_statements/643291/150518radioshackletter.pdf

the allegations are contrary to law, denied.

36. These efforts, taken together, reflect the same truism: "When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up to these promises."[27]

**Answer:** Admitted that the website located at the URL identified in footnote 27 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied. To the extent the allegations are contrary to law, denied.

37. At the state level, the California legislature has paved the way in protecting consumer privacy. In 2003, for example, California became the first state to pass a law regulating privacy policies and mandating their accuracy. Known as the California Online Privacy Protection Act, the statute requires a company operating in California to "conspicuously post its privacy policy" and "[d]iscose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[28] Importantly, the statute defines "personally identifiable information" as including "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that permits the physical or online contacting of a specific individual."[29]

**Answer:** This paragraph states legal conclusions to which no response is required. The statute speaks for itself. To the extent the allegations are contrary to law, denied.

38. Fifteen years after leading the way with CalOPPA, California enacted the California Consumer Privacy Act, becoming the first state to enact a comprehensive data privacy law. Similar to CalOPPA, the CCPA requires companies to post privacy notices that disclose "[t]he categories of personal information to be collected and … whether that information is sold or shared."[30] The CCPA

---

[27] https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforce00ment
[28] Cal. Bus. & Prof. Code § 22575(a).
[29] *Id.*
[30] Cal. Civ. Code § 1798.100(1).

also makes expressly clear that "[a] business shall not … use person information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice consistent with this section."[31]

**<u>Answer</u>:** This paragraph states legal conclusions to which no response is required. The statute speaks for itself. To the extent the allegations are contrary to law, denied.

***

39. Put together, both federal and state law make clear that a company acts with unlawful purpose when it makes express representations about protecting consumers' privacy yet proceeds to collect, disclose, or use their personal information in a manner that exceeds or conflicts with those representations.

**<u>Answer</u>:** This paragraph states legal conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

**C. The California Invasion of Privacy Act and the Wiretap Act**

40. "In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which deals with wiretapping and other forms of electronic surveillance." Scott v. United States, 436 U.S. 128, 130 (1978). Known today as the Wiretap Act, the statute remains "the primary law protecting the security and privacy of business and personal communications." S. Rep. 99-541 at *3.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

41. As originally enacted, the Wiretap Act only extended to surveillance techniques in which "the contents of a communication [could] be overheard and understood by the human ear." S. Rep. 99-5441, at *2. Put differently, Congress "specifically excluded the [electronic] transmission of data from protection against private and governmental interceptions." H.R. 99647, at *22. Less than two decades later, technological advancements forced Congress to modify the Wiretap Act's ambit:

> In the intervening years, data transmission and computer systems have become a pervasive part of the business and home environments. … Some of these new services permit an individual to use a keyboard and telephone to transmit electronic messages and data and to receive interactive

[31] *Id.*

> services featuring banking and other financial services, shopping, news, messages and education. Many of these services also record the nature of the transactions engaged in by the user. Thus, the new technologies represent both an explosion in communication opportunities as well as surveillance possibilities. *Id.*

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

42. In 1986, Congress sought to address these "dramatic changes in new computer and telecommunications technologies" by "amend[ing] title III of the Omnibus Crime Control Safe Streets Act of 1968—the Federal wiretap law—to protect against the unauthorized interception of electronic communications." S. Rep. 99-5441 at *1.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

43. Today, the Wiretap Act provides that "any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication … shall be punished … or shall be subject to suit." 18 U.S.C. § 2511. The term "electronic communication" broadly encompasses "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12). That includes, for example, "computer- to-computer communications," like "the transmission of financial records or funds transfers from financial institutions, medical records between hospitals and/or physicians' offices, and the transmission of proprietary data among the various offices of a company." S. Rep. 99-541 at *3.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

44. Shortly before and after Congress enacted the Wiretap Act, state legislatures enacted their own prohibitions against eavesdropping on communications. In 1967, for example, California enacted an anti-wiretapping statute—the California Invasion of Privacy Act—to address concerns "that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from

the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630. Like the Wiretap Act, CIPA prohibits intercepting "electronic communications, *see* Cal. Penal Code § 631, and it also prohibits "us[ing], or attempt[ing] to use, in any manner, or for any purpose, or to communicate in any way, information so obtained." *Id.*

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

45. Though largely coextensive with the Wiretap Act, CIPA not only prohibits intercepting electronic communications but also outlaws "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal § 632. The term "confidential communications" means "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes … circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal § 632(c).

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent the allegations are contrary to law, denied.

**D. Rack Room's Privacy Representations**

46. Throughout its website, Defendant repeatedly promises consumers that it will keep their electronic communications confidential.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. Further, the website speaks for itself. To the extent a response is required, denied.

47. When customers first access rackroomshoes.com, Defendant presents them with a prominent banner that reads: "By continuing to use our website, you consent to our use of cookies and agree with our Privacy Policy."

<u>Figure 7</u>




**<u>Answer</u>:** Admitted.

48. The Privacy Policy begins by explaining that "Rack Room values the privacy of its customers," and it "endeavors to comply with relevant ethical standards in gathering, using and safeguarding customer information."[32]

**Answer:** Denied.

49. The Privacy Policy then makes the following representation: "Rack Room Shoes collects information through cookies and beacons … but none of the information collected through cookies or beacons is personally identifiable."

Figure 8

Rack Room Shoes collects information through cookies and beacons (as discussed below) but none of the information collected through cookies or beacons is personally identifiable.

**Answer:** This paragraph states conclusions to which no response is required. Further, the Privacy Policy speaks for itself. To the extent a response is required, denied.

50. The Privacy Policy later makes a similar representation: "Our usage of cookies is in no way linked to any Personal Information while on our site."

Figure 9

**COOKIES**

A cookie is a piece of data stored on the hard drive of your computer, containing information about you. Our usage of cookies is in no way linked to any Personal Information while on our site. Cookies can make the browsing experience easier. For instance, by accepting a cookie from our site, we can provide you a more personalized experience while shopping, thereby saving time while on our site. Most browsers can be set to reject cookies or to ask you if you want to accept/reject an incoming cookie. If you reject the cookie, you may still use our site, although you will be limited in some areas of our site. Cookies can also enable us to track and target the interests of our customers to enhance the experience on our site.

**Answer:** This paragraph states conclusions to which no response is required. Further, the Privacy Policy speaks for itself. To the extent a response is required, denied.

51. The Privacy Policy defines "Personal Information" as "information that personally

[32]https://www.rackroomshoes.com/privacy

identifies you when you voluntarily provide it to us, such as your name, mailing address, billing address, biometric information (as set forth below), e-mail address, phone number, date of birth and, in regard to online purchases only, your credit card number."

**Answer:** This paragraph states conclusions to which no response is required. Further, the Privacy Policy speaks for itself. To the extent a response is required, denied.

52. Defendant's "cookie banner" doubles down on those representations. Defendant represents that there are two types of cookies on its website: "Necessary Cookies" and "Targeting Cookies."

Figure 10




**Answer:** This paragraph states conclusions to which no response is required. Further, the website speaks for itself. To the extent a response is required, denied that the cookie banner contains any statements regarding "Necessary Cookies" and "Targeting Cookies."

53. "Necessary Cookies" are those that "are necessary for the website to function," but Rack Room promises that they "do not store any personally identifiable information."

Figure 11




**Answer:** This paragraph states conclusions to which no response is required. Further, the

website speaks for itself. To the extent a response is required, admitted only that the screenshot accurately reflects the website's description of necessary cookies.

54. "Targeting Cookies" are cookies that concern "adverts on other sites," but Rack Room promises that those too "do not store directly personal information, but are based on uniquely identifying [a user's] browser and internet device."

Figure 12




**Answer:** This paragraph states conclusions to which no response is required. Further, the website speaks for itself. To the extent a response is required, admitted only that the screenshot accurately reflects the website's description of targeting cookies.

55. Despite repeatedly promising to keep electronic communications confidential, Defendant systematically discloses such information to numerous third parties.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

**E. Defendant Assists Meta Platforms with Intercepting Confidential Communications**

a) Meta's Platform and its Business Tools

56. Meta describes Facebook as a "real identity platform,"[33] meaning users are allowed only one account and must share "the name they go by in everyday life."[34] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[35]

[33] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701?msockid=13746841a2d46d8e071f7cbaa3c86cc3
[34] https://www.facebook.com/communitystandards/integrity_authenticity.
[35] https://www.facebook.com/

**Answer:** Admitted that the websites located at the URLs identified in footnote 33-35 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations of this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

57. In 2023, Meta generated $134 billion in revenue.[36] Roughly 95% of that came from selling advertising space.[37]

**Answer:** Admitted that the websites located at the URLs identified in footnote 36-37 purport to state Meta's revenue and the percentage of that revenue that came from advertising. The websites speak for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted.

58. Meta sells advertising space by highlighting its ability to target users.[38]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

59. Meta can target users so effectively because it surveils user activity both on and off its site.[39]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

60. By targeting users on and off its sites, Meta can make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[40] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[41]

**Answer:** Admitted that the websites located at the URLs identified in footnotes 40-41

---

[36] https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx

[37] https://www.forbes.com/sites/dereksaul/2023/10/25/meta-earnings-record-profits-sales-as-ads-stay-robust-during-zuckerbergs-year-of-efficiency/

[38] https://www.facebook.com/business/help/205029060038706.

[39] https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[40] https://www.facebook.com/business/ads/ad-targeting.

[41] https://www.facebook.com/business/news/Core-Audiences.

contain the quoted language as of the date of this Answer. Further, the websites speaks for themsleves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding the remaining allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

61. Advertisers can also build "Custom Audiences."[42] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[43] With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[44] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[45]

**Answer:** Admitted that the websites located at the URLs identified in footnotes 42-45 contain the quoted language as of the date of this Answer. Further, the websites speaks for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding the remaining allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

62. As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[46] Put more succinctly, Meta's Business Tools are bits of code that

---

[42] https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[43] https://www.facebook.com/business/ads/ad-targeting.
[44] https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[45] https://www.facebook.com/business/help/170456843145568?id=2469097953376494; https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[46] https://www.facebook.com/help/331509497253087.

advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

**Answer:** Admitted that the website located at the URL identified in footnote 46 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding the remaining allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

63. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[47] Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[48] Advertisers can even create their own tracking parameters by building a "custom event."[49]

**Answer:** Admitted that the websites located at the URLs identified in footnotes 47-48 contain the quoted language as of the date of this Answer. Further, the websites speaks for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding the remaining allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

64. One such Business Tool is the Meta Pixel. Meta offers this piece of code to advertisers, like Rack Room Shoes, to integrate into their websites. As the name implies, the Meta Pixel "tracks the people and type of actions they take."[50] When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to send a separate message to Meta's servers.

---

[47] *See* https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* https://www.facebook.com/business/help/218844828315224?id=1205376682832142; https://developers.facebook.com/docs/marketing-api/app-event-api/.

[48] https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[49] https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* https://developers.facebook.com/docs/marketing-api/app-event-api/.

[50] https://www.facebook.com/business/goals/retargeting.

**Answer:** Admitted that the website located at the URL identified in footnote 50 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Admitted that Meta offered the Meta Pixel to Defendant. The remaining allegations in this paragraph contain conclusions to which no response is required. To the extent a response is required, denied.

65. This second, secret transmission contains the original GET request[51] sent to the host website along with additional data that the Pixel is configured to collect. This transmission is initiated by Meta's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Meta's embedded code.

**Answer:** Admitted that the website located at the URL identified in footnote 51 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The paragraph also contains conclusions to which no response is required. To the extent a response is required, denied.

66. An example illustrates the point. Take an individual who navigates to Defendant's website and clicks on a tab to browse shoes. When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Rack Room Shoes utilizes the Meta Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Meta causes the browser to secretly duplicate the communication with Defendant, transmitting it to Meta's servers, alongside additional information that transmits the communication's content and the individual's identity.

**Answer:** Admitted that Rack Room Shoes utilized the Meta pixel on its website. Admitted

---

[51] "A GET request is an HTTP request used to retrieve data from a specific web page. For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code." See OXYLAB, WHAT IS A GET REQUEST, https://oxylabs.io/blog/curl-get-requests

that the Meta pixel's code sends some information to Meta for certain website users depending on the user's browser, settings, use of an ad-blocker, and/or denial of cookie permissions. The paragraph also contains conclusions to which no response is required. To the extent a response is required, the remaining allegations are specifically denied.

67. After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. The paragraph also contains conclusions to which no response is required To the extent a response is required, denied.

b) Rack Room Shoes and the Meta Pixel

68. Defendant intentionally integrates the Meta Pixel into its website.

Figure 13




**Answer:** This paragraph states legal conclusions to which no response is required. Further, the website speaks for itself. To the extent a response is required, denied.

69. Defendant's Pixel captures event data called "PageView."

Figure 14




**Answer:** Admitted that the Meta pixel on Defendant's website is capable of capturing event data called "PageView" for some website visitors depending on their browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the Meta pixel on Defendant's website captures event data called "PageView" for all website visitors. Defendant specifically denies that it owns the Meta pixel or that the Meta pixel on Defendant's website is accurately characterized as "Defendant's Pixel."

70. The "PageView" event transmits the URL accessed.

**Answer:** Admitted that the "PageView" event transmits the URL accessed for some website visitors depending on their browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the "PageView" event transmits the URL accessed for all website visitors.

71. The URL reveals a user's search queries. As an example, if a customer navigates to rackroomshoes.com and searches for "Men Nike Track Shoes," Defendant transmits the following URL:

Figure 15




**Answer:** Admitted that some URLs collected by Meta for some users contain search queries. Denied that Defendant "transmits" URL's to Meta, that all URLs are collected by Meta, that

all URLs collected by Meta contain search queries, or that the URL contained in Figure 15 is collected by Meta for all website visitors regardless of their browser, settings, use of an ad-blocker, and or denial of cookie permissions.

72. Defendant's Pixel also captures event data called "Button Click."

Figure 16




**Answer:** Admitted that the Meta Pixel on Defendant's website is capable of capturing event data called "Button Click" for some website visitors depending on their browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the Meta Pixel on Defendant's website captures event data called "Button Click" for all website visitors. Defendant specifically denies that it owns the Meta pixel or that the Meta pixel on Defendant's website is accurately characterized as "Defendant's Pixel."

73. The "Button Click" event transmits the name of the button clicked and the name of the webpage to Meta.

**Answer:** Admitted that the "Button Click" event transmits to Meta the name of the button clicked and the name of the webpage for some website visitors depending on their browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the "Button Click" event transmits to Meta the name of the button clicked and the name of the webpage for all website visitors.

74. Defendant's Pixel captures event data called "View Content."

Figure 17




**Answer:** Admitted that the Meta pixel on Defendant's website is capable of capturing event data called "View Content" for some website visitors depending on their browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the Meta pixel on Defendant's website captures event data called "View Content" for all website visitors. Defendant specifically denies that it owns the Meta pixel or that the Meta Pixel on Defendant's website is accurately characterized as "Defendant's Pixel."

75. The "View Content" event transmits the inventory number for the browsed item to Meta.

**Answer:** Defendant lacks knowledge regarding whether the "View Content" event transmits the inventory number for the browsed item to Meta and therefore is unable to admit or deny. To the extent required: Denied that the "View Content" event transmits to Meta the inventory number for the browsed item for all website visitors regardless of the visitor's browser, settings, use of an ad-blocker, and/or denial of cookie permissions.

