**MARCUS RASHBAUM PINEIRO & MEYERS LLP**
Michael A. Pineiro (*pro hac vice*)
Christopher R. Reilly (*pro hac vice*)
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4260
E-Mail: mpineiro@ mrpfirm.com
creilly@mrpfirm.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

DEMETRIUS SMITH and MAIA WILLIAMS
Plaintiffs,

v.

RACK ROOM SHOES, INC.
Defendant.

Case No. 3:24-cv-06709-RFL

[*Assigned to Judge Rita F. Lin*]

PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION

Date: September 8, 2026
Time: 10:00 a.m.
Courtroom: Courtroom 4, 17th Floor

Trial Date: N/A
Action Filed: September 24, 2024

## INTRODUCTION

Defendant promised consumers who accessed its website that it would protect their privacy and their personally identifiable information. While making those representations, Defendant utilized an arsenal of third-party tracking technologies that bundled and transmitted the content of communications and personally identifiable information. Defendant's opposition does little to confront this, choosing instead to append declarations with averments that insinuate what the record demonstrably proves wrong. Because Plaintiffs have submitted evidence showing a uniform scheme applied class-wide, they have satisfied the prerequisites for class certification. Plaintiffs thus respectfully request that the Court grant their motion for class certification in full.

## BACKGROUND

Defendant "owns and operates rackroomshoes.com, one of the largest online shoe retailers in the country." *See* Third Amended Complaint, ECF No. 128 ("TAC") at ¶ 2. "When customers first access rackroomshoes.com, Defendant presents them with a prominent banner that reads: 'By continuing to use our website, you consent to our use of cookies and agree with our Privacy Policy.'" *See* Answer to the Third Amended Complaint, ECF No. 175 ("Answer") at ¶ 47. For more than three years, Defendant informed consumers through its privacy policy that "Rack Room Shoes values the privacy of its customers and visitors to this website." *See* ECF No. 219-15 McNall Decl., Ex. A. To that end, Defendant promised that "Rack Room Shoes endeavors to comply with relevant ethical standards in gathering, using and safeguarding customer information that is entrusted to Rack Room Shoes." *Id.* Defendant also promised that "Rack Room Shoes collects information through cookies and beacons … but none of the information collected through cookies or beacons is personally identifiable." *See id.* On December 4, 2024, Defendant updated its privacy policy and excised these representations, including that the company "values the privacy of its customers and visitors to this website." *See* McNall Decl., Ex. B. But old habits die hard. To this day, Defendant claims that "beacons, cookies or tags" intended to measure performance—like, for example, Adobe Analytics and Google Analytics—refrain from collecting personally identifiable information because "[a]ll information that cookies collect is aggregated and therefore anonymous." *Id.* All four representations were and remain false.

## I. THE META PIXEL

During the class period, "[Defendant] utilized the Meta pixel on its website." *See* Answer at ¶ 66. [redacted] *See* Ex. F, LL. [redacted] *See* Ex. MM. Despite recognizing that Meta [redacted] Rack Room enabled [redacted] *See* Ex. B. [redacted] *See* Ex. HH at RRS_0004969.

On November 14, 2024, Plaintiffs sent Meta a preservation notice and a CCPA request, providing Meta provided with their name, address, e-mail addresses, phone numbers, and I.P. address to facilitate a search. Plaintiffs also instructed Meta to please keep that information confidential. On October 15, 2025, Plaintiffs served Meta with a subpoena requesting "the specific pieces of personal information about Plaintiffs that [it] received from the Rack Room Meta Pixel." *See* Ex. NN (capitalization adjusted). On May 15, 2026, Meta produced spreadsheets that Plaintiffs later attached as Exhibits C and D to their motion for class certification. Defendant has submitted a declaration from its counsel averring that she is "informed and believe[s] the 'Event Data' produced by Facebook was matched not by Plaintiffs' email addresses, but rather by phone numbers." *See* Tagvoryan Decl. ¶ 10.

## II. THE ATTENTIVE TAG

"Defendant integrated code from Attentive into its website." *See* Answer at ¶ 113. [redacted] *See* Ex. OO at 79:9–13. Defendant does

not—because it cannot—dispute as much, instead choosing to submit declarations laden with insinuations that are demonstrably false. As an example, Mr. Bogolin avers that "Rack Room contracted with Attentive during the period of February 2022 to June 2025," and that "Attentive was used for customer-engagement and marketing functions, particularly text message marketing." *See* Bogolin Decl. ¶ 3. Mr. McNall then avers that Defendant "utilized the Attentive tag for the purposes of the services mentioned in Jason Bogolin's declaration during the following period of about: October 10, 2023 through May 13, 2025." *See* McNall Decl. ¶ 13. Taken together, those averments intend to suggest that Defendant only utilized the Attentive Tag during that time period. Such a suggestion would be false; Plaintiffs have already submitted evidence establishing that the Attentive Tag began collecting event data long before October 1, 2023. Ex. L (containing entries associated with the Attentive Tag that date as far back as "8/2/2022").