76. Defendant's Pixel captures event data called "AddToCart."

Figure 18




**<u>Answer</u>:** Admitted that the Meta pixel on Defendant's website is capable of capturing event data called "AddToCart" for some website visitors depending on their browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the Meta Pixel on Defendant's website captures event data called "AddToCart" for all website visitors. Defendant specifically denies that it owns the Meta pixel or that the Meta pixel on Defendant's website is accurately characterized as "Defendant's Pixel."

77. AddToCart discloses the item's name and type.

**<u>Answer</u>:** Admitted that the "AddToCart" event can collect the item's name and type for some users depending on their browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the "AddToCart" event discloses the item's name and type for all website visitors regardless of the visitor's browser, settings, use of an ad-blocker, and/or denial of cookie permissions.

78. Defendant's Pixel pairs event data with a user's personally identifiable information.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent a response is required, Defendant specifically denies that the Meta pixel on Defendant's website pairs event data with a user's personally identifiable information. Further, Defendant specifically denies that it owns the Meta pixel or that the Meta pixel on Defendant's website is accurately characterized as "Defendant's Pixel."

79. When a user accesses Defendant's websites while logged into Facebook, the Pixel will compel the user's browser to transmit the c_user cookie, which contains the user's unencrypted

Facebook ID:

Figure 19

| | | |
|---|---|---|
| ar_debug | 1 | .facebook.com |
| c_user | 100035966074568 | .facebook.com |
| datr | B3zfZvZFXLRINb... | .facebook.com |
| fr | 0zlkq0elxLtqBvqi... | .facebook.com |
| presence | C%7B%22t3%22... | .facebook.com |
| ps_l | 1 | .facebook.com |
| ps_n | 1 | .facebook.com |
| sb | B3zfZjETNf-pjAS... | .facebook.com |
| wd | 1593x952 | .facebook.com |
| xs | 2%3AJhxYpAHzY... | .facebook.com |

**Answer:** Admitted that some users logged into Facebook may have their c_user cookie transmitted to Facebook, depending on the user's browser, settings, extensions, and whether the user has disconnected future activity in their Meta account's "Off-Facebook Activity" settings. Denied that all users have their c_user cookie transmitted.

80. A Facebook ID is personally identifiable information. To find the account associated with the Facebook ID, one need only open a web browser and enter the following: www.facebook.com/[Facebook ID].

**Answer:** Admitted only that a Facebook ID can identify a user's Facebook account. The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

81. When a visitor's browser has recently logged out of an account, Meta compels the visitor's browser to send a small set of cookies:

Figure 20

| | | |
|---|---|---|
| wd | 1593x952 | .facebook.com |
| datr | B3zfZvZFXLRINb... | .facebook.com |
| ps_n | 1 | .facebook.com |
| ar_debug | 1 | .facebook.com |
| ps_l | 1 | .facebook.com |
| sb | B3zfZjETNf-pjAS... | .facebook.com |
| fr | 0zlkq0elxLtqBvqi... | .facebook.com |

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

82. No matter the circumstances, Meta receives at least one cookie from a user's browser:

Figure 21

| | | |
|---|---|---|
| _fbp | fb.1.1725899609586.... | .rackroomshoes.com |

**Answer:** Denied.

83. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

84. The _fbp cookie contains, at least, an unencrypted value that uniquely identifies the browser.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

85. Meta, at a minimum, uses the c_user, fr and _fbp cookies to link to Facebook IDs and corresponding Facebook profiles.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

86. The Meta Pixel also captures the identifiers that a user submits through form fields.

**Answer:** Admitted that the Meta pixel has the ability to capture certain data submitted through form fields, depending on the pixel configuration and the user's browser, settings, use of an ad-blocker, and/or denial of cookie permissions. Denied that the Meta pixel on Defendant's website captures identifiers submitted through form fields, or did so for all users or during the relevant time period.

87. Even when a consumer checks out as a guest, for example, they must provide the following information:

Figure 22




**Answer:** Admitted.

88. When a consumer completes a purchase, Defendant assists Meta with intercepting the consumer's first name, last name, phone number, email address, city, state, and zip code. The following figure shows Meta receiving hashed values for "fn," which stands for first name; "ln," which stands for last name; "em," which stands for email address; "ph," which stands for phone number; "ct," which stands for city; "st," which stands for state or province; and "zp," which stands for zip code:[52]

[52]https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/.

<u>Figure 23–24</u>

id: 577593229294108
ev: SubscribedButtonClick
dl: https://www.rackroomshoes.com/cart
rl: https://www.google.com/
if: false
ts: 1725919683828
cd[buttonFeatures]: {"classList":"text-uppercase btn btn-primary mt-4 with-loader","destination":"https://www.rackroomshoes.com/cart","id":"","imageUrl":"","innerText":"CONTINUE TO CHECKOUT","numChildButtons":0,"tag":"button","type":"submit","name":"","value":""}
cd[buttonText]: CONTINUE TO CHECKOUT
cd[formFeatures]: [{"id":"userId","name":"","tag":"input","placeholder":"email / phone","inputType":"text","valueMeaning":"empty"},{"id":"","name":"","tag":"button"}]
cd[pageFeatures]: {"title":"View Cart | Checkout Page | Rack Room Shoes"}
sw: 1920
sh: 1080

udff[fn]: d233633d9524e84c71d6fe45eb3836f8919148e4a5fc2234cc9e6494ec0f11c2
udff[ln]: 5239ea501ef63222c9321261bea495d46d2f8b2f7985d80bf4c7c4b542d6bd28
udff[em]: 6e31b641a0242ca918631883e2f73b099bb2c889da9f7ed4ec5fd4c2f91acc73
udff[ph]: 9b3716968eabd8398b861de8c40d7d39e444aeed48d3bf6222f50d1c183c2515
udff[ct]: 61e1107708f6d4cbc4ec097dbf13e32552fde750e0eb5ac1a7fff815e36d0fe3
udff[st]: 593f2d04aab251f60c9e4b8bbc1e05a34e920980ec08351a18459b2bc7dbf2f6
udff[zp]: 85755415d9818e33b477feee63d0e98bc63296d91f0d5429f4131331d15d81f8

**<u>Answer:</u>** The first sentence of this paragraph states conclusions to which no response is required. To the extent a response is required, denied. Admitted that Figures 23-24 appear to show hashed values for various data fields as defined by Meta's documentation. Denied that the figures show Meta receiving hashed values for various fields.

89. Put together, Defendant's Pixel pairs event data with personally identifiable information and sends that bundle to Meta so the social media site can match the website activity to a specific user:

Figure 25




**Answer:** Denied that Defendant, as opposed to Meta, has the ability to pair event data with personally identifiable information. It is specifically denied that the Meta pixel on Defendant's website sends "that bundle" to Meta so the social media site can match the website activity to a specific user. Whether the Pixel sends any information to Meta depends on the user's Facebook account, browser, settings, use of ad-blockers or other extensions, and/or denial of cookie permissions. Further, Defendant specifically denies that it owns the Meta Pixel or that the Meta pixel on Defendant's website is accurately characterized as "Defendant's Pixel."

90. Once received and processed by Meta, Defendant knowingly uses the intercepted communications to build Custom Audiences and run targeted advertisements.

**Answer:** This paragraph states conclusions to which no response is required. Further, the website speaks for itself. To the extent a response is required, denied.

91. Upon information and belief, Defendant uses other Business Tools, like Conversions API, to assist Meta with intercepting its users' communications.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

c) Meta Never Receives Consent to Intercept Confidential Communications

92. Meta never receives consent from users to collect electronic communications on websites that have a statutory obligation to shield those communications from disclosure. In fact, Meta expressly warrants the opposite.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

93. When creating a Facebook account, a user assents to four agreements: the Terms of Service, the Data Policy, the Privacy Policy, and the Cookies Policy. For California Residents, Meta also publishes a California Privacy Policy.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, admitted.

94. Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[53] The Terms of Service then prohibit anyone from using Facebook's platform in a manner that is "unlawful, misleading, discriminatory or fraudulent."[54]

**Answer:** Admitted that the website located at the URL in footnotes 53-54 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Denied that Facebook's Terms of Service "begins by stating" the quoted language.

95. Facebook's Data Policy describes how Meta collects information from its "Meta Business Tools," including "the Meta pixel."[55] Specifically, Meta acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[56] Meta then offers an express representation: **"We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."**[57]

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, admitted only that the website located at the URL in footnotes 55-57 contains the quoted language as of the date of this Answer, though none of the quoted language appears in bold type. Further, the website speaks for itself.

96. Facebook's Privacy Policy says Meta "require[s] partners to have the right to collect, use and share [consumers'] information before giving it to us."[58]

---

[53] https://www.facebook.com/legal/terms/update..
[54] *Id.*
[55] https://www.facebook.com/help/155833707900388/
[56] *Id.*
[57] *Id.*
[58] https://www.facebook.com/privacy/policy/version/5601719079934335

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph because the website located at the URL in footnote 58 redirects to https://www.facebook.com/privacy/policy and Defendant therefore is unable to admit or deny what the website listed in footnote 58 states or stated. Further, the website speaks for itself. To the extent a response is required, denied.

97. Facebook's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[59]

**Answer:** Admitted only that the website located at the URL in footnote 59 contains the phrase "the Privacy Policy will apply to our processing of the data that we collect via cookies." Defendant specifically denies that this partial statement constitutes Meta's statement on the application of the Privacy Policy to Meta's use of cookies because the complete statement on the website reads "**Except as otherwise stated in this policy**, the Privacy Policy will apply to our processing of the data that we collect via cookies." (emphasis added). Further, the website speaks for itself. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. In addition, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

98. For California residents, Meta reiterates that promise: "We require each of these partners to have rights to collect, use, and share your data before providing any data to us."[60]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph because the website located at the URL listed in footnote 60 redirects to https://www.facebook.com/privacy/policies/uso/ and therefore Defendant is unable to admit or deny what the website listed in footnote 60 states or stated. To the extent a response is required, admitted that the website located at https://www.facebook.com/privacy/policies/uso/ contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. In addition, this paragraph states conclusions to which no response is

[59] www.facebook.com/policies/cookies/.

[60] https://www.facebook.com/legal/policy/ccpa.

required. To the extent a response is required, denied.

99. Facebook's other representations reinforce these warranties. In an article titled, "How does Meta work with data providers?," Meta states that "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[61] Under the Custom Audience Terms, businesses must "represent and warrant … that [they] have all necessary rights and permissions and a lawful basis to disclose and use the Hashed Data in compliance with all applicable laws, regulations, and industry guidelines."[62]

**Answer:** Admitted that the website located at the URL in footnote 61 contains the quoted language as of the date of this Answer. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. Denied that the website located at the URL in footnote 62 contains the quoted language. Further, the website speaks for itself. In addition, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

100. Because state and federal law required Defendant to comply with its privacy promises, Defendant lacked a lawful basis to disclose personally identifiable information. Accordingly, Meta never received consent from Plaintiffs and Class members to intercept their communications on Defendant's website.

**Answer:** This paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

**F. Defendant Assists Attentive with Intercepting Confidential Communications**

a) Attentive and its Tracking Tools

101. Attentive operates one of the largest marketing platforms in the country, with "over 27% of the top 1,000 retailers in North America" utilizing its product, "including 40% of the top apparel brands, 40% of the top jewelry brands, [and] 33% of the top health and beauty brands."[63] Given

[61] https://www.facebook.com/help/494750870625830?ref=dp.
[62] https://www.facebook.com/legal/terms/customaudience
[63] https://www.attentive.com/retail-ecommerce-marketing

Attentive's ubiquity, the company has collected more than "1.8 billion email and phone numbers" and "1.4 trillion customer data points."[64]

**<u>Answer</u>:** Admitted that the websites located at the URLs in footnote 63-64 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted.

102. To unlock the "full advantage" of its platform, Attentive requires retailers to integrate the "Attentive Tag" into their websites.[65] The Attentive Tag captures "behavioral data, page view, product view, add to cart, and purchase events."[66]

**<u>Answer</u>:** Admitted that the website located at the URL in footnote 65-66 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding allegations in this paragraph, including in particular whether Attentive "requires" anyone to do anything, and therefore is unable to admit or deny. To the extent a response is required, denied.

103. Through the Attentive Tag, Attentive "analyze[s] behaviors across the entire customer life cycle."[67] In exchange for that information, Attentive provides retailers with "a treasure trove of insights about [their] customers' shopping habits, like their browsing and purchasing history."[68]

**<u>Answer</u>:** Admitted that the websites located at the URLs in footnote 67-68 contain the quoted language as of the date of this Answer. Further, the websites speaks for themselves. Defendant specifically denies any implication that the statements on those websites are true, accurate, or admissible for the truth of the matter asserted. Defendant further specifically denies that "Attentive provides retailers with a treasure trove of insights about [their] customers' shopping habits, like their browsing and purchasing history." The website located in the URL in footnote 68 actual states, in full, "**Your** website is a treasure trove of insights about **your** customers' shopping habits, like their browsing

---

[64] https://www.attentive.com/audience-segmentation-manager
[65] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag
[66] *Id.*
[67] https://www.attentive.com/sms-analytics-and-reporting
[68] https://www.attentive.com/blog/web-traffic-optimization

and purchasing history." https://www.attentive.com/blog/web-traffic-optimization (emphasis added) (last visited February 12, 2026). Defendant lacks knowledge regarding the remaining allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

104. Attentive collects and assimilates personal information into its "Identity Graph," which is "a web of data built with multiple unique identifiers (e.g. cookies, phone numbers, email, on-site shopping behavior, device information, first name, last name, etc.) with the customer at the center."[69] Through the Identity Graph, Attentive offers retailers "a comprehensive customer profile."

Figure 26




**Answer:** Admitted that the blog post located at the URL in footnote 69 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

105. These profiles show various data points, like a consumer's "activities," "preferences," [f]avorite products," and "[d]evices."

[69] https://www.attentive.com/blog/attentive-signal-faq#:~:text=The%20short%20answer%20is%20our%20Attentive%20Identity%20Graph.,name%2C%20etc.%29%20with%20the%20customer%20at%20the%20center.

Figure 27




**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

106. Each profile also contains tabs for "Subscriptions," "Activities," "Attributes," and "Offers."[70]

Figure 28




[70] https://help.attentivemobile.com/hc/en-us/articles/4412398776724-View-subscriber-profiles#h_01HMHNE64DY37DDMX49SGNHDPX

**Answer:** Admitted that the website located at the URL in footnote 70 contains the words "subscriptions," "activities," "attributes," and "offers" as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted.