Defendant's declarations also suggest that Attentive only provided services related to "text message marketing," and that the Attentive Tag never transmitted any information—much less personally identifiable information—unless "a visitor signed up to mobile marketing via an opt in form online." *See* Bogolin Decl. ¶ 3; McNall Decl. ¶ 15. Such a suggestion would be wrong on two levels. *First*, Defendant's declarations make representations that directly conflict with the testimony of an employee, Wayden Enciso, who stated that Attentive served as [redacted] *See* Ex. PP at 8:22–9:5; 19:25. Defendant also notably declined to list the employee "in charge of the email marketing," Britt Olsen, as either a relevant witness or a custodian. *See* Ex. QQ, RR. What is more, none of Defendant's declarations come from an employee "whose job responsibilities include(d) configuring, integrating, or troubleshooting the relevant tracking technologies." *See* Ex. RR.

*Second*, the record already establishes that the Attentive Tag collected email addresses and phone numbers regardless of whether a consumer chose to receive marketing texts. To start, Defendant admits that "[w]hen consumers purchase products on Defendant's website, they must input their phone number and email addresses." *See* ECF No. 175 at ¶ 115 ("Answer"). Defendant also introduces an expert report that cites a webpage authored by Attentive to support his conclusion that Attentive "uses first- and third-party cookies." *See* Ex. SS. That webpage confirms

that the Attentive Tag collected two first-party cookies—the "attntv_mstore_email," and the "attntv_mstore_phone"—that were "used at checkout for attribution," and that contained the "user email" and the "user phone." *See id.*; *see also* TAC ¶ 116, Figure 31.

## III. ADOBE ANALYTICS

"[redacted] An employee from the business intelligence team, David Pamperin, has also confirmed that this practice continues unabated, explaining that Rack Room [redacted]

Defendant predictably challenges whether the evidence shows "any information was actually obtained by Attentive, Zeta, Adobe, or Google during their visits." *See* MCC Opp. at 8:13. But rather than challenge the evidentiary record through advocacy, Defendant instead submits a self-serving declaration from its defense counsel where she interprets the evidence on the Court's behalf. *See* Tagvoryan Decl. ¶ 12. With respect to Adobe, defense counsel avers that the "partial deposition testimony from David Pamperin … does not support the notion that Defendant deployed Adobe code during the class period that attempted to intercept the contents of communications or personally identifiable information." *See id.* But that averment omits necessary context by declining to address the documents that Mr. Pamperin reviewed when [redacted] Ex. PP. at 43:1–46:24. Mr. Pamperin still refused to change that position after reviewing a presentation that elaborated on Rack Room's plans to [redacted]

[redacted]

## IV. GOOGLE ADS AND GOOGLE ANALYTICS

[redacted]

## V. ZETA TAGS

Defendant denies that, "[t]hrough client-side and server-side tracking tools, [Rack Room]

helps Zeta intercept the content of consumers' electronic communications—including full-string URLs, button clicks, and form-field entries—alongside personally identifiable information liked hashed email addresses and universal user IDs ('UUIDs') that link to consumer profiles." *See* Answer at ¶ 135. In its opposition to class certification, Defendant cites to a declaration from its Chief Digital Officer, Molly Hartney, for the proposition that "there is no evidence that Defendant used Zeta technology." *See* 12:16. In her declaration, Ms. Hartney states that "neither I nor anyone on my team can attest that Rack Room deployed LiveIntent technology on its website at any time or used any information from such technology." *See* Hartney Decl. ¶ 2. Ms. Hartney also avers that "Rack Room does not use and did not use any server-side code from Zeta." *See id.* ¶ 6. Conspicuously absent from Ms. Hartney's declaration is the same averment for browser-side code.

## VI. EXPERIENCES OF DEMETRIUS SMITH & MAIA WILLIAMS

### A. Demetrius Smith

Demetrius Smith is a long-time resident of California who works as a bus driver for the San Francisco Municipal Transportation Agency. *See* Ex. XX at 18:12–25 ("Smith Dep."). Born and raised in San Francisco, Mr. Smith lives with his wife, Kymorea Johnson, who has a side gig customizing Crocs and re-selling them "through word of mouth." *See id.* at 25:3–25. On July 14, 2024, Mr. Smith navigated to Rack Room's website and bought shoes "for [his] wife." *Id.*

Mr. Smith's views on privacy are nuanced and easy to take out of context. As he explained during his deposition, Mr. Smith believes that privacy is "important," and that "browsing for shoes is sensitive information." *See id.* at 67:15, 101:23. When asked incredulously, "how is browsing for shoes sensitive," Mr. Smith replied: "So having a phone or a device can be sensitive, right? … I put privacy blocks and set up all these privacies on all my devices, but my information still gets put out there." *See id.* at 68:17–69:5. When questioned whether he "reject[s] cookies," Mr. Smith said, "if I go on a website, and the cookies keep popping up, then I won't put my information on that website, so I avoid that." *Id.* at 57:15–18. Those concerns about privacy are more than talk; when questioned why his Facebook says he lives in Charleston, South Carolina, Mr. Smith responded, "[b]ecause I don't want nobody to know where I'm really at." *Id.* at 81:4–25.