107. Upon information and belief, the "Activities" tab reveals the content of the consumer's electronic communications.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

b) Attentive Intentionally Circumvents Privacy Controls

108. To maintain its market share, Attentive constantly innovates to address "signal loss." Signal loss "refers to the diminishing strength of pixel fires on important signals or data points (such as purchase events), which were once reliably tied to campaigns and individual users."[71] To mitigate that loss, Attentive developed "Attentive Signals." Attentive's Chief Strategy Officer, Eric Miao, best explains the innovation:

> Attentive Signal is our identity product. It's at the core of our platform. It powers everything you can do with it—from optimizing your customer segmentation strategy to triggering top-performing journeys. It collects and attributes a vast amount of shopper data directly to Attentive subscribers. This includes everything from zero-party data, like shopping preferences, to enrichment data, like device information.[72]

**Answer:** Admitted that the website located at the URL in footnotes 71 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statement on the website are true, accurate, or admissible for the truth of the matter asserted. Denied that the website located at the URL in footnote 72 contains the quoted language. Defendant lacks knowledge regarding allegations in this paragraph concerning the block quoted language and Attentive's motives and therefore is unable to admit or deny. To the extent a response is required, denied.

109. Put differently, "Attentive Signal is an identity solution that enables marketers to

---

[71] https://www.forbes.com/councils/forbesagencycouncil/2023/07/19/how-to-overcome-signal-loss- in-digital-marketing-campaigns/

[72] https://www.attentive.com/signal-identity-solution

understand who's shopping on their site, identify specific habits, and build personalized experiences."[73] According to Attentive, it's so effective "that no matter where or how someone chooses to shop, all of their data can be linked back to their unique profile."[74] It's so effective, in other words, that Attentive can eliminate the "three key factors that contribute to signal loss": "evolving privacy requirements," "advanced ad-blockers," and "savvy customers."[75]

**Answer:** Denied that the website located at the URL in footnote 73 contains the quoted language. Admitted that the blog post located at the URL in footnote 74 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. Admitted that the blog post located at the URL in footnote 75 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

c) Rack Room's Knowledge of Attentive's Platform and Practices

110. Defendant knows that Attentive uses identifiers and online activity for its own commercial purposes. Among other things, Attentive makes prominent representations on its website about how it leverages personal information to enhance its platform. Attentive claims, for example, that it can send more triggered emails than its competitors because it "recognizes over 1 [billion] email addresses and phone numbers across devices":

---

[73] https://www.attentive.com/signal-identity-solution

[74] https://www.attentive.com/blog/attentive-signal-faq#:~:text=Attentive%20Signal%20is%20our%20identity,data%20directly%20to%20Attentive%20subscribers..

[75] https://www.attentive.com/blog/attentive-signal-faq#:~:text=This%20includes%20everything%20from%20zero,personalized%20experiences%20that%20customers%20want.

Figure 29

## Triggered Email

**Identify and engage more of your on-site browsers**

Increase the email identification rate of your website traffic. Attentive recognizes over 1b email addresses and phone numbers across devices, resulting in a 100% increase in triggered email sends.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. In addition, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

111. Moreover, over the last two years, Attentive has incorporated artificial intelligence into several new products—"AI Journeys," "Audiences AI," and "Identity AI"— that were trained using the "1.4 trillion datapoints" in Attentive's possession.[76] Since rolling those products out, Attentive has aggressively pitched them to existing customers, stating that their products will soon "help marketers deliver the sorts of truly 1:1 personalized experiences they have always dreamt of (and can deliver without any additional manual work)."[77] Those pitches have paid off; as of December 2023, "80% of Attentive customers [were] using AI."[78] Whether Rack Room counts among the 80% or not, Defendant knows that Attentive created these products by, in part, leveraging personal information from customers who accessed Defendant's website.

**Answer:** Admitted that the blog post located at the URL in footnote 76 contains the phrases "AI journeys" and "1.4 trillion datapoints" as of the date of this Answer. Denied that the blog post located at the URL in footnote 76 contains the phrases "Audiences AI" or "Identity AI." Admitted that the blog post located at the URL in footnote 77 contains the quoted language as of the date of this Answer. Admitted that the website located at the URL in footnote 78 contains the quoted language as of the date of this Answer. Further, the websites speaks for themselves. Defendant specifically denies

---

[76] https://www.attentive.com/blog/attentive-ai#:~:text=Trained%20on%20over%201.4%20trillion,planning%2C%20testing%2C%20and%20sending%20high

[77] https://www.attentive.com/blog/attentive-signal-faq

[78] https://www.businesswire.com/news/home/20231213790998/en/Attentive-Drives-Strong-Momentum-with-80-of-Customers-Now-Using-Its-AI-Solutions

any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

112. Finally, for all retailers that use Attentive's platform, they must provide Attentive with a license to "copy, process and transmit the data, information and other materials transmitted to or through the Platform," including "Customer Data" like "telephone numbers" and "email addresses."[79] That license also allows Attentive to use Customer Data "to provide and improve the Services."[80] From that contract alone, Defendant knew that Attentive would use Customer Data to enhance its platform.

**Answer:** Admitted that the website located at the URL in footnotes 79-80 contains each of the phrases quoted in this paragraph as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. This paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

d) Rack Room's Website and Attentive's Tracking

113. Defendant integrated code from Attentive into its website —including but not limited to the Attentive Tag—for the purpose of "capturing behavioral data" and linking it to personally identifiable information.

**Answer:** Admitted that Defendant integrated code from Attentive into its website. The remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied..

114. As with the Meta Pixel, when consumers access and navigate rackroomshoes.com, Attentive's software script surreptitiously directs the user's browser to send a separate message to Attentive's servers. This second, secret transmission contains the original GET request[81] sent to the host website along with additional data that Attentive's code is configured to collect. This transmission

---

[79] https://www.attentive.com/legal/msa
[80] https://www.attentive.com/legal/msa
[81] "A GET request is an HTTP request used to retrieve data from a specific web page. For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code." *See* OXYLAB, WHAT IS A GET REQUEST, https://oxylabs.io/blog/curl-get-requests

is initiated by Attentive's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Attentive's embedded code.

**<u>Answer</u>:** Admitted that the website located at the URL identified in footnote 81 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The paragraph also contains conclusions to which no response is required. To the extent a response is required, denied.

115. When consumers purchase products on Defendant's website, they must input their phone numbers and email addresses:

<u>Figure 30</u>




**<u>Answer</u>:** Admitted.

116. When consumers click "continue," Defendant assists Attentive with contemporaneously receiving unencrypted versions of both identifiers:

<u>Figure 31</u>

| | | |
|---|---|---|
| attntv_mstore_phone | 4075804543:0 | www.rackroomshoes.com |
| attntv_mstore_email | chrisreillyfl@gmail.com:0 | www.rackroomshoes.com |

**<u>Answer</u>:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. In particular, Defendant cannot determine where on the website consumers are alleged to click "continue" as there is no reference to a specific webpage on the website. In addition, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

117. Under these circumstances, identifiers constitute "content," not record information.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

118. Attentive also pairs those direct identifiers with event data, like "page views and purchases."[82] By way of example, if a user clicks on "Mens Air Max Alpha Trainer Cross Training Shoe," Attentive contemporaneously receives the following information:

<u>Figure 32</u>


v: 4.37.24_ab98783f9a
pd: https://www.rackroomshoes.com/p/nike-mens-air-max-alpha-trainer-5-cross-training-shoe/601642
u: 8baf553ae4994cc2941a6a0d6a031b53
c: rackroomshoes
ceid: QF4
lt: 1725914609732
tag: modern
cs: 2595617328
t: c
r: https://www.rackroomshoes.com/
m: {"source":"gtag","email":"chrisreillyfl@gmail.com","image":"https://deichmann.scene7.com/asset/deichmann/US_01_601642_01?$rr_main$&defaultImage=default_obs","name":"MENS AIR MAX ALPHA TRAINER 5 CROSS TRAINING SHOE","phone":"4075804543","productId":"%[Tinuiti] Product - by page path SKU - Lookup Table%","sku":"%[Tinuiti] Product - by page path SKU - Lookup Table%"}
cb: 1725917879274


**<u>Answer</u>:** Denied that the website located at the URL in footnote 82 contains the phrase "page views and purchases" as of the date of this Answer. The website also does not contain the word "pairs" or the phrases "direct identifiers" or "event data." It is further denied that Figure 32 indicates that Attentive received the information reflected in the screenshot. The remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

119. As shown in the above figure, Attentive obtains: the full URL string; the name of the product; the customer's email address; and the customer's phone number. This information enables Attentive to identify consumers and understand the content of their electronic communications.

**<u>Answer</u>:** Admitted only that Figure 32 purports to show a full URL string and the name of a product. Denied that Figure 32 shows a customer's email address and a customer's phone number; the email address and phone number in Figure 32 belong to Plaintiffs' counsel Christopher Reilly. The remaining allegations in this paragraph contain conclusions to which no response is required. To the extent a response is required, denied that Figure 32 shows that Attentive obtains this information or understands the content of consumers electronic communication.

---

[82] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag#h_01J5R88CY3M5K3XP1XDSYWEQV7

120. Attentive receives this event data and personally identifiable information at "events.attentivemobile.com."

**Answer:** Defendant specifically denies that event data and/or personally identifiable information is sent to events.attentivemobile.com for all visitors to Defendant's website. In particular, website visitors with certain browsers, settings, ad-blockers, VPNs, and/or who have denied cookies may send no information to events.attentivemobile.com. Defendant lacks knowledge regarding who may or may not have sent information to events.attentivemobile.com and therefore is unable to admit or deny. To the extent a response is required, denied.

121. Once received and processed by Attentive, Defendant knowingly uses the intercepted communications to run marketing campaigns that target consumers based on their activity on Defendant's website.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

122. Even if a user turns "targeting cookies" off, Defendant still assists Attentive with intercepting event data, email addresses, and phone numbers.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

123. Defendant never received consent from Plaintiffs and Class members to assist Attentive in intercepting their electronic communications that contain their personally identifiable information.

**Answer:** This paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

124. Upon information and belief, Defendant can export a spreadsheet from Attentive showing all customers who inputted their phone numbers and email addresses into the sign-up unit on Defendant's website.

Figure 33

| | Conversion Date | Message Received Date | Message Title | Click View Through | | Platform | SKU | Order Total ($) |
|---|---|---|---|---|---|---|---|---|
| 2 | 2022-05-01 00:09:36.000 | 2022-04-26 12:24:02.000 | Concierge Test Initial Mess | CLICK | +165 [redacted] | Android | 3651845521508,3668613 | 60.82 |
| 3 | 2022-05-01 04:52:50.000 | 2022-05-01 04:46:53.000 | Welcome Subscribers | VIEW | +143 [redacted] | iOS | 3665558732900,4860877 | 23.89 |
| 4 | 2022-05-01 10:35:23.000 | 2022-05-01 10:26:37.000 | Message 04-12-22 1:31 | VIEW | +120 [redacted] | iOS | 3651845455972,4506002 | 122.9 |
| 5 | 2022-05-01 16:19:29.000 | 2022-04-24 16:30:28.000 | Malomo: Just Shipped | CLICK | +172 [redacted] | iOS | 4860877308004,4886394 | 52.8 |
| 6 | 2022-05-01 16:42:39.000 | 2022-05-01 16:39:31.000 | Welcome Subscribers | VIEW | +120 [redacted] | iOS | 3665559027812 | 34.69 |
| 7 | 2022-05-01 17:29:31.000 | 2022-04-10 06:30:29.000 | *EIQ 4.10.22 Lips Highlight | CLICK | +150 [redacted] | iOS | 6557014425700,4174339 | 180.56 |
| 8 | 2022-05-01 19:24:17.000 | 2022-05-01 19:03:55.000 | Welcome Subscribers | CLICK | +171 [redacted] | iOS | 6546217828452,3651845 | 60.46 |
| 9 | 2022-05-01 19:29:40.000 | 2022-05-01 19:09:40.000 | Concierge Test Initial Mess | VIEW | +132 [redacted] | Android | 4860877308004,3666508 | 17.28 |
| 10 | 2022-05-01 21:31:17.000 | 2022-05-01 21:17:41.000 | Welcome Subscribers - Fre | VIEW | +178 [redacted] | iOS | 4860877308004,3666508 | 28.29 |
| 11 | 2022-05-02 06:50:52.000 | 2022-05-02 06:36:50.000 | Welcome Subscribers | VIEW | +191 [redacted] | iOS | 6803415564388,3665559 | 173.12 |
| 12 | 2022-05-02 09:17:23.000 | 2022-05-02 09:01:56.000 | Welcome Subscribers | VIEW | +180 [redacted] | Desktop | 3651845521508,3666508 | 50.12 |
| 13 | 2022-05-02 12:52:55.000 | 2022-05-02 12:42:13.000 | Welcome Message 3 Imag | VIEW | +177 [redacted] | iOS | 4506002948196,3665559 | 27.81 |
| 14 | 2022-05-02 14:07:03.000 | 2022-05-02 13:49:25.000 | Winback Message 1 - 10% | CLICK | +120 [redacted] | iOS | 4860877308004,6540304 | 87.37 |
| 15 | 2022-05-02 14:16:38.000 | 2022-05-02 14:07:26.000 | Malomo: Order confirmed | VIEW | +120 [redacted] | iOS | 6803509936228,3666508 | 42.24 |
| 16 | 2022-05-02 18:25:23.000 | 2022-05-02 17:12:43.000 | Welcome Message 2 Imag | VIEW | +150 [redacted] | Desktop | 3666508742756,3651845 | 50.4 |
| 17 | 2022-05-02 18:40:29.000 | 2022-05-02 18:28:26.000 | Concierge Test Initial Mess | VIEW | +164 [redacted] | Desktop | 6553370755172,4828324 | 86.7 |
| 18 | 2022-05-03 08:47:59.000 | 2022-05-03 08:21:59.000 | *EIQ 4.26.22 Caffeine | CLICK | +181 [redacted] | iOS | 3666508841060,3668615 | 40.02 |
| 19 | 2022-05-03 09:19:51.000 | 2022-05-02 10:23:47.000 | Winback Message 2 - 10% | VIEW | +187 [redacted] | iOS | 3665558863972,6588787 | 52.82 |
| 20 | 2022-05-03 10:08:39.000 | 2022-05-03 09:47:45.000 | Welcome Subscribers - Fre | VIEW | +161 [redacted] | Desktop | 6557014425700,3665558 | 70.37 |
| 21 | 2022-05-03 11:28:44.000 | 2022-05-03 11:25:37.000 | Welcome Subscribers | VIEW | +142 [redacted] | Android | 6610688475236,6595207 | 42.71 |
| 22 | 2022-05-03 11:42:52.000 | 2022-05-03 11:41:41.000 | Winback Message 1 - Free | CLICK | +150 [redacted] | Android | 4419572793444,6803449 | 18 |
| 23 | 2022-05-03 12:23:54.000 | 2022-04-27 14:57:37.000 | Welcome Message 3 Imag | CLICK | +186 [redacted] | iOS | 4419572793444,4828323 | 165.72 |
| 24 | 2022-05-03 14:00:55.000 | 2022-05-03 09:30:36.000 | *EIQ 5.3.22 Sunkissed Glo | VIEW | +136 [redacted] | iOS | 4828325019748,3651845 | 57.26 |
| 25 | 2022-05-03 16:45:58.000 | 2022-05-03 16:37:45.000 | Welcome Subscribers - Fre | CLICK | +186 [redacted] | Desktop | 4860877308004,4506002 | 8.52 |
| 26 | 2022-05-03 19:13:47.000 | 2022-04-26 06:31:22.000 | *EIQ 4.26.22 Caffeine | CLICK | +178 [redacted] | Desktop | 4419572793444 | 64.13 |
| 27 | 2022-05-04 09:55:49.000 | 2022-05-04 09:43:22.000 | Welcome Subscribers | VIEW | +190 [redacted] | iOS | 6546217828452 | 40.84 |
| 28 | 2022-05-04 12:57:23.000 | 2022-05-04 12:40:02.000 | Welcome Subscribers | VIEW | +146 [redacted] | iOS | 3666508841060,6803335 | 39.97 |
| 29 | 2022-05-04 13:06:37.000 | 2022-05-01 11:37:08.000 | Welcome Subscribers | CLICK | +131 [redacted] | iOS | 6546217828452,6598274 | 67.9 |
| 30 | 2022-05-04 16:19:21.000 | 2022-05-04 16:14:40.000 | Message 04-12-22 1:31 | VIEW | +163 [redacted] | iOS | 6803509936228,6803335 | 43.19 |
| 31 | 2022-05-04 16:34:54.000 | 2022-05-04 16:31:50.000 | Malomo: Order confirmed | VIEW | +120 [redacted] | Desktop | 4886390079588 | 40.51 |
| 32 | 2022-05-04 17:23:03.000 | 2022-05-04 17:21:14.000 | Winback Message 1 - 10% | CLICK | +131 [redacted] | iOS | 6802859425892,6802476 | 86.4 |
| 33 | 2022-05-04 17:59:23.000 | 2022-05-04 12:57:59.000 | Malomo: Delivered | VIEW | +162 [redacted] | Android | 3651845455972 | 24.85 |
| 34 | 2022-05-04 19:51:30.000 | 2022-05-04 10:40:41.000 | Concierge Test Initial Mess | VIEW | +195 [redacted] | Desktop | 4860877308004,4412198 | 89.98 |
| 35 | 2022-05-04 20:39:08.000 | 2022-05-04 20:37:02.000 | Welcome Subscribers - Fre | VIEW | +190 [redacted] | iOS | 3666508841060 | 16.2 |
| 36 | 2022-05-05 02:04:51.000 | 2022-04-05 15:09:50.000 | *EIQ 4.5.22 Flo Squad Invit | CLICK | +186 [redacted] | iOS | 3651845455972,4828324 | 44 |
| 37 | 2022-05-05 09:09:01.000 | 2022-05-05 09:06:18.000 | *EIQ 5.5.22 Sunny Skies La | CLICK | +120 [redacted] | iOS | 6803475693668 | 31.88 |
| 38 | 2022-05-05 09:14:05.000 | 2022-05-05 09:06:07.000 | *EIQ 5.5.22 Sunny Skies La | CLICK | +142 [redacted] | iOS | 6803475693668 | 52.56 |
| 39 | 2022-05-05 09:16:30.000 | 2022-05-05 09:05:48.000 | *EIQ 5.5.22 Sunny Skies La | VIEW | +167 [redacted] | Desktop | 6539885543524,6803475 | 54.06 |
| 40 | 2022-05-05 09:25:08.000 | 2022-05-04 13:21:24.000 | Malomo: Just Shipped | CLICK | +141 [redacted] | Desktop | 6803475693668 | 52.5 |
| 41 | 2022-05-05 09:34:09.000 | 2022-05-05 09:30:07.000 | *EIQ 5.5.22 Sunny Skies La | CLICK | +197 [redacted] | iOS | 6689164427364,6803475 | 55.25 |
| 42 | 2022-05-05 09:35:42.000 | 2022-05-05 09:17:14.000 | *EIQ 5.5.22 Sunny Skies La | CLICK | +197 [redacted] | iOS | 6803475693668 | 51.18 |
| 43 | 2022-05-05 09:40:17.000 | 2022-05-05 09:12:46.000 | *EIQ 5.5.22 Sunny Skies La | CLICK | +171 [redacted] | Desktop | 6803475693668,6802859 | 45.89 |
| 44 | 2022-05-05 10:09:47.000 | 2022-05-05 09:05:59.000 | *EIQ 5.5.22 Sunny Skies La | VIEW | +184 [redacted] | Android | 6553370755172,4828324 | 48.6 |
| 45 | 2022-05-05 11:44:13.000 | 2022-05-05 10:52:00.000 | *EIQ 5.5.22 Sunny Skies La | CLICK | +172 [redacted] | iOS | 4419572793444,3665558 | 99.38 |
| 46 | 2022-05-05 12:33:12.000 | 2022-05-05 09:05:45.000 | *EIQ 5.5.22 Sunny Skies La | VIEW | +160 [redacted] | iOS | 6803475693668,6598261 | 59.49 |
| 47 | 2022-05-05 13:52:01.000 | 2022-05-05 13:43:35.000 | Malomo: Order confirmed | VIEW | +14056509087 | Desktop | 4869814812772 | 50 |