At the same time, Mr. Smith has little trust that institutions and corporations will protect his personal information. Mr. Smith testified, for example, that he believes "[w]e're in a

surveillance state right now," and that "[e]verything is under surveillance." *See id.* 69:11–14. Mr. Smith also believes such surveillance is deeply entrenched, warning that "[i]t's over with for privacy," and that "[w]e all being watched." *See id.* 56:1. Given his deep pessimism, Mr. Smith views cookie banners as ineffectual and privacy policies as "a disclaimer." *See id.* at 57:1–25. Indeed, even when companies "promise privacy," he testified that he is "going to keep alert," noting "that's how companies make [their] money: Sharing data, third -- third-party information." *Id.* at 62:1–25; 120:24 – 121:1. When twice asked whether he "expected [his] information to be shared when [he] went to the Rack Room Shoes website," Mr. Smith's answer was the same: "No." *See id.* at 56:16–19, 67:4–25. And when asked whether "the sharing of [his] information" caused him harm, Mr. Smith replied, "I don't trust -- trust websites with my information when I do make a purchase, so it's harming me for even being productive on there or trying to do online shopping." *See id.* 98:22–99:3. In other words, "it scare[s] me away from that." *See id.* 98:22–99:3.

B. Maia Williams

Maia Williams is a resident of Victorville, California who recently retired. *See* Ex. YY at 29:8–11 ("Williams Dep."). Prior to her retirement, Ms. Williams worked for almost two decades as a Psychiatric Technician for the California Department of Corrections. *See id.* at 15:1–15. Ms. Williams has an adult son with disabilities, and she now spends her days as his caregiver. *Id.* at 14:21–25. On March 10, 2024, Ms. Williams navigated to Rack Room's website, where she "clicked on shoes for sale and ultimately purchased two pairs of sneakers." *See* TAC ¶ 9.

As she explained during her deposition, Ms. Williams expected Rack Room to keep her information private. When asked whether she "ha[d] any expectation of privacy when [she] visited the rackroomshoes.com website," Ms. Williams answered, "I would expect a site that I was purchasing from to hopefully protect me some type of way, yes." *See* Williams Dep. at 40:19–22. When questioned whether she thought "information shared with Rack Room Shoes is sensitive," Ms. Williams similarly replied, "I would think it would be, yes." *Id.* at 50:19–21. Asked more generally whether she "[h]as a right to privacy in what shoes you buy," Ms. Williams likewise responded, "Yes, I do." *See id.* 51:17–19. And when questioned whether she thought "the shoes you buy is sensitive information," Ms. Williams answered, "[i]t could be, yes." *Id.* at 64:10–14. Ms. Williams explained the basis for her views during a colloquy about having shared her e-mail

address with "possibly more than 25 people." *See id.* at 19:19–21. Pressed whether she "ask[ed] them not to share it with anyone else," Ms. Williams testified, "I may not have asked them, but I think it would be reasonable for me to expect that." *See id.* at 65:25–66:1. And when asked to explain why she possessed such an expectation, Ms. Williams provided an answer that articulates the principle animating this action: "Because they didn't have my permission." *See id.* 66:8.

## ARGUMENT

### I. PLAINTIFFS ESTABLISH ARTICLE III STANDING

Defendant advance two arguments to support its assertion that "Plaintiffs fail to establish a concrete injury as to any of the challenged third-party technologies." *See* MCC Opp. at 12:17–18. "First, neither Plaintiff has evidence of actual interception of their browsing activities." *See id.* at 10:12–14. "Second, Article III standing does not arise merely because of a violation of a privacy statute." *See id.* at 10:14. Both arguments misapprehend the injury-in-fact inquiry.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *See Lance v. Coffman*, 549 U.S. 437, 440 (2007). "At the core of the Article III case-or-controversy requirement is the doctrine of standing." *Habeas Corpus Resource Center v. U.S. Dep't of Justice*, 816 F. 3d 1241, 1248 (9th Cir. 2016). "Standing is built on a single basic idea—the idea of separation of powers." *Food and Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 378 (2024). As a corollary, "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotation omitted). Put differently, "Article III standing requires a concrete injury even in the context of a statutory violation." *Popa v. Microsoft Corp.*, 153 F. 4th 784, 789 (9th Cir. 2025) (quotations omitted). "[A]n intangible injury may be concrete if it presents a material risk of tangible harm or has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts, like common law torts or certain constitutional violations." *Phillips v. U.S. Customs and Border Protection*, 74 F. 4th 986, 992 (9th Cir. 2023) (cleaned up). "Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

Despite recognizing that "[s]tanding is a threshold jurisdictional inquiry," Defendant fails to apply that principle here. *See* MCC Opp. at 9:12. More specifically, as a jurisdictional question, "the court must leave the resolution of material factual disputes to the trier of fact when the issue of standing is intertwined with an element of the merits of the plaintiff's claim." *See Brown v. Energizer Holdings, Inc.*, 118 F. 4th 1134, 1144 (9th Cir. 2024). Indeed, "[f]or standing purposes," the Supreme Court has instructed courts to "accept as valid the merits of [the] legal claim." *See FEC v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022) (cleaned up). At a minimum, "a jurisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *See Safe Air for Everyone v. Meyer*, 373 F. 3d 1035, 1039 (9th Cir. 2004) (cleaned up). And as the Ninth Circuit has observed, "jurisdictional issues and substantive issues are deemed intertwined when the question of jurisdiction is dependent on the resolution of factual issues going to the merits." *See Bown*, 118 F. 4th at 1143 (cleaned up).