**Answer:** Admitted that Attentive software allows a business to download a spreadsheet containing customer information. Denied that any such spreadsheet in general or Figure 33 in particular shows all customers who input phone numbers or email addresses into the sign-up unit on Defendant's website.

125. Attentive also provides retailers with a "transactional email list" for consumers who "enter their email as part of their contact information when completing an order."[83]

**Answer:** Admitted only that the website located at the URL in footnote 83 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted.

[83] https://help.attentivemobile.com/hc/en-us/articles/13168560289812-Send-transactional-emails- with-Attentive

### G. Defendant Assists Zeta Global with Intercepting Confidential Communications

126. Zeta Global is a well-known and registered data broker that providers retailers with "AI-powered recommendations in real time based on proprietary signals, market and competitive intelligence, unique deterministic identifiers, and much more."[84]

**Answer:** Denied that the website located at the URL in footnote 84 contains the quoted language as of the date of this Answer. Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

127. Zeta touts its ability "to consolidate scattered customer identifiers into a persistent profile," thereby allowing retailers to "recognize customers, gain a complete view of each customer relationship, analyze behavioral trends, action insights, and reach them at moments they are most likely to engage."[85]

**Answer:** Admitted only that the website located at the URL in footnote 85 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted.

128. From 2019 to 2024, Zeta embarked on an acquisition blitz to augment its existing platforms and products. Those efforts culminated in 2024, when Zeta spent $250 million to purchase another data broker, LiveIntent, to help Zeta "build more robust customer profiles and sustain them with continuous data collection and profile enrichment."[86] According to Zeta, "[t]he acquisition integrate[d] LiveIntent's extensive identity graph—over 235 million unique hashed email addresses per month—into Zeta's Data Cloud, significantly complementing Zeta's identity resolution solutions."[87]

**Answer:** Admitted that the websites located at the URLs in footnotes 86-87 contain the quoted language as of the dated of this Answer. Further, the websites speaks for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible

[84] https://zetaglobal.com/platform/
[85] https://zetaglobal.com/solutions/data-identity/
[86] https://zetaglobal.com/zeta-data/
[87] https://investors.zetaglobal.com/news/news-details/2024/Zeta-Global-to-Acquire-LiveIntent-in-a- Highly-Accretive-Transaction/default.aspx

for the truth of the matter asserted. Defendant lacks knowledge regarding allegations in this paragraph regarding Zeta's alleged "acquisition blitz" and whether the LiveIntent acquisition was designed "to help Zeta 'build more robust customer profiles and sustain them with continuous data collection and profile enrichment'" (the website located at the URL in footnote 86 says nothing about the LiveIntent acquisition) and therefore is unable to admit or deny. To the extent a response is required, denied.

129. "An identity graph is an online database"; it "stores all identifiers tied to individual customers and prospects,"[88] and it "captur[es] customer behavior and preferences across devices and marketing channels."[89] By "unifying disparate audience data points and attributing them to a single profile," an identity graph creates "a comprehensive view of each customer or prospect," allowing companies to "understand exactly who their customers are, how they behave on each platform, and activate that data and insights to drive engagement."[90]

**Answer:** Admitted that the blog posts located at the URLs in footnotes 88-90 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Additionally, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

130. Zeta has "240+ million consumer profiles."[91] Given "Zeta does not currently perform cookie-based identity resolution for users based outside the United States,"[92] the number of profiles is comprehensive in scope. Zeta has built these profiles by collecting "over 900 million active email addresses tied to over 25 billion identifiers."[93] For retailers like Defendant, Zeta's products "can build a comprehensive view of their users, understand their customers' behavior across properties and platforms, monetize yield, enrich their customer database, and supercharge their marketing efforts."[94]

**Answer:** Admitted that the website located at the URL in footnote 91 contains the phrase "240+ million consumer profiles" as of the date of this Answer. Denied that the same website contains

[88] https://www.liveintent.com/blog/li-weekly-whats-an-identity-graph/
[89] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/
[90] https://www.liveintent.com/blog/personalization/
[91] https://zetaglobal.com/zeta-data/
[92] *Id.*
[93] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/
[94] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/

the phrase "Zeta does not currently perform cookie-based identity resolution for users based outside the United States" as of the date of this Answer. Admitted that the blog posts located at the URLs in footnotes 93-94 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Additionally, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

131. Defendant uses Zeta to bridge its marketing and advertising campaigns through Zeta's Customer Data Platform, including by leveraging Zeta's "single, universal persistent identifier" to link to corresponding consumer profiles.[95]

**<u>Answer</u>:** Denied.

132. To help Zeta intercept electronic communications and personally identifiable information, Defendant integrates Zeta's proprietary code—including but not limited to the "Zeta Tag Bundle" or "Zeta Container Tag" ("Zeta Tag")—into its website. Zeta uses various domains—including rezync.com, live.rezync.com, liadm.com, rfihub.com, and lightboxcdn.com—to receive consumers' online activity and personally identifiable information.[96]

**<u>Answer</u>:** Denied

133. When consumers access a website hosting the Zeta Tag, Zeta's software script surreptitiously directs the user's browser to send a separate message to Zeta's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that the Zeta Tag is configured to collect. This transmission is initiated by Zeta's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website— Defendant's own code, and Zeta's embedded code.

**<u>Answer</u>:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied. Defendant specifically denies that Zeta's code ran on Defendant's website.

---

[95] https://knowledgebase.zetaglobal.com/kb/zeta-product-definitions-modules
[96] https://knowledgebase.zetaglobal.com/gswz/zeta-tags-and-cookie-domains

134. Defendant also integrates server-side code from Zeta to help intercept consumers' communications and personally identifiable information. Unlike client-side tracking, server-to- server tracking operates akin to an automatic routing device, allowing Defendant to directly forward electronic communications and personally identifiable information to Zeta's servers as consumers navigate its website.

**<u>Answer</u>:** Denied.

135. Through client-side and server-side tracking tools, Defendant helps Zeta intercept the content of consumers' electronic communications—including full-string URLs, button clicks, and form-field entries—alongside personally identifiable information like hashed email addresses and universal user IDs ("UUIDs") that link to consumer profiles.[97]

**<u>Answer</u>:** Denied.

136. After matching the intercepted communications to a user's profile, Zeta directs that user's browser to send UUIDs and hashed email addresses to five other data brokers.

<u>Figures 34–36 (Initiator Chains)</u>

*Zeta (liadm.com) to Svorn (lijit.com) to LiveRamp (pippio.com) to Neustar (agkn.com)*




*Zeta (liadm.com) to LiveRamp (pippio.com) to AtData (rlcdn.com)*




*Zeta (liadm.com) to Throttle (thrtle.com)*




[97] https://zetaglobal.com/resource-center/customer-data-platform-cdp/

Figure 37: Initial Request URL and Response Headers

Figures 38–42: Hashed Versions of Email Address

*Svorn*




*LiveRamp*

*Neustar*

▾Query String Parameters view source view URL-encoded

sid: 9102279158
lsid: 15998
em: f308620aef5f30afb927c9cb746d144e
lsid: 15998
em: 1edaf8a22d7cdcac6e809c311416b731fc5a98e5

*AtData*

▾Query String Parameters view source view URL-encoded

sha256: 190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f
md5: f308620aef5f30afb927c9cb746d144e
sha1: 1edaf8a22d7cdcac6e809c311416b731fc5a98e5
us_privacy: 1YN-
_t: 1733972626

*Throtle*

**<u>Answer</u>:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

137. Once the data brokers receive the GET request with the hashed email address, they contemporaneously direct the user's browser to set and send cookies that associate the user's activity with his or her email address.

<u>Figures 43–46: Cookie Values</u>

*Svorn*

| | |
|---|---|
| Set-Cookie: | ljt_reader=2445fe67c08047ba44e7369a; Path=/; Domain=lijit.com; Expires=Fri, 12 Dec 2025 03:05:10 GMT; Secure; SameSite=None |
| Set-Cookie: | 3pids="8105:f308620aef5f30afb927c9cb746d144e,,1edaf8a22d7cdcac6e809c311416b731fc5a98e5,,190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f,,\|8100:f308620aef5f30afb927c9cb746d144e,,1edaf8a22d7cdcac6e809c311416b731fc5a98e5,,190299ba3eaa266b9e9037103c14df27830038399be71f6f5f71d2a61a68478f,,"; Path=/; Domain=lijit.com; Expires=Fri, 12 Dec 2025 03:05:10 GMT; Secure; SameSite=None |

*LiveRamp*

*Neustar*

**Request Cookies** ☐ show filtered out request cookies

| Na... ▲ | Value | Domain |
|---|---|---|
| ab | 0001%3ALDUBTh... | .agkn.com |

**Response Cookies**

| Na... ▲ | Value | Domain |
|---|---|---|
| ab | 0001%3ALDUBTh... | .agkn.com |

**Response Cookies**

| Name ▲ | Value | Domain | Path |
|---|---|---|---|
| pxrc | CPrV87oGEgclqB... | pippio.com | / |

*Throtle*

| | |
|---|---|
| :authority: | thrtle.com |
| :method: | GET |
| :path: | /sync?vxii_pid=5038&vxii_pdid=y-GvEFdPxE2oRxW3vHjV0o7EyNVpzYmU5w9d0V3g--~A |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | mc=eyJpZCI6Ijk2Zjk5NDRiLTIwNTktNDE1NC05MTMyLTBjMWIxNDk1NzNjYyIsImwiOjE3MzQwNDg1Mzk1MDksInQiOjJ9; sc=eyJpIjoiZmRiM2MwYzItMTA1Mi00MzA4LTk2YWYtN2E3OTFiYWRhN2ZiIiwic2IkIjoic2IkLTczYjY1NmE4LWI4ZTYtMTFlZi1hYjhkLTAyNDIwYWZmMGMwZSIsIm1zIjoyLCJ0cyI6MSwicHMiOjEsInNwIjo1MDM4LCJwcCI6MSwidHNIIjoxLCJpcil6dHJ1ZSwibHRzZSI6MTczNDA0ODUzOTUwOSwiXyI6dHJ1ZX0 |

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

138. Once received and processed by Zeta and the other data brokers, Defendant knowingly

uses the intercepted communications to run marketing and advertising campaigns that target consumers based on their activity on Defendant's website.