In general, "[a]n action for invasion of privacy by intrusion upon seclusion has two elements: (1) an intrusion into a private place, conversation, or matter (2) in a manner highly offensive to a reasonable person." *See Varnado v. Midland Funding LLC*, 43 F. Supp. 3d 985, 992 (N.D. Cal. 2014). Plaintiffs satisfy the first element because "Rack Room's privacy policy … creates a reasonable expectation of privacy in the bundled information that Rack Room permitted third parties to collect." *See Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169, at *3 (N.D. Cal. Apr. 4, 2025) (quotations omitted). That same result holds true for the Purchaser Class because "the acquisition of information is not a requirement" and "the act of intrusion is complete once it is discovered." *See Koeppel v. Speirs*, 808 N.W. 2d 177, 181 (Iowa 2011). The California Supreme Court has likewise found "the requisite intrusion in the first place" under similar circumstances. *See Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 292 (2009); *see also Harkey v. Abate*, 131 Mich. App. 177 (1983) ("[T]he installation of the hidden viewing devices alone constitutes an interference with privacy which a reasonable person would find highly offensive.").

The second element "focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d 589, 606

(9th Cir. 2020). As California courts have recognized, "the existence of a statute on a particular topic is one excellent method of establishing public policy as to that subject." *Jie v. Liang Tai Knitwear Co.*, 89 Cal. App. 654, 689 (2001). And here, California law prohibits website operators who "collect[] personally identifiable information" from "fail[ing] to comply with the provisions of its posted privacy policy." *See* Cal. Bus. & Prof. § 22576. What is more, the evidence also demonstrates that "the company's own officials recognized these practices as a problematic privacy issue." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d at 606. Against that backdrop, both the Purchaser Classes and the Meta Subclasses establish an intrusion that "is highly offensive." *See Shah v. MyFitnessPal, Inc.*¸824 F. Supp. 3d 906, 917 (N.D. Cal. 2026) ("Deceit can be a kind of 'plus' factor in determining whether an action is highly offensive.") (cleaned up).

Defendant's caselaw says no differently. Defendant cites to the Ninth Circuit's decision in *Popa v. Microsoft*, but there, the Ninth Circuit simply confirmed that courts "look to the specific underlying harm experienced by the plaintiff and compare it, in detail, to a *specific* common-law tort." *See id.* at 791 (emphasis in the original). And here, Plaintiffs demonstrate that Defendant "represented to the [class members] that their information would not be collected, but then proceeded to collect it anyway." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d at 606.

Through a notice of supplemental authority, Defendant also cites to a decision from the Southern District of Florida, *Cobbs v. PetMed Express, Inc.*, in which the court held that the plaintiffs lacked Article III standing because "one 'essential element' of the tort of intrusion upon seclusion is, unsurprisingly, 'seclusion'—i.e., the plaintiff 'must have a subjective expectation that the [conveyed information] will remain private and the expectation must also be one which society is willing to accept as reasonable.'" *See Cobbs v. PetMed Express, Inc.*, 2026 WL 2234135, at *4 (S.D. Fla. July 31, 2026). But that case is distinguishable for at least two reasons. *First*¸ the court focused on the "conveyed information" and imported an element for subjective expectation of privacy, thereby ignoring that—even under a subjective standard—"[a] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 734–44 (1979). Indeed, that is precisely why "[t]he expectation of privacy is not measured by what takes place during or after the conversations, but it is measured

by what is expected before the conversations begin." *See United States v. Felton*, 753 F. 2d 256, 260 (3d Cir. 1985). *Second*, the plaintiffs failed to "supplement or dispute the portions of their depositions as filed by Defendant in Opposition to the Motion." *See Cobbs*, 2026 WL 2234135, at *3. Here, however, Plaintiffs have done precisely as much. *See* Ex. XX, YY.