**Answer:** Denied.

139. Although the data brokers receive email addresses that are hashed, those identifiers still constitute personally identifiable information. Zeta, for example, recognizes that a hashed email address "can be matched to identical values created by the same hashing algorithm on the same email address."[98] Defendant also knows that these third parties—Zeta, Svorn, LiveRamp, Neustar, AtData, and Throtle—are doing exactly that. In July 2025, Rack Room's Chief Digital Officer participated in a webinar with a digital strategist for AtData—one of the data brokers who Plaintiffs allege receive hashed email addresses—to discuss "[h]ow retailers are building a 360° view of the customer."[99] During the webinar, Rack Room's Chief Digital Officer noted that email addresses are "a very high signal … personal identifier for us."[100] AtData could not agree more; as the self-described "email address experts," AtData has centered its business model around the notion that "[t]he email address is the central component of digital identity and the key to recognizing, understanding, and reaching [a retailer's] audience."[101]

**Answer:** Admitted that the website located at the URL in footnote 98 contains the quoted language as of the date of this Answer. Admitted that in July 2025, Rack Room's Chief Digital Officer participated in a webinar with a digital strategist for AtData. Denied that anyone in the video said the quoted phrase "how retailers are building a 360° view of the customer." Admitted that Rack Room's Chief Digital Officer stated "I think for us to the point of longevity and highness it is a very high signal rich behavioral, uh, I would say, personal identifier for us" and then went on to discuss collecting emails at Rack Room Shoes' retail stores for the loyalty program. Admitted that the website located at the URL in footnote 101 contains the quoted language as of the date of this Answer. Defendant lacks knowledge regarding other allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to which no response is required. To the extent a response is

[98]https://knowledgebase.zetaglobal.com/gswz/privacy-guidelines
[99]https://www.youtube.com/watch?v=IFV2jFrvrsM
[100]https://www.youtube.com/watch?v=IFV2jFrvrsM
[101]https://atdata.com/

required, denied.

140. On its homepage, AtData touts exactly how it uses "the most valuable identity marker"[102] to identify customers:

Figure 47




**Answer:** Admitted only that the website located at the URL in footnote 102 contains the quoted phrase "the most valuable identity marker" as of the date of this Answer. Defendant specifically denies that the cited website contains the image in Figure 47.

141. When AtData receives a hashed email address, the data broker cannot "[r]ecognize anonymous visitors and match them to profiles" without first matching the hashed version against one of the "80+ billion" unhashed versions in its possession.[103]

**Answer:** Defendant specifically denies that the website located at the URL in footnote 103 contains the phrases "[r]ecognize anonymous visitors and match them to profiles" or "80+ billion" as of the date of this Answer. As a result, Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

142. In any event, as the FTC has explained, "hashes aren't 'anonymous' and can still be used to identify users," so "[c]ompanies should not act or claim as if hashing personal information renders it anonymized."[104] Indeed, two of the data brokers here, LiveRamp and Neustar, acknowledge that there is nothing anonymous about hashed email addresses. As LiveRamp explains, "[w]hile an email in hashed form may not be human readable, they are standardized algorithms, and many firms

[102]https://atdata.com/use-cases/connect-data-across-channels/?prd=websitevisitorid

[103]https://atdata.com/identity/website-visitor-id/#:~:text=Website%20Visitor%20ID%20uses%20AtData%E2%80%99s%20pixel%20technology%20to,deliverable%2 0email%2C%20or%20postal%20address%20to%20optimize%20conversions.

[104]https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make- your-data-anonymous

are now offering services that can reverse email hashing to correctly guess consumers' email addresses."[105] The transmission to Neustar, a subsidiary of TransUnion, proves the point. TransUnion and Neustar use "combined data assets," and, in 2024, "TransUnion received top ranks for accuracy in linking hashed email addresses to physical addresses."[106] If a hashed email can link to a physical address, then it certainly qualifies as personally identifiable information.

**Answer:** Admitted that the websites located at the URLs in footnotes 104-106 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Additionally, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

143. More generally, the email addresses are hashed through a cryptographic protocol, "MD5," that experts have long considered "severely compromised."[107] Indeed, "[t]he MD5 hash algorithm was declared 'not safe' by its own creator in 2012 after research showed how susceptible it was to brute-force attacks."[108] In 2016, for example, "a crew of hobbyist crackers" reviewed a leaked database of "15.26 million passwords obscured using MD5," and, within ten days, they "deciphered more than 11 million of the passwords."[109] Given the exponential increase in computing power, it would take "a crew of hobbyists crackers" much less time to do the same thing today.

**Answer:** Admitted that the websites located at the URLs in footnotes 107-109 contain the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Defendant lacks knowledge regarding the remaining allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to

[105] https://liveramp.com/blog/the-trouble-with-hashed-emails-hems/#:~:text=Hashed%20emails%20(HEMs)%20aren't%20secure&text=While%20an%20email%20in%20hashed,on%20a%20personally%20identifiable%20level.

[106] https://newsroom.transunion.com/transunion-announces-enhanced-identity-graph-for-marketing- solutions/

[107] https://www.okta.com/identity-101/md5/

[108] https://www.bleepingcomputer.com/news/security/cracked-logins-of-570-000-mortal-online-players-sold-on-forums/

[109] https://arstechnica.com/information-technology/2015/09/once-seen-as-bulletproof-11-million- ashley-madison-passwords-already-cracked/

which no response is required. To the extent a response is required, denied.

144. As the owner and operator of the website, Defendant intended for these third parties—Zeta, Svorn, LiveRamp, Neustar, AtData, and Throtle—to receive consumers' electronic communications and their personally identifiable information. And because those third parties are well-known and registered data brokers, Defendant knew that they would use those communications for their own commercial purposes. Indeed, Defendant entered a contract with Zeta granting the data broker "a non-exclusive worldwide license to use the [Customer] Data for its own business and marketing purposes."[110]

**<u>Answer</u>:** Admitted that Defendant is the owner and operator of the website. The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied. Defendant specifically denies that it entered a contract with Zeta.

145. Put together, Defendant assisted at least six data brokers—Zeta, Svorn, LiveRamp, Neustar, AtData, and Throtle—with intercepting electronic communications that not only revealed the consumers' personally identifiable information but also the content of their communications.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

146. Although each of these disclosures constitute a blatant violation of consumers' privacy, Defendant's disclosures to Throtle, Inc., are particularly egregious.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

147. "Throtle offers valuable and effective identity solutions for the healthcare industry."[111] Similar to Zeta, Throtle maintains an identity graph that collects "exposure and engagement data (impressions, clicks, etc.)" and matches that activity against "a wide array of personal and persistent data points, including email addresses, postal addresses, mobile numbers, device IDs, MAIDs, and so on."[112] Through "precise data accuracy across hundreds of millions of profiles,"[113] Throtle's identity

---

[110] https://zetaglobal.com/platformterms/
[111] https://www.throtle.io/
[112] https://www.newswire.com/news/throtle-s-data-pixel-technology-to-enhance-healthverity-media- 22295349
[113] https://www.throtle.io/

graph offers insights into, among other things, "disease and patient identification."[114]

**Answer:** Denied that the websites located at the URLs in footnotes 111-112 and 114 contain the quoted language as of the date of this Answer. Admitted only that the website located at the URL in footnote 113 contains the phrase "precise data accuracy across hundreds of millions of profiles." Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Defendant also specifically denies that its website has anything to do with healthcare, the healthcare industry, disease information, patient information, or any other similarly sensitive information.

148. As Throtle itself recognizes, "[h]ealthcare data is among the most sensitive information out there."[115] Although Defendant is a shoe retailer, even unremarkable purchases can provide alarmingly precise inferences about a person's health. By failing to receive consumers' consent before disclosing their personally identifiable information and online activity to a data broker that specializes in deducing inferences about medical conditions, Defendant brazenly violated their trust and privacy.

**Answer:** Denied that the website located at the URL in footnote 115 contains the quoted language. The URL contained in footnote 115 leads to a 404 error that the website cannot be found. Defendant therefore lacks knowledge regarding whether the quoted language exists or has been accurately represented. Admitted that Defendant is a shoe retailer. Defendant specifically denies that "unremarkable purchases" from a shoe retailer "can provide alarmingly precise inferences about a person's health." The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

**H. Defendant Assists Google with Intercepting Confidential Communications**

149. Google is the largest online advertising company on the planet.[116]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny, even after accessing the website located at the URL in footnote 116. To the extent the allegations are contrary to law, denied.

150. Defendant knowingly integrated code from Google into its website to use services—

---

[114] https://www.newswire.com/news/throtle-s-data-pixel-technology-to-enhance-healthverity-media- 22295349
[115] https://www.throtle.io/blog/consumer-identity-graphs-are-not-the-same-as-marketing-databases
[116] https://www.emarketer.com/topics/category/google

including but not limited to Google Analytics and Google Ads—for the purpose of augmenting their advertising and analytics efforts by capturing the content of electronic communications and linking those communications to personally identifiable information.

**Answer:** Admitted that Defendant integrated Google Analytics and Google Ads onto its website. The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

151. When consumers access and navigate rackroomshoes.com, Google's software script surreptitiously directs the user's browser to send a separate message to Google's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that Google's code is configured to collect. This transmission is initiated by Google's code and concurrent with communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and run Defendant's website— Defendant's own code, and Google's embedded code.

**Answer:** Defendant specifically denies that Google's software script directs all users' browsers to send messages to Google's servers regardless of the user's browser, settings, use of ad-blockers, and/or denial of cookie permissions. Accordingly, Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

152. Defendant assists Google with intercepting the content of electronic communications, including full-string URLs and information that reveals button clicks.

Figure 48


Summary >

Page View

G-MKLYD2PG43

URL

https://analytics.google.com/g/collect

Parameters

| Name ↑ | Parameter | Value |
|---|---|---|
| are | are | 1 |
| Client ID | cid | 43779515.1733972551 |
| Debug View | _dbg | 1 |
| dma | dma | 0 |
| Event Name | en | page_view |
| frm | frm | 0 |
| gcd | gcd | 13l3l3l3l1l1 |
| gtm | gtm | 45je5881v885247644za200 |
| Internal Ping Type | _gaz | 1 |
| Language | ul | en-us |
| Measurement ID | tid | G-MKLYD2PG43 |
| Non-personalized Ads | npa | 0 |
| Page Location | dl | https://www.rackroomshoes.com/p/timberland-mens-6-inch-waterproof-boot/350037?gtm_debug=1755056550334 |
| Page Referrer | dr | https://tagassistant.google.com/ |
| Page Title | dt | Tan Timberland Mens 6-inch Waterproof Boot \| Rack Room Shoes |

**Answer:** Admitted that the screenshot in Figure 48 purports to show a "page location" with a URL. Denied that the screenshot in Figure 48 "reveals button clicks." The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

153. Google pairs those electronic communications with personally identifiable information, including unique identifiers that link to Google accounts.[117]

Figure 49




[117]Plaintiffs Savage and Williams have gmail accounts, and, when purchasing products on Defendant's website, they provided Defendant with the email addresses associated with those accounts. *See* RRS 001484.

**Answer:** Defendant specifically denies that the image in Figure 49 supports the allegations in this paragraph. Defendant also specifically denies that RRS 001484 establishes that Plaintiff Williams provided Defendant with her email address associated with her Google account when she purchased products on Defendant's website. RRS 001484 makes reference only to former Plaintiff Savage, who provided her email address via "double opt in" before dismissing her claims in this case. Defendant lacks knowledge regarding the remaining allegations in this paragraph concerning what Google does and therefore is unable to admit or deny. To the extent a response is required, denied.

154. As the owner and operator of the website, Defendant intended for Google to receive consumers' electronic communications and their personally identifiable information. Defendant also knew that Google would use those communications for its own commercial purposes. Indeed, Defendant entered a contract with Google allowing the advertising giant to "retain and use … information collected."[118]

**Answer:** Admitted that Defendant is the owner and operator of the website. The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

**I. Defendant Assists Taboola with Intercepting Confidential Communications**

155. Taboola is an advertising and technology company.[119]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

156. Defendant knowingly integrated code from Taboola into its website—including the Taboola Pixel—for the purpose of augmenting its advertising efforts by capturing the content of electronic communications and linking it to personally identifiable information.

**Answer:** Denied.

157. When consumers access and navigate rackroomshoes.com, Taboola's software script surreptitiously directs the user's browser to send a separate message to Taboola's servers. This second, secret transmission contains the original GET request sent to the host website along with additional

[118]https://marketingplatform.google.com/about/analytics/terms/us-20210331/
[119]https://www.taboola.com/about/our-story

data that Taboola's code is configured to collect. This transmission is initiated by Taboola's code and concurrent with communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and run Defendant's website— Defendant's own code, and Taboola's embedded code.

Figure 50




**Answer:** Defendant specifically denies that Taboola's software script directs all users' browsers to send messages to Taboola's servers regardless of the user's browser, settings, use of ad-blockers, and/or denial of cookie permissions. Accordingly, Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

158. Defendant intentionally assists Taboola with intercepting the content of electronic communications, including full-string URLs and information that reveals button clicks.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

159. Taboola then pairs the content of those communications with personally identifiable

information, including unique identifiers and hashed email addresses.[120]

**<u>Answer</u>:** Defendant lacks knowledge regarding allegations in this paragraph concerning what Taboola does and therefore is unable to admit or deny. To the extent a response is required, denied.

160. As the owner and operator of the website, Defendant intended for Taboola to receive consumers' electronic communications and personally identifiable information. Defendant also knew that Taboola would use those communications for its own commercial purposes. Indeed, Defendant entered a contract with Taboola allowing the company to "to create derivate works or modeled data sets and analytics from such Collected Data."[121]

**<u>Answer</u>:** Admitted that Defendant is the owner and operator of the website. Admitted that the website located at the URL in footnote 121 purports to be "Terms and Conditions to Distributing Content on the Taboola Network." Denied that the website contains the phrase "to create derivate works or modeled data sets and analytics from such Collected Data." Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

**J. Defendant Assists Criteo with Intercepting Confidential Communications**

161. Criteo is an advertising and technology company.[122]

**<u>Answer</u>:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent the allegations are contrary to law, denied.

162. Defendant knowingly integrated code from Criteo into its website—including the Criteo Tag—to enhance its advertising efforts by capturing the content of electronic communications and pairing those communications with personally identifiable information.

**<u>Answer</u>:** Admitted only that Defendant integrated code from Criteo on its website. The remainder of this paragraph states conclusions to which no response is required. To the extent a

---

[120] https://www.taboola.com//wp-content/uploads/2020/09/taboola.com-us-sponsored-content-tc-v-3.0-2.pdf
[121] *Id.*
[122] https://www.criteo.com/

response is required, denied.

163. When consumers access and navigate rackroomshoes.com, Criteo's software script surreptitiously directs the user's browser to send a separate message to Criteo's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that Criteo's code is configured to collect. This transmission is initiated by Criteo's code and concurrent with communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and run Defendant's website— Defendant's own code, and Criteo's embedded code.

**Answer:** Defendant specifically denies that Criteo's software script directs all users' browsers to send messages to Criteo's servers regardless of the user's browser, settings, use of ad-blockers, and/or denial of cookie permissions. Accordingly, Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

164. Defendant assists Criteo with intercepting the content of electronic communications, including full-string URLs and information that reveals button clicks.[123]

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

165. Criteo then pairs the content of those communications with personally identifiable information, including unique identifiers and hashed email addresses.[124]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph concerning what Criteo does and therefore is unable to admit or deny. To the extent a response is required, denied.

166. As the owner and operator of the website, Defendant intended for Criteo to receive consumers' electronic communications and personally identifiable information. Defendant also knew that Criteo would use those communications for its own commercial purposes. Indeed, Defendant entered a contract with Criteo allowing the advertising company to "use the Service Data," which includes customer information, "to improve the Criteo Technology, the Criteo Services, and other

[123] *See* RRS_001479.