## I. PLAINTIFFS ESTABLISH ASCERTAINABILITY

Defendant asserts that "Plaintiffs' Meta classes are not ascertainable" because "Meta Event Data cannot reliably identify the actual Rack Room purchaser or website user, which is necessary because the class definitions require the purchase and the Meta identifier to be the same person." *See* MCC Opp. at 14:2–4. That is false. The process that Plaintiffs advance is straightforward: Plaintiffs "propose[] to (1) obtain records from both [Rack Room] and Facebook and then (2) analyze these records to ultimately identify the proposed Class[es]." *See Jancik v. WebMD LLC*, 2025 WL 560705, at *3 (N.D. Ga. Feb. 20, 2025). Rather than address that methodology directly, Defendant claims that "Plaintiffs' expert conceded that purchase dates must match Meta Event Data dates to confirm that the purchaser and website user are the same person." *See* MCC Opp. at 14:11–14. That assertion is likewise false. Ms. Verkhovskaya's expertise is in "data analysis," and she opines that "there is a method by which Purchase Data can be connected to Event Data, using Profile Data and/or data unhashed from the Event Data, in order to identify potential class members." *See* Verkhovskaya Decl. ¶ 37. During her deposition, Ms. Verkhovskaya considered two hypotheticals: "One involves an instance where someone adds an item to their cart and then purchases that product, and the second one is where someone adds an item the cart and doesn't make a purchase." *See* Verkhovskaya at 105:8–19. When asked if it would matter for the second hypothetical "whether purchase events were temporally related" for the second hypothetical, Ms. Verkhovskaya testified, "It would not." *See id.* ¶105:14–18. Because Ms. Verkhovskayah articulates a methodology that ensures Meta Subclass members "can be ascertained by reference to objective criteria," nothing more is needed. *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 237 (N.D. Cal. 2014) (quoting Manual for Complex Litigation (4th) § 21.22).

## II. PLAINTIFFS ESTABLISH PREDOMINANCE

### *A. Consent Raises Common Issues of Law and Fact*

Defendant contends that consent "is an individualized issue" because "varying disclosures" could have created "different subjective understanding of data collection practices." *See* MCC Opp. at 15:26–18:2. Defendant's argument runs headlong into authority from the Ninth Circuit.

"Consent can be explicit or implied, but any consent must be actual." *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793 (quotations omitted). "In order for consent to be actual, the disclosures must explicitly notify he users of the practice at issue." *See Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1055 (N.D. Cal. 2025) (quotations omitted). "In other words, consent is only effective if the person alleging harm consented to the particular conduct, or to substantially the same conduct and if the alleged tortfeasor did not exceed the scope of that consent." *Brown v. Google LLC*, 685 F. Supp. 3d 909, 926 (N.D. Cal. 2023) (quotations omitted).

Defendant asserts that Mr. Smith "was fully aware that websites track and share data, expressly admitted he generally expects his data to be shared, and proceeded to use the website and make purchases anyway, all while taking no steps to reject." *See* MCC Opp. at 16:27–17:2. Contrary to that assertion, Mr. Smith twice denied that he "expected [his] information to be shared when [he] went to the Rack Room Shoes website." *See id.* at 56:16–19, 67:4–25. In any event, even assuming "knowledge of the alleged privacy violations," such knowledge still "does not equal consent." *See Rodriguez v. Google LLC*, 2024 WL 37302, at *7 (N.D. Cal. Jan. 3, 2024).

Noting that "neither Smith nor Williams read the privacy policy," Defendant next contends that this issue "creates an issue of individualized implied consent." *See* MCC Opp. at 17:3. To arrive that conclusion, Defendant claims that Plaintiffs incorrectly allege "that visitors to Defendant's website would have encountered a notification at the bottom of their screen containing a link to its Privacy Policy, that Plaintiffs did so, and that Plaintiffs understood that policy to mean that they were not consent to data collection." *See id.* at 17:3–8. But in fact, Plaintiffs allege that they "possessed an expectation of privacy" because they received "a notice … that [their] continued use of the website would constitute assent to Defendant's Privacy Policy." *See* TAC ¶¶ 7, 9. Defendant also "[a]dmitted" that "[w]hen customers first access rackroomshoes.com, Defendant presents them with a prominent banner that reads: 'By continuing to use our website, you consent to our use of cookies and agree with our Privacy Policy.'" *See* Answer at ¶ 47. Snf

by conceding "the visual prominence of [the] advisal," Defendant likewise concedes that "the website provide[d] reasonably conspicuous notice of the terms to which the consumer [would] be bound." *Godun v. JustAnswer LLC*, 135 F. 3d 699, 709 (9th Cir. 2025).

Defendant next contends that "whether each putative class member impliedly consented … would require precisely the type of individualized inquiry that defeats predominance under Rule 23(b)(3)." *See* MCC Opp. at 17:21–18:1. Defendant supports that argument with a declaration appending three versions of the cookie banner and two versions of the privacy policy. *See* McNall at ¶¶ 4–5, 9–10. Defendant's employee, Kevin McNall, also avers that "Rack Room utilized multiple versions of the cookie banner notification," and that "aggregated analytics record" demonstrate that "some visitors clicked on hyperlinks to the Company's privacy policy from various locations on the website, including from privacy disclosures and/or cookie-banner interfaces, while others never did so." *See id.* ¶¶ at 9, 12. The first version of the banner shows it appeared on "Oct. 15, 2020," and the third version of the banner shows how it looks today. *See* McNall Decl., Ex. C–E. In other words, two of the three banners address times outside the class period. The two privacy policies also fail to raise individualized issues because the "misrepresentations are substantially similar." *See Roffman v. Rebbl, Inc.*, 653 F. Supp. 3d 723, 739 (N.D. Cal. 2023). And with respect to the "aggregated analytics records," Mr. McNall's averment does nothing but confirm that Plaintiffs and class members "entered an implied contract by their actions." *See Doe v. Regent of Univ. of Cal.*, 672 F. Supp. 3d 813, 821 (N.D. Cal. 2023).