[124] https://help.criteo.com/kb/guide/en/pass-hashed-emails-through-cross-device-event-cYHxCUc1qv/Steps/1977811

Criteo products, programs and/or services."[125]

**Answer:** Admitted that Defendant is the owner and operator of the website. Admitted that the website located at the URL in footnote 125 purports to be "Criteo Umbrella Terms and Conditions." Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

**K. Defendant Assists Adobe with Intercepting Confidential Communications**

167. Adobe is a software company.[126]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent the allegations are contrary to law, denied.

168. Defendant knowingly integrated code from Adobe into its website for services—including but not limited to Adobe Analytics—for the purpose of tracking and identifying consumers who navigate its website by capturing the content of their electronic communications and pairing those communications with personally identifiable information.

**Answer:** Admitted that Defendant integrated Adobe code into its website. The remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

169. When consumers access and navigate rackroomshoes.com, Adobe's software script surreptitiously directs the user's browser to send a separate message to Adobe's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that Adobe's code is configured to collect. This transmission is initiated by Adobe's code and concurrent with communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and run Defendant's website— Defendant's own code, and Adobe's embedded code.

**Answer:** Defendant specifically denies that Adobe's software script directs all users'

[125] https://www.criteo.com/wp-content/uploads/2022/07/Criteo-Umbrella-Terms-of-Service_EN- EN.pdf
[126] https://www.techmonitor.ai/what-is/what-is-adobe-4956838

browsers to send messages to Adobe's servers regardless of the user's browser, settings, use of ad-blockers, and/or denial of cookie permissions. Accordingly, Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

170. Defendant assists Adobe with intercepting the content of electronic communications, including full-string URLs and information that reveals button clicks.

Figure 51




**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied. Defendant specifically denies that Figure 51 shows information that reveals button clicks.

171. Adobe then pairs the content of these communications with personally identifiable information, including unique identifiers that link to a consumer profile.

**<u>Answer</u>:** Defendant lacks knowledge regarding allegations in this paragraph concerning what Adobe does and therefore is unable to admit or deny. To the extent a response is required, denied.

### L. Defendant Uses Intercepted Communications for Advertising and Marketing

172. In 2017, Rack Room turned to Salesforce to integrate "[c]onsumer engagement data, campaigns and personnel … onto a single CRM platform,"[127] thereby allowing Defendant to "organize and merge customer information from all touch points into a single repository."[128] In a presentation with Salesforce at a conference later that year, Defendant reiterated its vision:

127

128 https://chainstoreage.com/technology/rack-room-shoes-steps-digital-messaging-strategy

Figures 52–53







**Answer:** Defendant lacks knowledge regarding allegations in this paragraph related to footnote 127, which is blank, and therefore is unable to admit or deny those allegations. Admitted that the website located at the URL in footnote 128 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations in this paragraph are admitted.

173. Through Salesforce Marketing Cloud, Defendant "identifie[d] each customer with a user profile."[129] As Salesforce describes it, "[t]his single, comprehensive user profile … is the

[129] https://help.salesforce.com/s/articleView?id=mktg.mc_pers_identity_about.htm&type=5

foundation of campaign personalization and data analysis."[130]

**Answer:** Admitted that the websites located at the URLs in footnotes 129-130 contain the quoted language as of the date of this Answer. Further, the websites speaks for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Denied that Defendant "identified each customer with a user profile."

174. When consumers purchased a product through Rack Room's website, Defendant caused Salesforce Marketing Platform to receive personal identifiers—including full name, email address, phone number, and postal address—that Salesforce then associated with consumer profiles so Defendant could automatically send transactional and marketing emails.

**Answer:** Admitted only that Defendant stores customer data in Salesforce and that Defendant sends transactional emails as a result. The remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

175. Defendant also caused Salesforce Marketing Cloud to receive information revealing "purchases, browsing history, email interactions, subscriptions, loyalty membership, interests, preferences, browser type, location, and demographics."[131]

**Answer:** Admitted that the website located at the URL in footnote 131 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. The remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

176. Defendant caused Salesforce to receive much of this information by funneling intercepted communications into the Salesforce Marketing Cloud.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

177. Defendant integrated Attentive with Salesforce Marketing Cloud so that Salesforce

---

[130] https://help.salesforce.com/s/articleView?id=mktg.mc_pers_identity_about.htm&type=5

[131] https://help.salesforce.com/s/articleView?id=mktg.mc_pers_identity_about.htm&type=5

could receive intercepted communications—including contact information submitted into sign-up units while checking out or signing up for rewards—to augment its marketing and advertising efforts.[132]

Figure 54




**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied. Defendant specifically denies that it "integrated Attentive with Salesforce Marketing Cloud so that Salesforce could receive intercepted communications - including contact information submitted into sign-up units while checking out or signing up for rewards—to augment its marketing and advertising efforts."

178. Similarly, in 2018, Defendant integrated Salesforce with Facebook to create "relevant content targeted to specific members" on the social media platform.[133]

**Answer:** Admitted that the website located at the URL in footnote 133 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth

[132]"We're using it not just for email, but also for SMS notifications and push notifications." *See* https://diginomica.com/how-rack-room-shoes-turned-omni-channel-pursuits-into-roi-a-salesforce- retail-story.
[133]https://chainstoreage.com/technology/rack-room-shoes-steps-digital-messaging-strategy

of the matter asserted. This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

179. Since at least March 2024, Defendant integrated Zeta Global with Salesforce Marketing Cloud to run campaigns using Zeta's identifier and the intercepted content of electronic communications.

**Answer:** Denied.

180. For six years, Defendant expressed only positive sentiment about Salesforce Marketing Cloud, touting the product as generating "777 percent return-on-investment" and creating "an online revenue increase of 161 percent for email and 451 percent for SMS."[134]

**Answer:** Admitted that the website located at the URL in footnote 134 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. Defendant further denies that a Salesforce website establishes that Defendant "touted" anything.

181. Plaintiffs initiated this action on September 24, 2024. Sometime between September and November 2024, Defendant overhauled its CRM and switched to Cordial.

**Answer:** Admitted that the Complaint in this action was filed on or about September 24, 2024. The remaining parts of this paragraph state conclusions to which no response is required. To the extent a response is required, admitted only that Defendant's current CRM manager is Cordial.

182. Like Salesforce, Rack Room uses Cordial to "[u]nify and enhance data across [its] tech stack," combining "data, profiles, channels, and triggers in one platform."[135] Using "contact data to deliver tailored messages,"[136] Cordial helps Defendant achieve "1:1 personalization" that "predict[s] intent."[137]

**Answer:** Denied that the website located at the URL in footnotes 135 and 137 contains any of the quoted phrases other than "predict intent." Admitted that the website located at the URL in

[134] https://www.salesforce.com/news/press-releases/2018/01/15/rack-room-shoes-grows-revenue- with-salesforce-marketing-cloud/
[135] https://cordial.com/
[136] https://cordial.com/cross-channel-messaging/
[137] https://cordial.com/

footnote 136 contains the quoted language as of the date of this Answer. Further, the websites speak for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

183. Rack Room causes Cordial to receive personally identifiable information— including Zeta's identifier—alongside intercepted communications.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

184. Like with Salesforce, Cordial relies on Zeta's identifier—a "single, universal persistent identifier (e.g. the golden record identifier)"[138]—to match the content of electronic communications against a customer profile. With Zeta's identifier in hand, Rack Room causes Cordial to receive a litany of intercepted electronic communications, including form-field entries, full-URL strings, and information revealing button clicks.

Figure 55


```
visid_incap_2362154=7gzPpFAPRRuljgZVoLE5jsebo2gAAAAAQUIPAAAAAAAB/tbAbqCCen2tZtEhAcfZr; incap_ses_1374_2362154=5Bnqed9n8BD3E396Km4RE8ebo2gAAAAAAnd7y3xfaPmgWeo2CguHQ==;
reese84=3:BV1gErZen3xcLrR17Fmyg==:wAmVPI+k3Di1m7CRyDVVVtPXd7XbKI4ooCkbKUimQ7YR7VHC14p6Ca9IDE9JukWCQGhG/duHAmPTjWnuFO4lUihlbd5ki1STVjUN3r12CYxgR9vwiixBvNXsUdVUPmAxWI5CS18a6eyr
h5dVYEVU9xO7xBVmVOO00zaKZCO31jV8C2DLBx6kW10I4Or7qfqBATasX8sRRz0h1U9I+IRK3d/TCVFEHSfQuhCkQahEZcGw6AfkG8dKyayo31UVF9U/qii3XIeLL3c4eOWGI1dHepL1eAlyO9sZqhmTzipXXh25u7vRBI+BUEs0fG/i
so9fJdtFInEkcVY9X0G82uf9FYQRKPOwwX8c5Vk8kzs6YieyfBhZOLsxz5IOtZ/NQ1MLiK6FKeo6UnUPRci8LWjlk+nsU1NbUKaW25HslKnXmjNXWF0PX3WZLkjUaHueVzYjl2LhZQVCmYT6Ry+vx/O8YfGMyU88855vAjKBRSbyrwzb
qD7r1/aNQWisG7UG5hKyH81XstNM0zg0nL1xlakYrA==:CZ4WLNJSJ5do6YYJcrLmq9SCDDbf8XjZSA9+R7h1Yj0=; _dyjsession=oykot0y9llrgn7trydvcvztsfitmc8lt; dy_fs_page=www.rackroomshoes.com;
nlbi_2362154=JZIHCFpnUmP2oPqLgshKFwAAAAAUm0+DpbRIRfVXq41uXybe; rrs_user_device_id=1739bba1-cff9-4db1-854d-3dc027768f15; rxVisitor=175555230431009CMOM78NB3QS8KGVBEP0EFMSIQURKEG;
v2_rackroomshoes={%22bid%22:%22a2556600-71a6-4f6c-80a5-dfe94f804baf%22}; s_ecid=MCMID%7C50440314592111345469043692990948160465; AMCVS_5599659F569D18787F000101%40AdobeOrg=1;
_dyid=-7286823946221806646; _gcl_au=1.1.959656614.1755552305; FPC=892487b3-29f0-4b32-91e03447b73c775a; s_ppn=undefined;
_pin_unauth=dWlkPVpEUmpOVGRtWm1VdE9UUTBZeTAwTnpBMUxUazFaREF0Tm1Zek1USmxOelk0WWpFNQ; s_cc=true; dtCookie=v_4_srv_4_sn_PB8P579FHKK847GTI547P8A0ITK43ELL_app-
3A5ba240480b8891db_1_ol_0_perc_100000_mul_1_rcs-3Acss_1; uws_storage=%22cookie%22;
uws_session=%7B%22start%22%3A1755552306556%2C%22count%22%3A1%2C%22referrer%22%3A%22%22%7D%7Csession_timeout;
uws_rate_comparators=%7B%22global%22%3A34602212%7D%7Csession_timeout;
uws_visitor=%7B%22vid%22%3A%22175555230655630530%22%2C%22start%22%3A1755552306556%2C%22count%22%3A1%7D%7C1763328306561; _dyid_server=-7286823946221806646;
nlbi_2362154_2147483392=6t1JCWpVBSI1gc1ogshKFwAAAAAMAnb7ijnhrXwQ71M1zA17; dtSa=-; _dy_soct=1755552315!2091920.0'2427209.0'2945947.0!; s_ips=400; s_nr30=1755552316120-New;
_uetsid=cf31dff07c7911f0afe94d90a9cd10b4; _uetvid=cf3200507c7911f0b50f89dde9f33fb9; __pr.11ws=UrbeGc78G_; s_sq=%5B%5BB%5D%5D; s_tp=2276;
s_ppv=https%253A%2F%2Fwww.rackroomshoes.com%2Fp%2Fcrocs-womens-brooklyn-platform-wedge-
sandal%2F203162%253Ficid%253D20250813_Homepage_Carousel1_Global_BOGOKeyBrands%2C18%2C18%2C400%2C1%2C5;
AMCV_5599659F569D18787F000101%40AdobeOrg=179643557%7CMCIDTS%7C20319%7CMCMID%7C50440314592111345469043692990948160465%7CMCAID%7CNONE%7CMCOPTOUT-
1755559521s%7CNONE%7CvVersion%7C5.5.0; OptanonAlertBoxClosed=2025-08-18T21:25:21.093Z; OptanonConsent=isGpcEnabled=0&datestamp=Mon+Aug+18+2025+17%3A25%3A21+GMT-0400+
(Eastern+Daylight+Time)&version=202502.1.0&browserGpcFlag=0&isIABGlobal=false&hosts=&consentId=7a9b0c0b-8cc2-49f3-8bfa-
60d7b906906a&interactionCount=2&isAnonUser=1&landingPath=NotLandingPage&groups=C0001%3A1%2CC0002%3A1%2CC0005%3A1%2CC0003%3A1%2CC0010%3A1%2CC0004%3A1&AwaitingReconsent=false&
intType=3; rxvt=1755554121553|1755552304311; dtPC=4$552315614_969h-vUSHEORAVPLUKORMMPIPJKKURIRCDFTRR-0e0
```


**Answer:** Admitted that the website located at the URL in footnote 138 contains the quoted language as of the date of this Answer. Further, the website speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. Defendant specifically denies that it has "Zeta's identifier in hand" or "causes Cordial to receive a litany of intercepted electronic communications." Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

---

[138] https://knowledgebase.zetaglobal.com/kb/zeta-product-definitions-modules

185. This information helps Cordial target consumers so well that Rack Room's Chief Digital Officer and Cordial's Chief Marketing Officer believe that it borders on Orwellian, having recently given a joint keynote address at a marketing conference entitled, "Mind reading for retailers: Rack Room Shoes' secret to capturing attention."[139]

**Answer:** Admitted that Defendant's Chief Digital Officer participated in the keynote address referenced in this paragraph. Defendant specifically denies the allegations about what its Chief Digital Officer believes. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

186. Upon information and belief, Defendant caused Salesforce to receive substantially the same information by funneling intercepted communications into the Salesforce Marketing Cloud during the time in which Defendant used that service.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

187. In a recent interview, Rack Room's Chief Digital Officer explained how Rack Room shares information between its CRM and CDP "to develop a deeper understanding of [Rack Room's] customers at an individual level."[140] Upon information and belief, Defendant configured Salesforce, Cordial, and Zeta to exchange personally identifiable information and intercepted communications.