Defendant later contends that "[c]ourts have denied certification classes where defendants produced concrete evidence that different class members may have had varying *subjective* understandings of data collection practices arising from a broad set of materials." *See* MCC Opp. at 18:12–14. Defendant misreads the caselaw. As the Ninth Circuit explains in *Calhoun*, the analysis hinges on whether the evidence "demonstrate[s] that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Calhoun*, 113 F. 4th 1141, 1147 (9th Cir. 2024); *see also In re Meta Android Priv. Litig.*, --- F. Supp. 3d ----, 2026 WL 1279416, at *5 (N.D. Cal. May 11, 2026) (same).

Seeking to prove otherwise, Defendant asserts that "customers who signed up for text

messaging through Attentive were separately on notice of both Rack Room's and Attentive's data collection practices." *See* 18:2–3. *First*, Defendant declines to indicate what language would form a basis for finding consent. *Second*, Defendant fails to introduce evidence showing how many class members were "exposed to, and may have explicitly or impliedly consented to," those purported disclosures. *See Calhoun*, 349 F.R.D. at 597. *Third*, even assuming the disclosures contained relevant language, Defendant asserts that they put customers "on notice," meaning that—at the very worst—these disclosures may later necessitate a subclass. *See* MCC Opp. at 18:2. Put differently, "[i]t is not obvious that extrinsic evidence will be introduced at all, and at best (and on this record, entirely hypothetically) it would be non-individualized extrinsic evidence." *See Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *23 (N.D. Cal. June 13, 2024). The same holds true for the "notice of data collection practices on other websites." MCC Opp at 18:4–5.

*B. A Confidential Communication Raises Common Questions of Law and Fact*

Citing to *Katz v. United States*, Defendant contends that "Section 632 adds another inherently individual issue into the mix" because "[w]hether a communication is confidential … turns on a reasonable expectation of privacy," and "a reasonable expectation of privacy" turns on "two prongs: (1) whether a subjective expectation of privacy existed; and (2) whether that expectation is objectively reasonable." *See* MCC Opp. at 19:6–8. Although a seminal decision, the two-prong standard from *Katz* has no relevance here. As the Ninth Circuit has noted, "[w]hen interpreting state law, [courts] are bound to follow the decisions of the state's highest court." *See Tabares v. City of Huntington Beach*, 988 F. 3d 1119, 1125 (9th Cir. 2025). And here, the California Supreme Court has already held that "a conversation is confidential if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *See Flanagan v. Flanagan*, 27 Cal. 575, 577 (2002). On its face, then, "[t]he standard of confidentiality is an objective one defined in terms of reasonableness." *See Faulkner v. ADT Sec. Services, Inc.*, 706 F. 3d 1017, 1019 (9th Cir. 2013) (quotations omitted).

*C. Common Evidence Exists Based on the Circumstantial Evidence*

Defendant contends that its "hard to imagine how someone can attempt to learn a message while in transit if they have not already intercepted it." *See* MCC Opp. at 20:6–7. To start,

"[b]ecause the term 'attempt' has acquired a peculiar and appropriate meaning in law, it must be construed according to that meaning." *See People v. Moses*, 10 Cal. 5th 893, 903 (2020) (quotations omitted). And as particularly relevant here, "where the criminal result of an attempt is not accomplished simply because of an obstruction in the way of the thing to be operated upon, and these facts are unknown to the aggressor at the time, the criminal attempt is committed." *See People v. Lee Kong*, 95 Cal. 666, 668 (1892). As a corollary, Plaintiffs can establish an "attempt" on a class-wide basis because "all users when first opening a website are given the same potential capabilities from the onset, as well as all of the third-party code necessary to provide those functions, including the capturing and transferring of data to third parties." *See* Good Report ¶ 59.

Defendant similarly contends that the Court should reject Plaintiffs' construction for CIPA § 632 because "Section 632(a) would be satisfied whenever tracking technology was allegedly designed or configured." *See* MCC Opp. at 21:19–20. That is wrong; Plaintiffs would need to establish that Defendant helped to put the tracking technologies "into action or service" for the purpose of eavesdropping upon a confidential communication. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 838, 880 (9th Cir. 2002). Such a construction is also "consistent with the legislative purpose behind the statute: to prevent intrusion on one's thoughts, ideas, or knowledge." *See In re Apple Data Litig.*, 824 F. Supp. 3d 888, 900 (N.D. Cal. 2026) (quotations omitted); *see also Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) ("[W]hen faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection.").