**Answer:** Admitted only that Defendant's Chief Digital Officer used the quoted language during the video located at the URL in footnote 140. Further, the video speaks for itself. This remainder of this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

**M. Rack Room Shoes and Miscellaneous Third Parties**

188. Along with Meta, Attentive, Zeta, Sovrn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo, Defendant's website incorporates several other tracking technologies that disclose information to the following companies: Microsoft, Inc., TikTok, Inc., Mastercard, Inc., Sharethrough Inc., Intercept Interactive, Inc., Pinterest, Inc., Outbrain, Inc., PayPal Holdings, Inc.,

[139] https://cordial.com/resources/mind-reading-for-retailers-rack-room-shoes-secret-to-capturing- attention/
[140] https://www.youtube.com/watch?v=IFV2jFrvrsM

Freshworks Inc., DynaTrace LLC, Digital Media Solutions, Inc., and LexisNexis Risk Solutions, Inc.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

189. Of these companies, nine are registered in California as data brokers,[141] and all of them tout their ability to offer "personalized" marketing and advertising strategies:[142]

a. Zeta Global allows companies to "connect [their] data to the larger digital ecosystem" and "[t]ap into a scalable, organic data set anchored around encrypted email addresses that are authenticated by daily engagement."[143]
b. Sovrn, Inc., and its parent company, Sovrn Holdings, Inc., offer programmatic advertising and "help small and mid-sized publishers understand their audience, enrich their proprietary first-party data, and package up audience segments for advertisers."[144]
c. LiveRamp Holdings, Inc., is a company that "helps businesses centralize their fragmented customer data to create more accurate audience segments, and achieve better behavioral targeting."[145]
d. Neustar, Inc., and its parent company, TransUnion LLC, offer services that "build and activate advanced audience profiles and look-a-like models across channels."[146]
e. AtData, Inc., is a company that allows businesses to "[e]nhance [their] customer profiles … with AtData's proprietary technology and data assets, including more than 1 billion unique records."[147]
f. Throtle, Inc., offers "personalized marketing to healthcare professionals (HCPs) and consumers."[148]
g. Microsoft, Inc., offers companies "ad personalization and measurement" that leverages "first-party data" and "us[es] Customer match to easily on-board [their] audiences and re-engage [their] customers in a streamlined way."[149]
h. TikTok offers companies the ability to "[b]oost [their] business with the most engaged audiences all in one place."[150]
i. Google, LLC offers businesses "[p]ersonalized advertising."[151]

---

[141] LiveIntent https://oag.ca.gov/data-broker/registration/187040;
Sovrn, https://oag.ca.gov/data-broker/registration/187736;
LiveRamp https://oag.ca.gov/data-broker/registration/560496;
Neustar, https://oag.ca.gov/data-broker/registration/562353;
AtData, https://oag.ca.gov/data-broker/registration/568244;
Throtle, https://oag.ca.gov/data-broker/registration/185964;
Digital Media Solutions, https://oag.ca.gov/data-broker/registration/545420;
ShareThrough, https://oag.ca.gov/data-broker/registration/578001;
LexisNexis, https://oag.ca.gov/data-broker/registration/186572.
[142] *See, e.g.*, https://www.undertone.com/;
[143] https://www.liveintent.com/identity-solutions/
[144] https://www.sovrn.com/blog/making-sense-of-programmatic-advertising/
[145] https://www.publift.com/blog/what-is-liveramp
[146] https://www.cdn.neustar/resources/product-literature/marketing/neustar-identity-resolution- marketing-solutions.pdf
[147] https://atdata.com/data-enrichment/
[148] https://www.throtle.io/about-us
[149] https://about.ads.microsoft.com/en/blog/post/june-2024/shaping-your-identity-strategy
[150] https://support.tiktok.com/en/account-and-privacy/personalized-ads-and-data/how-your-ads-are-personalized
[151] https://support.google.com/adspolicy/answer/143465?hl=en

j. Adobe, Inc., offers companies "real-time personalization insights and engagement."[152]

k. Taboola, Inc., offers "Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[153]

l. Criteo, S.A., offers a service called "Criteo Audience Match," which allows businesses to "re-engage [their] customers across social networks, web, mobile web, and apps."[154]

m. Sharethrough, Inc., is a company that offers advertising product that enable companies to engage in "user-based targeting."[155]

n. Intercept Interactive, Inc., offers a product called "Undertone," which Defendant utilizes, and which provides "personalized, High Impact ad campaigns with unmatched precision & seamless cross-channel scalability."[156]

o. Pinterest, Inc., is a social media platform that lets businesses "[u]se our targeting suite to find new customers or upload customer lists for retargeting campaigns."[157]

p. Outbrain, Inc., is a marketing company that "us[es] data from user profiles and behavior to target potential customers who meet certain criteria."[158]

q. PayPal Holdings, Inc., offers products that rely on artificial intelligence to "process data – including behavioral, demographic, and psychographic information – across various platforms to help businesses understand customer behaviors and preferences."[159]

r. MasterCard's "Dyanmic Yield" product, which Defendant utilizes, promises to "[t]ransform simple customer interactions into long-lasting hyperpersonalized relationships."[160] It captures "person-level data, no matter the source, and use[s] it for personalization."[161]

s. FreshWorks, Inc., provides "FreshChat," a service that Defendant utilizes, which offers "insights into customer behavior" and "personalized experiences."[162]

t. Dynatrace LLC lets customers "[k]now each customers journey and interactions with your application."[163]

u. Digital Media Solutions, Inc., and its subsidiary, Traverse Data, Inc., "leverage[] data and the power of the email channel to generate new customers for marketers and incremental revenue for publishers."[164]

v. LexisNexis Risk Solutions, Inc., says it provides "person-level insights to inform personalization and segmentation strategies."[165]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required and the allegations are contrary to law,

[152] https://business.adobe.com/products/experience-platform/personalized-insights-engagement.html
[153] https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works
[154] https://www.criteo.com/blog/criteos-technology-helps-re-engage-lapsed-shoppers/
[155] https://support.sharethrough.com/hc/en-us/articles/211834783-Bidding-Targeting-and-Optimizations
[156] https://www.undertone.com/
[157] https://business.pinterest.com/advertise/
[158] https://www.outbrain.com/glossary/ad-targeting/
[159] https://www.paypal.com/us/brc/article/enhance-customer-experience-with-ai-personalization
[160] https://www.mastercardservices.com/en/capabilities/dynamic-yield
[161] *Id.*
[162] https://www.freshworks.com/live-chat-software/
[163] https://www.dynatrace.com/solutions/customer-experience/
[164] https://www.traversedata.com/author/craig.html
[165] https://risk.lexisnexis.com/corporations-and-non-profits/customer-acquisition

denied. To the extent the allegations in this paragraph are based on the websites located at the URLs in footnotes 141-165, the websites speak for themselves. Defendant specifically denies any implication that the statements on the websites are true, accurate, or admissible for the truth of the matter asserted.

190. Upon information and belief, Defendant assisted those third parties with intercepting communications from Plaintiffs and Class members that contained their personally identifiable information.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

**N. Defendant's Conduct Caused Plaintiffs and Class Members to Suffer Economic Injury**

191. Plaintiffs' and Class members' online activity—including the browsing history and purchase history generated by navigating Defendant's website—has financial value. As a leading expert in data privacy, Professor Paul Schwartz at UC Berkeley, explained in an article published by the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[166]

**Answer:** Admitted that the law review article cited in footnote 166 contains the quoted information. The law review article speaks for itself. Defendant specifically denies any implication that the statements in the article are true, accurate, or admissible for the truth of the matter asserted. The remaining allegations in this paragraph state conclusions to which no response is required. To the extent a response is required, denied.

192. Numerous studies support Professor Schwartz's conclusion. In one such study, for example, researchers studied the value that 180 consumers placed on keeping personal data secure. As relevant here, consumers valued contact information at approximately $4.20 per year; they valued their online purchase history at $5.70 per year; and they valued their browsing history at $52 per year.[167]

---

[166] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 HARV. L. REV. 2055, 2056 (2005)

[167] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), *available at* https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

193. Moreover, numerous companies offer products through which consumers can receive payment in exchange for a license to track their data. Meta itself, for example, ran a "Facebook Research" app in 2019 through which it paid $20 for a license to collect browsing history and other communications from consumers between the ages of 13 and 35.[168]

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. The website located at the URL in footnote 167 speaks for itself. Defendant specifically denies any implication that the statements on the website are true, accurate, or admissible for the truth of the matter asserted. To the extent a response is required, denied.

194. Defendant's conduct caused numerous third parties—including Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—to profit from Plaintiffs' and Class members' personal information and their activity on Defendant's website. Directly and indirectly, for example, Defendant paid these third parties to collect and analyze that information so Defendant could better target advertisements and marketing materials. [169] Moreover, through services like "Lookalike Audiences,"[170] those third parties also received payment from companies other

[168] Josh Constine, *Facebook pays teens to install VPN that spies on them*, TECHCRUNCH (Jan. 29. 2019), *available at* https://techcrunch.com/2019/01/29/facebook-project-atlas/

[169] *See, e.g.*, Derek Saul, *Meta Earnings: Record Profits, Sales As Ads Stay Robust During Zuckerberg's Year of Efficiency*, FORBES (Oct. 25, 2023) (noting that "Meta generates more than 95% of revenue from advertising"), *available at* https://www.forbes.com/sites/dereksaul/2023/10/25/meta- earnings-record-profits-sales-as-ads-stay-robust-during-zuckerbergs-year-of-efficiency/ Attentive, *Attentive's AI Marketing Innovations and Business Milestones Set New Standards Heading into 2025* (Jan. 15, 2025) (noting that Attentive made more than $500 million in "annual recurring revenue" by using customer data to "personalize consumer engagement"), *available at* https://www.attentive.com/press-releases/attentives-ai-marketing-innovations-and-business- milestones-set-new-standards-heading-into-2025; Zeta, News Details (Oct. 8, 2024) (announcing Zeta Marketing Company's acquisition of LiveIntent for $250 million and noting LiveIntent's "people-based marketing" relies on "proprietary technology … to identify, unlock, engage, and monetize audiences"), *available at* https://investors.zetaglobal.com/news/news-details/2024/Zeta- Global-to-Acquire-LiveIntent-in-a-Highly-Accretive-Transaction/default.aspx;

[170] *See, e.g.*, META, ABOUTLOOKALIKE AUDIENCES (describing a lookalike audience as a ways advertisers "can reach new people who are likely to be interested in [their] business" by leveraging information collected on other websites), available at https://www.facebook.com/business/help/164749007013531?id=401668390442328; *see also* LIVEINTENT, LIVEINTENT'S LOOKALIKE AUDIENCES: THE AUDIENCE SOLUTION DESIGNED FOR CUSTOMER ACQUISITION (describing a lookalike audience as one that "acquire[s] net new customers and drive[s] revenue" by taking customers' online activity on other website "to predict the likelihood that a group of prospective customers will convert"), *available at* https://www.liveintent.com/blog/liveintents-lookalike-audiences-the-audience-

than Defendant to leverage Plaintiffs' and Class members' personal information and online activity for that same purpose.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied. Defendant specifically denies that it "caused numerous third parties…to profit."

195. Put another way, Defendant and other companies paid the third parties here— Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—for services and products that relied on analyzing or otherwise exploiting Plaintiffs' and Class members' personal information and their activity on Defendant's website.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. Further, this paragraph states conclusions to which no response is required. To the extent a response is required, denied.

196. Because California law recognizes a legal interest in unjustly earned profits, Plaintiffs and Class members have an entitlement to profits earned from their personal data.

**Answer:** This paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

***

197. In sum, Defendant knowingly and repeatedly has made—and continues to make—false representations that give customers a misplaced sense of privacy. By making these representations, Defendant created an expectation of privacy on its website, promising users that it would refrain from using tracking technologies that link web activity to personally identifiable information. As a corollary, by making these representations, Plaintiffs and Class members possessed the reasonable expectation that their communications with Defendant would remain confidential. Rather than uphold that expectation, Defendant surreptitiously assisted third parties with intercepting their confidential communications.

---

solution-designed-for- customer-acquisition/#:~:text=Lookalike%20Audiences%20represent%20everything%20we%20love%20about%20advertising,of%20people%20who%20are%20similar%20to%20that%20seed.

**Answer:** This paragraph states legal conclusions to which no response is required. To the extent a response is required, denied.

## TOLLING, CONCEALMENT, AND ESTOPPEL

198. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

199. Defendant has repeatedly represented to its customers that its "usage of cookies is in no way linked to any Personal Information while on [its] site."[171]

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

200. Defendant has never disclosed that it would or could disregard those representations and instead helps third parties intercept communications containing customers' personally identifiable information. Defendant affirmatively hid its true actions and knowingly made statements that were misleading and concealed the true nature of their conduct and operation. The circumstances of third party trackers employed on and with respect to Defendant's website would lead reasonable users to believe third parties were not collecting their personally identifiable information or that Defendant was facilitating disclosure of the same.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

201. Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

202. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendant therefore is estopped from relying on any statute of limitations.

---

[171] Privacy Policy, Rack Room Shoes, rackroomshoes.com/privacy (last accessed Sept. 9, 2024).

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

203. All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

204. Accordingly, Plaintiffs and the Class could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

## CLASS ALLEGATIONS

205. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated and seek to certify the following class (the "Nationwide Class"): All persons in the United States who accessed and navigated www.rackroomshoes.com.

**Answer:** Admitted that Plaintiffs purport to represent a class.

206. Plaintiffs also seek to certify the following sub-class (the "California Class"): All persons in the state of California who accessed and navigated www.rackroomshoes.com.

**Answer:** Admitted that Plaintiffs purport to represent a subclass.

207. Plaintiffs reserve the right to modify the class definitions, including by using additional subclasses, as appropriate based on further investigation and discovery obtained in the case.

**Answer:** Admitted only that Plaintiffs purport to reserve the right to modify the class definitions.

208. Numerosity of the Class: The Nationwide Class and California Class are composed of thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both parties and the Court.

**Answer:** This paragraph states conclusions to which no response is required. To the extent

a response is required, denied.

209. Existence and Predominance of Common Questions of Fact and Law: There is a well-defined community of interest in the questions of law and fact affecting proposed Class members. The questions of law and fact common to the proposed class predominate over questions affecting only individual members. Such questions include, but are not limited to, the following:

a. whether Defendant facilitated or procured the unlawful actions of third parties, including Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo;
b. whether Defendant obtain express consent to their conduct;
c. whether Defendant's conduct violated the Wiretap Act or California Invasion of Privacy Act, Cal. Penal Code § 631;
d. whether Plaintiffs and the proposed Class members are entitled to damages,
e. reasonable attorneys' fees, pre-judgement interest and costs of this suit; and
f. whether Defendant should be enjoined from similar conduct in the future.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

210. Typicality: Plaintiffs are asserting claims that are typical of the proposed Class members' claims because they have accessed and browsed Defendant's website, www.rackroomshoes.com. Plaintiffs and the proposed Class members have similarly suffered harm arising from Defendant's violations of the law, as alleged herein.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

211. Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases. Plaintiffs do not have any interests antagonistic to those of the Classes.

**Answer:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

212. Superiority: A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' and the proposed Class members' claims. Plaintiffs and Class members have suffered irreparable harm as a result of Defendant's unfair, unlawful, and unconscionable conduct. Because of the size of the individual Class members' claims, few, if any, proposed Class members

could afford to seek legal redress for the wrongs complained of herein. Absent the class action, the proposed Class members will continue to suffer losses and the violations of law described herein will continue without remedy, and Defendant will be permitted to retain the proceeds of its misdeeds. Defendant continues to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

213. Injunctive Relief: Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

**<u>Answer</u>:** Admitted only that the class seeks injunctive relief. The remaining parts of this paragraph state conclusions to which no response is required. To the extent a response is required, denied that injunctive relief is available.

214. Particular Issues: Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

**<u>Answer</u>:** This paragraph states conclusions to which no response is required. To the extent a response is required, denied.