Defendant ends by quoting *Ingraham* for the proposition that "individualized inquiries would be needed to determine whether and, if so, what information was sent for any particular individual through a particular technology." *See* MCC Opp. at 22:21–23:5. But here, because the proper constructions resolve the individualized issues in *Ingraham*, "[n]early all of the evidence in the record … support[s] a finding that common issues of law and fact would predominate over any individual issues." *See Meek v. SkyWest, Inc.*, 562 F. Supp. 3d 488, 499 (N.D. Cal. 2021) (quotations omitted). Indeed, with respect to the Meta Subclasses, "[i]t does not matter whether an individual had a specific privacy setting that blocked the [Meta] Pixel from automatically

transmitting Event Data to Facebook because the Class[es] [are] limited in scope to only those individuals for which Facebook has available Event Data." *See Jancik*, 2025 WL 560705, at *7. And with respect to the Purchaser Classes, Defendants concedes that consumers "must input their phone numbers and email addresses" when "purchas[ing] products on Defendant's website." *See* Answer ¶ 115. What is more, Defendant necessarily communicated "the material terms of [the] contract," otherwise "basic contract law provides that no contract formation has occurred." *See Wedington Productions, Inc. v. Flick*, 60 Cal. App. 4th 793, 797 (1998). Accordingly, having demonstrated that Defendant configured the tracking technologies to send information revealing the necessary ingredients for the transaction, Plaintiffs adequately supply class-wide proof that Defendant used these tracking tools to transmit communications paired with personally identifiable information. *See Flanagan v. Flanagan*, 27 Cal. App. 4th 766, 775 (2002) (rejecting the argument that CIPA § 632 requires California residents to "prove the content of each conversation" and to "show that [they] had an objectively reasonable expectation that no one would divulge that content to a third party"); *Sanders v. Am. Broadcasting Co.*, 20 Cal. 4th 907, 914 (1999) ("[A] person may reasonably expect privacy against the electronic recording of a communication, even though he or she had no reasonable expectation as to the confidentiality of the communication's content."); *see also McCann v. Iroquois Memorial Hosp.*, 622 F. 3d 745, (7th Cir. 2010) ("[T]he plaintiffs need not produce direct evidence of the intentional interception; for often the only way to prove that a stealthy interception occurred is through circumstantial evidence.").

Nothing within the report from Defendant's expert, James Vint, says any differently. At bottom, Mr. Vint opines that certain "variables" will necessitate "a device-by-device and user-by-user investigation" to determine "what, if anything, may have been transmitted to any third-party as users navigated the Website and whether any such information is individually identifiable and/or sensitive." *See* Vint Report ¶¶ 102; 182. To arrive at that conclusion, Mr. Vint litters his report with misstatements both large and small. [redacted] *See*

Ex. ZZ, Vint Dep., at 47:1–8. [redacted]*e* Vint Dep. at 30:17–33:4. The record demonstrably proves otherwise. *See* Ex. F; Ex. NN [redacted]

Mr. Vint also confirms why class treatment is appropriate. [redacted] Because it is safe to conclude that there are no class members who thought to record their purchase using developer tools, Mr. Vint's testimony brings Plaintiffs and Defendant to the same place: The evidence that would necessitate a "user-by-user" and "device-by-device" approach—*i.e.*, a customer's imperfect recollection and information from a device—lacks probative value.

*D. The Statute of Limitations Raises Common Questions of Law and Fact*

Defendant asserts that "Plaintiffs fail to explain why [the statute of limitations] would not create individualized issues with respect to how and when any particular customer learned of purported tracking technologies on the website." *See* MCC Opp. at 23:7–24:7. It is axiomatic, however, that "[t]he existence of a statute of limitations issue does not compel a finding that

individual issues predominate over common ones." *See Willaims v. Sinclair*, 52 9 F. 2d 1383, 1388 (9th Cir. 1975). "That is particularly so when the issues surrounding the statute of limitations are susceptible to common proof." *Pace v. Quintanilla*, 308 F.R.D. 644, 648 (C.D. Cal. 2015). And here, "[Defendant's] representations to each class member were the same, which permits the question of fraudulent concealment to be answered on a classwide basis." *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 577 (N.D. Cal. 2025); *In re Tesla Advanced Driver Assistance Systems Litig.*, 350 F.R.D. 119, 135 (N.D. Cal. 2025) (noting that "[b]oth theories of tolling that remain in the case—the delayed discovery rule and equitable estoppel—turn primarily on [an] objective inquiry," and that "[t]hese questions … are well-suited for resolution on a class-wide basis").

### *E. Location for CIPA § 631 Raises Common Questions of Law and Fact*

Defendant contends that "there cannot be a predominant issue" because "there are individual issues per plaintiff regarding where the violation occurred." *See* MCC Opp. at 24:15–25:7. But here, Plaintiffs propose limiting the classes for CIPA § 631 claims to California residents who completed their purchases "using shipping addresses exclusively within California." *See* MCC at 10:20–28. As courts have held in analogous circumstances, a shipping address will render it "more likely than not" that a person accessed Rack Room's website while "hav[ing] been located in California." *See Raffin v. Medicredit, Inc.*, 2017 WL 131745, at *3 (C.D. cal. Jan. 3, 2017). In any event, they constitute common evidence given the classes both require a purchase. *Steven Ades & Hart Woolery v. Omni Hotels Management Corp.*, 2014 WL 4627271, at *7 (C.D. Cal. Sept. 8, 2014) ("To the extent that Omni has evidence that some of these calls were not recorded or were not placed from California or by the putative plaintiff, Omni can offer that evidence.").