## <u>COUNT I</u>

## Violation of the Wiretap Act

## 18 U.S.C. § 2510, *et. seq.*

215. Plaintiffs repeat the allegations contained in paragraphs 1 through 214 as if fully set forth herein.

**<u>Answer</u>:** Defendant realleges and incorporates its responses to allegations in the preceding paragraphs as if fully set forth herein.

216. Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

**<u>Answer</u>:** Admitted only that Plaintiffs purport to bring this claim individually and on behalf of the Nationwide Class.

217. Defendant customized and deployed computer code from numerous third parties—including but not limited to Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—that intercepted electronic communications from Plaintiffs and Class members while they accessed and navigated Defendant's website. By doing so, Defendant played an active role in the use of the computer code to intercept Plaintiffs' and Class members' electronic communications. Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, associating the content of Plaintiffs' and Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiffs and Class members in its Privacy Policy.

**Answer:** Denied.

218. The interceptions were done contemporaneously with Plaintiffs' and Class members' sending and receiving communications. The intercepted communications included the "contents" of electronic communications, including detailed URL requests.

**Answer:** Denied.

219. The transmission of data between Plaintiffs and Defendant constitute "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

**Answer:** Denied.

220. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The computer codes and programs used by Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties to track Plaintiffs' and Class members' communications while they were navigating Defendant's website;

b. Plaintiffs' and Class members' browsers or mobile applications;

c. Plaintiffs' and Class members' computing and mobile devices;

d. Third parties' web and ad servers;

e. The web and ad-servers from which Meta, Attentive, and other third parties tracked and intercepted Plaintiffs' and Class members' communications while they were using a web browser or mobile application to navigate Defendant's website;

f. The computer codes and programs used by Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties to effectuate their tracking and intercepting of Plaintiffs' and Class members'

communications while they were navigating Defendant's website; and

g. The plan that Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties carried out to effectuate their tracking and intercepting of Plaintiffs' and Class members' electronic communications.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

221. Plaintiffs and Class members were unaware that Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties were redirecting the referrer URL, form field entries, or the text of buttons clicked.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

222. Plaintiffs and Class members never provided Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties with consent to intercept or collect their electronic communications.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

223. After third parties intercepted Plaintiffs' and Class members' electronic communications, Defendant knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts. When, for example, the third parties—including Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—received and processed Plaintiffs' and Class members' electronic communications, Defendant used those communications to run targeted advertisements and personalized marketing campaigns.

**Answer:** Denied.

224. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiffs and Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably incurred.

**Answer:** Denied.

**COUNT II**

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code § 631**

**(California Class)**

225. Plaintiffs repeat the allegations contained in paragraphs 1 through 214 as if fully set forth herein.

**Answer:** Defendant realleges and incorporates its responses to allegations in the preceding paragraphs as if fully set forth herein.

226. Plaintiffs bring this claim individually and on behalf of the California Class.

**Answer:** Admitted only that Plaintiffs purport to bring this claim individually and on behalf of the California Class.

227. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping on private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

228. California Penal Code § 631(a) provides in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

**Answer:** This paragraph states a conclusion to which no response is required. To the

extent the allegations are contrary to law, denied.

229. A defendant must show it had the consent of all parties to the communication.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

230. At all relevant times, Defendant aided, agreed with, and conspired with third parties to track and intercept Plaintiffs' and the California Class members' internet communications exchanged with Defendant while accessing Defendant's website. Defendant assisted these interceptions without first receiving authorization or consent from Plaintiffs and the California Class members.

**Answer:** Denied.

231. Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties intercepted these communications without consent from all parties to the communications.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

232. Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties intended to learn, and did learn, some meaning of the content in the communications including without limitation in the URLs, search queries, and other content described herein exchanged between the California Class members and Defendant on Defendant's website.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

233. Defendant, when aiding and assisting third parties' eavesdropping, intended those third parties to learn the content of the visitor's communications.

**Answer:** Denied.

234. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and, even if they do not, the tracking technology by Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties falls within the broad catch-all category of "any other manner":

a. The computer codes and programs that Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo, and other third parties used to track Plaintiffs' and the Class members' communications while they navigated Defendant's website;
b. Plaintiffs' and Class members' browsers;
c. Plaintiffs' and Class members' computing and mobile devices;
d. The web and ad servers of Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo;
e. The web and ad-servers from which Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties tracked and intercepted Plaintiffs' and Class members' communications while they were using their web browser to access or navigate Defendant's website;
f. The computer codes and programs that Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties used to track and intercept the Plaintiffs' and Class members' communications while they were using a browser to visit Defendant's website.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

235. The plan that Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, Criteo, and other third parties carried out to effectuate its tracking and interception of Plaintiffs' and Class members' communications while they were using a web browser or mobile application to visit Defendant's website originated in and was executed in California.

**Answer:** Defendant lacks knowledge regarding allegations in this paragraph and therefore is unable to admit or deny. To the extent a response is required, denied.

236. Defendant intentionally used these intercepted communications to run advertising and marketing campaigns through Salesforce, Cordial, and Zeta Global.

**Answer:** Denied.

237. Pursuant to California Penal Code § 637.2, Plaintiffs and the California Class members have been injured by the violation of California Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages, as well as injunctive relief.

**Answer:** Denied.

**COUNT III**

**Violation of California Invasion of Privacy Act**

**Cal. Penal Code § 632**

**(California Class)**

238. Plaintiffs repeat the allegations contained in paragraphs 1 through 214 above as if fully set forth herein.

**Answer:** Defendant realleges and incorporates its responses to allegations in the preceding paragraphs as if fully set forth herein.

239. Plaintiffs bring this claim individually and on behalf of the California Class.

**Answer:** Admitted only that Plaintiffs purport to bring this claim individually and on behalf of the California Class.

240. The data collected on Defendant's websites constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

**Answer:** Denied.

241. Defendant is liable for aiding and abetting violations of 632 by Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo.

**Answer:** Denied.

242. Defendant is also liable for recording and uploading confidential communications to Salesforce, Cordial, and Zeta for marketing and advertising campaigns.

**Answer:** Denied.

243. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the California Class members have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**Answer:** Denied.

**COUNT IV**

**Violation of the Comprehensive Computer Data and Access and Fraud Act ("CDAFA")**

**Cal. Penal Code § 502, *et. seq.***

**(California Class)**

244. Plaintiffs repeat the allegations contained in paragraphs 1 through 214 above as if fully set forth herein.

**Answer:** Defendant realleges and incorporates its responses to allegations in the preceding paragraphs as if fully set forth herein.

245. Plaintiffs bring this claim individually and on behalf of the California Class.

**Answer:** Admitted only that Plaintiffs purport to bring this claim individually and on behalf of the California Class.

246. Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

247. Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and the California Class members' data.

**Answer:** Denied.

248. Plaintiffs and Class members suffered economic injury because Defendant caused numerous third parties—including Meta, Attentive, Zeta, Svorn, LiveRamp, Neustar, AtData, Throtle, Google, Adobe, Taboola, and Criteo—to unjustly profit from Plaintiffs and Class members' personal information and online activity.

**Answer:** Denied.

249. It would not be equitable to allow those third parties to keep those profits, which were generated by violating Plaintiffs' privacy interests.

**Answer:** Denied.

250. As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused loss to Plaintiffs and the California Class members in an amount to be proven at trial.

**Answer:** Denied.

251. Plaintiffs, on behalf of themselves and the California Class members, seek compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

**Answer:** Admitted only that Plaintiffs seek the relief described herein. Denied that Plaintiffs are entitled any relief whatsoever.

252. Plaintiffs and the California Class members are entitled to punitive damages because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice.

**Answer:** Denied.

253. Plaintiffs and the California Class members are also entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

**Answer:** Denied.

**COUNT V**

**Invasion of Privacy**

**(California Class)**

254. Plaintiffs hereby incorporate paragraphs 1 through 214 as if fully stated herein.

**Answer:** Defendant realleges and incorporates its responses to allegations in the preceding paragraphs as if fully set forth herein.

255. Plaintiffs bring this claim individually and on behalf of the California Class.

**Answer:** Admitted only that Plaintiffs purport to bring this claim individually and on behalf of the California Class.

256. The right to privacy in California's constitution creates a right of action against private entities such as Defendant.

**Answer:** This paragraph states a conclusion to which no response is required. To the

extent the allegations are contrary to law, denied.

257. Plaintiffs' and Class members' expectation of privacy is deeply enshrined in California's Constitution. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property and obtaining safety, happiness, and private." The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Critically, the argument in favor of Proposition 11 reveals the legislative intent was to curb business' control over unauthorized collection and use of consumers' personal information:

> The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

258. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

259. To plead a California constitutional privacy claim, a plaintiff must show an invasion of (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied.

260. As described herein, Defendant has intruded upon the following legally protected privacy interests:

a. The Wiretap Act as alleged herein;

b. The California Invasion of Privacy Act as alleged herein;

c. Defendant's Privacy Policies and other public promises that it would not procure third parties to track or intercept the Plaintiffs' and Class members' communications or access their computing device and web-browsers while

browsing Defendant's website.

**Answer:** Denied.

261. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiffs and Class members could not reasonably expect Defendant would commit acts in violation of federal and state civil and criminal law.

**Answer:** Denied.

262. Plaintiffs and Class members also had a reasonable expectation of privacy under the circumstances in that Defendant affirmatively promised users (including Plaintiffs and Class members) that it would not procure third parties to track their online activity and personally identifiable information while they were using Defendant's website.

**Answer:** Denied.

263. Defendant's actions constitute a serious invasion of privacy in that it:

a. Violated several criminal laws, including the Wiretap Act;

b. Invaded the privacy rights of millions of Americans (including Plaintiffs and Class members) without their consent; and

c. Constituted the unauthorized taking of valuable information from millions of Americans through deceit.

**Answer:** Denied.

264. Committing criminal acts against millions of Americans constitutes an egregious breach of social norms that is highly offensive.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied. To the extent this generalized statement refers to Defendant's conduct, denied.

265. The surreptitious and unauthorized tracking of the internet communications of millions of Americans, particularly where, as here, Defendant promised to protect their privacy, constitutes an egregious breach of social norms that is highly offensive.

**Answer:** Denied.

266. The disclosure of personally identifiable information of millions of Americans through deceit is highly offensive behavior.

**Answer:** This paragraph states a conclusion to which no response is required. To the extent the allegations are contrary to law, denied. To the extent this generalized statement refers to

Defendant's conduct, denied.

267. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation and injunctive relief.

**Answer:** Denied.

**PRAYER FOR RELIEF**

268. WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. For an order certifying the putative Nationwide Class and California Class and naming Plaintiffs as the representatives of the putative Classes and Plaintiffs' attorneys as Class Counsel to represent the putative Class members;

b. For an order declaring that the Defendant's conduct violates the statutes referenced herein;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs and the putative Nationwide Class and California Class on all counts asserted herein;

e. For the statutory damages in amounts to be determined by the Court and/or jury;

f. For prejudgment interest on all amounts awarded;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiffs and the putative Nationwide Class and California Class their reasonable attorneys' fees and expenses and cost of suit.

**Answer:** Admitted only that Plaintiffs seek the relief described herein. Denied that Plaintiffs are entitled to any relief whatsoever.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

**Answer:** Admitted only that Plaintiffs demand a trial by jury.

[*Affirmative Defenses continued on next page*]

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative defenses without assuming any burden of pleading or proof that would otherwise rest on Plaintiffs. Defendant may assert additional affirmative defenses to which it may be entitled or which may be developed during discovery, including unique affirmative defenses applicable to different putative class members of Plaintiffs' proposed class and subclass. Defendant may assert such additional affirmative defenses as the need arises, insofar as class certification has not been granted and is not appropriate in this case.

### FIRST AFFIRMATIVE DEFENSE

**(First Amendment)**

The statutory causes of action asserted by Plaintiffs violate the First Amendment of the U.S. Constitution on its face and as applied.

### SECOND AFFIRMATIVE DEFENSE

**(Bad Faith/Unclean Hands)**

Plaintiffs and their agents, if any, acted in bad faith and with unclean hands based on all relevant facts, law, and circumstances known by them. Accordingly, Plaintiffs are barred, in whole or in part, from any recovery.

### THIRD AFFIRMATIVE DEFENSE

**(Statutory Standing)**

Plaintiffs are not within the "zone of interests" protected by the statutes at issue and thus lack statutory standing to assert such claims against Defendant.

### FOURTH AFFIRMATIVE DEFENSE

**(Waiver and Estoppel)**

Plaintiffs and members of any putative class have waived their right to recover herein, in whole or in part, and/or their claims are barred by estoppel.

### FIFTH AFFIRMATIVE DEFENSE

**(Comparative Fault)**

Any damages sustained by Plaintiffs or members of any putative class must be reduced in proportion to the wrongful or negligent conduct of persons or entities other than Defendant, including

third parties, under the principles of equitable allocation, recoupment, set-off, proportionate responsibility, and/or comparative fault.

**SIXTH AFFIRMATIVE DEFENSE**

**(Third-Party Acts)**

Any alleged injury or damage sustained by Plaintiffs or members of any putative class were caused, in whole or in part, by the conduct of third parties who were not acting as Defendant's agents, and/or was not ratified by Defendant. Moreover, there is no vicarious liability as to Defendant.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Unconstitutionality of Damages)**

The statutory penalties sought by Plaintiffs and members of any putative class are excessive and thus violate the Due Process Clause of the United States Constitution.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

Plaintiffs' claims are barred by the applicable statute of limitations, including those under 18 U.S.C. § 2520(e), Cal. Penal Code § 502(e)(5), and Cal. Code of Civil Procedure § 340.

**NINTH AFFIRMATIVE DEFENSE**

**(Consent)**

Without assuming the burden of proof, Plaintiffs' claims are barred because they provided the requisite consent.

**TENTH AFFIRMATIVE DEFENSE**

**(Indemnity and Contribution)**

Defendant cannot be held liable for any of Plaintiffs' damages pursuant to principles of contractual and equitable indemnity and/or contribution.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Lack of Intent)**

Defendant cannot be held liable for any of Plaintiffs' damages and claims by virtue of its lack of knowledge and/or intent.

**TWELFTH AFFIRMATIVE DEFENSE**

**(No Reasonable Expectation of Privacy)**

Defendant cannot be held liable for any of Plaintiffs' damages and claims because Plaintiffs did not maintain a reasonable expectation of privacy in the data or information alleged to have been collected and shared.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Party to Communications)**

Defendant cannot be held liable for any of Plaintiffs' damages and claims because Defendant was a party to the communications at issue.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Lack of Standing)**

Plaintiffs lack standing to bring this lawsuit because they did not take the actions on the website as alleged in the Complaint and did not suffer any cognizable harm under both constitutional and statutory standing principles.

* * *

**PRAYER FOR RELIEF**

WHEREFORE, Defendant denies that Plaintiffs are entitled to any of the relief sought, and denies that a class can be certified in this action. Defendant requests that the Court:

1. Dismiss the Complaint with prejudice;

2. Enter judgment for Defendant;

3. Dismiss the class claims;

4. Award to Defendant its costs, expenses, and attorney's fees incurred in defending this action; and

5. Grant such other and further relief as the Court deems just and proper.

DATED: February 20, 2026

BLANK ROME LLP

By: */s/ Ana Tagvoryan*
Ana Tagvoryan
Glen L. Abramson
Harrison Brown
D. Morgan Barry

Attorneys for Defendant
RACK ROOM SHOES, INC.