### *F. Damages Raise Common Questions of Law and Fact*

Defendant contends that "Plaintiffs fail to show damages are capable of measurement on a classwide basis," and that "both Wiretap Act (damages 'per each day of violation') and CIPA (damages 'for each violation') require individualized proof." *See* MCC Opp. at 25:8–10. As an initial matter, Plaintiffs need only show "that damages are capable of measurement on a classwide basis, in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying [their] legal theory." *See Just Film, Inc. v. Buono*, 847 F. 3d 1108, 1120 (9th

Cir. 2017) (quotations omitted). Applying that principle here, the Purchaser Classes will calculate their damages under the Wiretap Act by referencing each day with a purchase, and they will calculate their damages under CIPA § 631 and CIPA § 632 based on a per-purchase basis. With respect to the Meta Subclasses, they can likewise calculate their damages under the Wiretap by referencing each day with event data, and they can calculate their damages under CIPA § 631 and CIPA § 632 based on each time Meta logged it. To be sure, "the [Wiretap Act] makes the decision of whether or not to award damages subject to the court's discretion." *See Campbell v. Facebook Inc.*, 315 F.R.D. 250, 268 (N.D. Cal. 2016). But given this analysis necessarily entails evaluating "several factors," the better time to make such an assessment is at summary judgment or trial. *See DirecTV, Inc. v. Huynh*, 2005 WL 2864467, at *10 (N.D. Cal. May 31, 2025).

**III. PLAINTIFFS ESTABLISH ADEQUACY OF REPRESENATION**

Defendant claims that "Plaintiffs are inadequate because neither has meaningfully monitored or directed the case." *See* MCC Opp. at 26: 13. That is incorrect. From the outset, Mr. Smith and Ms. Williams have taken their responsibilities as class representatives seriously. *See* Ex. BBB, CCC. As an example, when asked to identify his "duties as a class representative," Mr. Smith testified it was "[t]o represent the class to the best [of] my capabilities." *See* Ex. XX at 115:25–116:3. And when Ms. Williams was asked "do you understand that you are seeking to be a class representative in this case," she answered, "If I was affected by having my privacy unprotected, then yes." *See* Ex. YY at 79:1–25. Plaintiffs imaged their devices; they helped download social media reports; they produced 9,000 pages of documents; they answered interrogatories; they responded to requests for admission; they participated in mediation; and they sat for depositions. Because the adequacy-of-representation prong serves only "to uncover conflicts of interest between named parties and the class[es] they seek to represent," Plaintiffs satisfy this standard. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (2023).

Defendant also claims that Mr. Smith "verified a false response to a request for admission asking him to admit that he did not preserve his device data at the outset of the litigation." *See* MCC Opp. at 28:5–7. That is incorrect; the request for admission defined "Device Data" as "including Facebook activity logs and reports," both of which he downloaded and produced.

Defendant then claims that Mr. Smith failed to preserve “his MacBook laptop,” and Ms. Williams failed to preserve “the old HP laptop and iPhone 13.” *See id.* at 29:8–27. Defendant supports that claim with a declaration from counsel with the following averment: “Based on my review of the device data productions in this litigation, the only relevant device data counsel received in this action appears to be from Plaintiff Smith’s iPhone.” *See* Tagvoryan Decl. ¶ 15. That averment is factually incorrect; Mr. Smith produced documents from his imaged MacBook Pro, and Ms. Williams produced documents from her HP Laptop. *See* Gillespie Decl. at ¶¶ 1-7. Ms. Williams’ laptop also contained web history dating back to November 26, 2023.

**IV. PLAINTIFFS ESTABLISH SUPERIORITY**

Defendant cursorily asserts that “this case [is] inappropriate for class treatment.” *See* MCC Opp. at 30:10–11. As courts reviewing analogous claims have held, common questions pervade this action, and “[s]uperiority is satisfied.” *See Frasco*, 349 F.R.D. at 557 (“Resolution of the common questions discussed in this order on a classwide basis will promote efficiency by (1) bypassing the need to relitigate identical questions and conduct nearly identical discovery in parallel litigations and (2) avoiding the strain on scarce judicial resources that suits by individual Flo App users would impose.”); *see also Rodriguez*, 2024 WL 38302, at *9–10 (finding that “class treatment of this case is the superior method of adjudication because each claim member would not have to litigate numerous and substantial issues to establish his or her right to recover”).

**CONCLUSION**

At bottom, “[a] court assesses predominance on the basis of evidence currently in the record, rather than evidence that a defendant might later advance.” *Jeffrey Katz Chiropractic, Inc. Diamond Respiratory Care, Inc.*, 340 F.R.D. 383, 387 (N.D. Cal. 2021). Because the issues in this action raise a common questions of law and fact, Plaintiffs respectfully request class certification.

DATED: August 10, 2026

**MARCUS RASHBAUM PINEIRO & MEYERS LLP**

By: */s/ Christopher R. Reilly*
Christopher R. Reilly

Michael A. Pineiro (*pro hac vice*)
Jeffrey A. Marcus (*pro hac vice forthcoming*)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 10, 2026, a true and correct copy of the foregoing response was served on counsel for the Defendant through ECF Notification.

/s/ *Christopher R. Reilly*
Christopher R. Reilly